Douglas G. Muehlhauser (SBN 179495)
doug.muehlhauser@knobbe.com
Mark Lezama (SBN 253479)
mark.lezama@knobbe.com
Alan G. Laquer (SBN 259257)
alan.laquer@knobbe.com
Alexander J. Martinez (SBN 293925)
alex.martinez@knobbe.com
Justin J. Gillett (SBN 298150)
justin.gillett@knobbe.com
James F. Smith (SBN 313015)
james.smith@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: 949-760-0404
Facsimile: 949-760-9502

Attorneys for Plaintiff
NOMADIX, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC., <br><br> Plaintiff, <br><br> v. <br><br> GUEST-TEK INTERACTIVE ENTERTAINMENT LTD., <br><br> Defendant. | Case No. <br> CV16-08033 AB (FFMx) <br><br> **NOMADIX'S OPPOSITION TO GUEST-TEK'S MOTION TO DISSOLVE PROTECTIVE ORDER** <br><br> HEARING: <br> July 3, 2018 <br> 10:00 a.m. <br> Courtroom 580 <br><br> Honorable Frederick F. Mumm |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   PROCEDURAL AND FACTUAL BACKGROUND ...............................2

III.  LEGAL STANDARD .................................................................4

IV.   GUEST-TEK HAS FAILED TO SHOW GOOD CAUSE
      TO DISTURB THE PROTECTIVE ORDER..................................4

      A.   Nothing since the protective order has undermined
           the Court's fundamental conclusion that *ex parte*
           communications between Guest-Tek and Mr. Reed
           threaten Nomadix's privilege.................................4

      B.   Guest-Tek has failed to show good cause to
           modify, let alone dissolve, the protective order...................6

           1.   Nothing prohibits Mr. Hughes, Nomadix's
                most knowledgeable attorney, from
                attending any meeting with Mr. Reed, and
                Mr. Hughes's attendance is necessary to
                ensure a smooth meeting and to protect
                Nomadix's privilege .......................................6

           2.   Mr. Reed raised his flimsy objection to Mr.
                Hughes only at Guest-Tek's urging..........................9

           3.   Neither Mr. Reed's personal feelings nor his
                preferences as to which Nomadix attorneys
                may be percipient witnesses constitute valid
                reasons to modify the protective order ....................13

           4.   It was not Mr. Reed but Guest-Tek who
                decided to cut the meeting short ............................14

           5.   Nomadix has done nothing to harass or
                intimidate Mr. Reed .......................................16

                a.   Guest-Tek fails to present any
                     evidence of harassment or
                     intimidation..........................................16

           b.     The present case does not even remotely resemble the cases Guest-Tek cites ........................................................... 19

           c.     Nomadix is not afraid of Mr. Reed—indeed, Nomadix has tried to obtain sworn testimony from Mr. Reed, while Guest-Tek has discouraged Mr. Reed from testifying ........................................................... 21

     6.     Guest-Tek has failed to show good cause to modify the protective order to allow it to schedule a meeting without consulting Nomadix ........................................................... 22

V.    THE COURT SHOULD ADMONISH GUEST-TEK, NOT NOMADIX ........................................................... 23

    A.    Guest-Tek is not entitled to its costs ........................................................... 23

    B.    The Court must not overlook Guest-Tek's repeated misrepresentations and material omissions ........................................................... 24

VI.   CONCLUSION ........................................................... 25

1

## TABLE OF AUTHORITIES

2

3

*CBS Interactive, Inc. v. Etilize, Inc.*,
    257 F.R.D. 195 (N.D. Cal. 2009) ........................................................4

4

5

*E.E.O.C. v. Original HoneyBaked Ham Co. of Ga., Inc.*,
    No. 11-cv-02560, 2012 WL 3472281 (D. Colo. Aug. 13, 2012)............19–21

6

7

*Factory Mut. Ins. Co. v. Insteel Indus., Inc.*,
    212 F.R.D. 301 (M.D.N.C. 2002).......................................................4

8

*Galella v. Onassis*,
    487 F.2d 986 (2d Cir. 1973) ........................................................19, 20

9

10

*Phillips ex rel. Estates of Byrd v. G.M. Corp.*,
    307 F.3d 1206 (9th Cir. 2002).........................................................4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.  INTRODUCTION

For more than seven years, Charles Reed served on Nomadix's Board of Directors. As a director, Mr. Reed was privy to Nomadix's most sensitive information, including privileged attorney–client communications concerning Defendant Guest-Tek Interactive Entertainment and the claims in this action. Recognizing that *ex parte* contact between Guest-Tek and Mr. Reed would threaten Nomadix's privilege, the Court issued a protective order prohibiting Guest-Tek from contacting Mr. Reed about Nomadix outside the presence of Nomadix's attorneys. (Dkt. No. 194.)

Guest-Tek now seeks to severely scale back that protective order or even dissolve it entirely. Instead of carrying its burden to show good cause for modifying or revoking the Court's order, Guest-Tek misrepresents facts, omits material facts, and levels baseless accusations of harassment, witness intimidation, and violations of court orders. After untangling these misrepresentations, material omissions, and accusations, two points emerge. First, Guest-Tek seeks to question Mr. Reed about Nomadix outside the presence of the Nomadix attorney most knowledgeable about the scope and content of the privileged information to which Mr. Reed has access—Nomadix's General Counsel, Kelly Hughes. Second, concerned less with finding out what Mr. Reed knows than with tarnishing Nomadix in the Court's eyes, Guest-Tek has built its entire motion around a dispute that Guest-Tek itself engineered.

Guest-Tek's motion is meritless. The facts show:

1) Contrary to Guest-Tek's accusations, Nomadix did not violate the protective order.

2) From his long tenure at Nomadix, Mr. Reed was well aware that Mr. Hughes was Nomadix's primary attorney, and Mr. Reed initially agreed to meet with Guest-Tek in Thailand with the express understanding that Nomadix attorneys might attend the meeting. Mr. Reed did not voice any

- 1 -

objection to any Nomadix attorney attending the meeting *until Guest-Tek's attorneys pointedly suggested Mr. Reed should object to Mr. Hughes.*

3) Guest-Tek forced Nomadix to travel to Thailand for a meeting with Mr. Reed even after Judge Birotte granted Guest-Tek's request to stay this case; and then, after all parties had assembled at the agreed-upon venue in Bangkok, Guest-Tek abruptly canceled the meeting without even trying to ask Mr. Reed a single substantive question about the case.

4) Nomadix has not discouraged Mr. Reed from being a witness. To the contrary, Nomadix is the party that has asked Mr. Reed to testify under oath, while Guest-Tek is the party whose attorneys have advised Mr. Reed how he can avoid being deposed.

Dissolving the protective order or excluding the single most knowledgeable Nomadix attorney on matters of privilege concerning Mr. Reed would perversely reward Guest-Tek for manufacturing a dispute. The Court should deny Guest-Tek's motion.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Mr. Reed's history with Nomadix, his substantial exposure to Nomadix's privileged information, and his interactions with Guest-Tek are discussed in detail at pages 2–8 of the joint stipulation on Nomadix's original motion for protective order. (Dkt. No. 171 at 2–8.) In granting the motion in February 2018, the Court ordered: "Guest-Tek's attorneys, employees, or representatives shall not communicate with, or otherwise have contact with, Mr. Reed on any topic relating to Nomadix unless Nomadix's attorneys are present." (Dkt. No. 194.)

In mid-April, Guest-Tek reached out to Mr. Reed to schedule a May 3 meeting in Thailand. (Swope Decl. Ex. 1 (Apr. 12, 2018 email from Michael Swope to Charles Reed).) On April 11, Mr. Reed agreed to meet Guest-Tek in Bangkok on May 3, noting "I understand Nomadix lawyers may appear at this

meeting." (Swope Decl. Ex. 1 (Apr. 11, 2018 email from Charles Reed to Michael Swope).) On April 24, more than a week before May 3, Nomadix informed Guest-Tek that its General Counsel, Kelly Hughes, would attend the Bangkok meeting. (Laquer Decl. Ex. 1.) Two days later, Guest-Tek took it upon itself to relay this information to Mr. Reed and ask him whether "Mr. Hughes' presence would in any way impede or inhibit [the] meeting." (Swope Decl Ex. 1 (Apr. 27, 2018 (Apr. 26 Pacific time zone) email from Michael Swope to Charles Reed).) In response, Mr. Reed stated he objected to Mr. Hughes attending the May 3 meeting. (*Id.* at Ex. 1 (Apr. 30, 2018 email from Charles Reed to Michael Swope).) But the only reason he offered was that he no longer considered Mr. Hughes a friend and did not want to speak with him again. (*Id.*) When Guest-Tek asked whether Nomadix still planned to bring Mr. Hughes to the meeting, Nomadix explained that it needed Mr. Hughes to attend, as his experience as  Nomadix's General Counsel for several years gave him the greatest knowledge of the scope and content of Nomadix's privileged and confidential information. (*Id.* at Ex. 1 (May 1, 2018 email from Alan Laquer to Michael Swope).)

Mr. Reed, Guest-Tek's attorney Michael Swope, and Nomadix's attendees all met at the InterContinental Bangkok around 10:00 a.m. on May 3, 2018. (Laquer Decl. ¶¶ 5–7.) Mr. Reed reiterated that he would prefer Mr. Hughes leave, but this time he did not cite the end of their friendship as the reason. Instead, Mr. Reed made clear he wished to avoid Mr. Hughes becoming a percipient witness who would be in a position to later testify with personal knowledge about Mr. Reed's statements during the meeting. (Laquer Decl. ¶ 9.) In spite of his objection, Mr. Reed stated he was willing to speak with Guest-Tek in front of Mr. Hughes, except that he might ask Mr. Hughes to leave if the questions turned to certain topics, although he did not identify what those topics were. (*Id.* ¶ 15.) Mr. Reed also indicated he was willing to speak in front of Mr. Hughes on any topic provided that Nomadix waived its legal rights and agreed not to use whatever Mr.

1   Reed said against him. (*Id.* ¶ 9.)  Without knowing what Mr. Reed might say,
2   Nomadix declined to waive its legal rights. After Mr. Reed made this query,
3   Nomadix informed Mr. Reed it had brought a letter that would address the very
4   question he had raised. Mr. Reed calmly declined to accept delivery of the letter.
5   (*Id.* ¶ 13.) Although Mr. Reed remained calm and unfazed, Guest-Tek's attorney
6   Mr. Swope demanded to know the contents of the letter. (*Id.*) When Nomadix
7   responded it would provide a copy of the letter if Mr. Reed accepted his copy, Mr.
8   Swope unilaterally cancelled the meeting. (*Id.*) Mr. Reed did not refuse to answer a
9   single question that Mr. Swope asked him. (*Id.* ¶ 15.)

## III.  LEGAL STANDARD

11         When a court has issued a protective order, a party seeking to modify the
12   protective order must show good cause for the modification. *CBS Interactive, Inc.*
13   *v. Etilize, Inc.*, 257 F.R.D. 195, 201 (N.D. Cal. 2009) (citing *Phillips ex rel. Estates*
14   *of Byrd v. G.M. Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002)); *see also Factory Mut.*
15   *Ins. Co. v. Insteel Indus., Inc.*, 212 F.R.D. 301, 303 (M.D.N.C. 2002). "A party
16   asserting good cause bears the burden to show that specific prejudice or harm will
17   result if the motion is not granted." *Id.* (citing *Phillips*, 307 F.3d at 1210–11).

## IV.  GUEST-TEK HAS FAILED TO SHOW GOOD CAUSE
## TO DISTURB THE PROTECTIVE ORDER

**A.   Nothing since the protective order has undermined the Court's fundamental conclusion that *ex parte* communications between Guest-Tek and Mr. Reed threaten Nomadix's privilege**

23         It is worth recalling why the Court issued a protective order in the first place.
24   Mr. Reed served on Nomadix's Board of Directors for over seven years, and
25   during his tenure he was privy to numerous privileged communications, including
26   attorney–client communications concerning Guest-Tek and the agreements and
27   claims at issue in this case. (Hughes Decl. ¶ 5.) Although Guest-Tek refused to
28   cease *ex parte* contact with Mr. Reed, Guest-Tek agreed in May 2017 not to solicit

confidential or privileged information from him. In spite of that agreement, by October Guest-Tek had solicited and obtained Mr. Reed's recollection of confidential and privileged communications, asked Mr. Reed to put that recollection in a sworn declaration, and then filed that declaration publicly. (Dkt. No. 100.) The Court found that "the danger that Mr. Reed will disclose (whether inadvertently or not) attorney client information if questioned about Nomadix by Guest-Tek, its counsel, or anyone working in connection with either" constituted good cause to grant a protective order. (Dkt. No. 194.) The Court therefore ordered: "Guest-Tek's attorneys, employees, or representatives shall not communicate with, or otherwise have contact with, Mr. Reed on any topic relating to Nomadix **unless Nomadix's attorneys are present**." (*Id.* (emphasis added).)

Since the Court issued that order, nothing has occurred to undermine the Court's conclusion that communications between Guest-Tek and Mr. Reed outside the presence of Nomadix's attorneys threaten Nomadix's privileged attorney–client information. If anything, the May 3 meeting in Thailand confirms that the threat to Nomadix's privilege remains real. When speaking with Guest-Tek attorney Mr. Swope, Mr. Reed began providing unsolicited commentary on his understanding of Nomadix's motivations, goals, and litigation strategy in this case. (Laquer Decl. ¶ 17.) Additionally, throughout the morning of May 3, Mr. Reed stated more than once that he wanted a Nomadix attorney present to make sure he did not divulge information he should not. (*Id.* ¶¶ 10, 16.)

**B.   Guest-Tek has failed to show good cause to modify, let alone dissolve, the protective order**

   **1.   Nothing prohibits Mr. Hughes, Nomadix's most knowledgeable attorney, from attending any meeting with Mr. Reed, and Mr. Hughes's attendance is necessary to ensure a smooth meeting and to protect Nomadix's privilege**

Guest-Tek's chief argument is that, despite Mr. Reed's complaint that he was supposedly no longer friends or on speaking terms with Mr. Hughes, Nomadix remained firm that Mr. Hughes would attend any meeting between Guest-Tek and Mr. Reed. Apparently on this basis, Guest-Tek alleges that Nomadix "violated" the protective order. (Guest-Tek's Mot. 10:5.) **But Guest-Tek fails to identify a single directive in the protective order that Nomadix disobeyed.** Rather than impose obligations on Nomadix, the protective order prohibits Guest-Tek from communicating with Mr. Reed on any topic concerning Nomadix "unless Nomadix's attorneys are present." (Dkt. No. 194.) Mr. Hughes is Nomadix's General Counsel. Nothing in the Court's order or the parties' underlying briefing suggests that this phrase refers only to Nomadix's *outside* attorneys. Nor did the Court's order limit Nomadix to attorneys approved by both Guest-Tek and Mr. Reed. The Court certainly did not limit Nomadix to attorneys whom Mr. Reed considers his friends.

Guest-Tek appears to contend that the protective order entitles Nomadix to have only a single attorney present at any meeting between Guest-Tek and Mr. Reed. (Guest-Tek's Mot. 9.) The text of the protective order does not support Guest-Tek's reading, as the protective order uses the plural "attorneys," limiting certain contact between Guest-Tek and Mr. Reed "unless Nomadix's attorneys are present." (Dkt. No. 194.) When scheduling the meeting with Mr. Reed, Guest-Tek acknowledged that "Nomadix lawyers [plural] will likely appear at this meeting."

(Dkt. No. 288-1 at ECF PageID 8814.) Before filing this motion, Guest-Tek never contended that Nomadix was entitled to bring only one attorney.

Not only was Mr. Hughes's attendance at the May 3 meeting entirely appropriate under the protective order, his attendance at any future meeting between Guest-Tek and Mr. Reed will be necessary. For most of Mr. Reed's more-than-seven-year tenure on Nomadix's Board of Directors, Mr. Hughes served as Nomadix's General Counsel. (Hughes Decl. ¶ 5.) As General Counsel, Mr. Hughes advised Mr. Reed regarding Guest-Tek over the course of several years, such as when Nomadix sued Guest-Tek for patent infringement in 2009; and when the parties entered into a license agreement in 2010; and when the parties mediated breach of that license agreement in 2014; and again when Nomadix and related parties were involved in due diligence in connection with a sale of Nomadix in 2015, during which Mr. Hughes advised Nomadix of the value of its claims against Guest-Tek. (*Id.*) Over the span of at least six years, Mr. Hughes advised Mr. Reed and other Nomadix directors regarding legal matters on a daily basis. (*Id.*) During that time, Mr. Hughes estimates he had at least hundreds of privileged discussions with Mr. Reed regarding Guest-Tek and the agreements and claims at issue in this action. (*Id.*) The vast majority of those discussions did not involve outside counsel. (*Id.*) Mr. Hughes is Nomadix's only attorney who has personal knowledge of the existence and content of such discussions. (*Id.*)

Guest-Tek argues there was no legitimate purpose to bring Mr. Hughes to Thailand because Nomadix's outside attorneys are talented litigators capable of protecting Nomadix's privilege. Guest-Tek's argument does not withstand scrutiny.

To be sure, Nomadix's outside attorneys such as Mr. Laquer are competent, experienced litigators. But the fact remains that Nomadix's General Counsel, Mr. Hughes, is the Nomadix attorney most knowledgeable about the scope and content of the privileged and sensitive information to which Mr. Reed was privy. Asking

1   Mr. Hughes to attend Guest-Tek's meeting with Mr. Reed served the legitimate,
2   good-faith purpose of ensuring that the Nomadix attorney most knowledgeable
3   about privilege issues involving Mr. Reed was in a position to minimize the
4   likelihood that Mr. Reed would divulge privileged information to Guest-Tek.
5   Whatever talents Nomadix's outside attorneys may possess as litigators, those
6   talents cannot come close to the first-hand knowledge and experience possessed by
7   Mr. Hughes as a safeguard against Mr. Reed divulging privileged information.

8       Not only does Guest-Tek's conclusion fail to follow from its stated premise,
9   Guest-Tek's argument rests implicitly on two dubious assumptions. First, Guest-
10  Tek assumes that Nomadix's outside counsel will be able to identify privileged
11  information on the fly when Guest-Tek and Mr. Reed confer. But numerous
12  privileged communications involved only Mr. Reed and Mr. Hughes and not
13  outside counsel, and outside counsel will be unable to identify those
14  communications instantaneously during Guest-Tek's meeting. Instead, outside
15  counsel would need to pause the meeting and confer privately with Mr. Reed to
16  thoroughly explore the facts surrounding Guest-Tek's question. In correspondence
17  leading up to the May 3 meeting, at the May 3 meeting itself, and in briefing on
18  this motion, Guest-Tek has been adamant that its discussion with Mr. Reed would
19  be "Guest-Tek's meeting" and not Nomadix's and that Nomadix's attorneys must
20  not interject or generally do anything but observe the discussion. (Swope Decl. Ex.
21  1 (Apr. 12, 2018 email from Michael Swope to Charles Reed).) Mr. Hughes's
22  attendance at future meetings between Guest-Tek and Mr. Reed should
23  substantially reduce the need for Nomadix's outside counsel to pause the meeting
24  and confer with Mr. Reed privately. Mr. Hughes's personal knowledge of the
25  scope and content of Mr. Reed's privileged communications is critical to ensuring
26  a smooth meeting with minimal interruptions.

27      Second, even if Guest-Tek were open to Nomadix's outside counsel
28  frequently pausing the meeting and conferring privately with Mr. Reed, Guest-

Tek's argument assumes that Mr. Reed will cooperate with Nomadix's outside counsel. But unlike a current Nomadix employee, Mr. Reed's interests are no longer necessarily aligned with Nomadix. He may misremember when Nomadix's counsel queries whether, for example, Mr. Reed's responses to a pending question would reflect legal advice from Mr. Hughes or another attorney. When deciding whether to object to a line of questioning by Guest-Tek on grounds of privilege, Nomadix's outside counsel should not be forced to rely on the memory of a former director who has already divulged his recollection of privileged conversations to Nomadix's litigation opponent. Mr. Hughes's personal knowledge of the scope and content of Mr. Reed's privileged communications is therefore also critical to Nomadix's ability to protect its privilege during any discussions between Guest-Tek and Mr. Reed.

In short, Mr. Hughes is the Nomadix attorney most knowledgeable about the privileged communications to which Mr. Reed was privy while at Nomadix, including the circumstances surrounding those communications, such as who was present and what was discussed. No amount of litigation experience and competence on the part of Nomadix's outside counsel can substitute for Mr. Hughes's knowledge. Mr. Hughes's attendance at meetings between Guest-Tek and Mr. Reed is appropriate under the protective order, serves the legitimate purpose of reducing the likelihood that Mr. Reed will divulge privileged information, and is critical to Nomadix's ability to protect its privileged information on the fly while minimizing interruptions during meetings between Guest-Tek and Mr. Reed.

## 2. Mr. Reed raised his flimsy objection to Mr. Hughes only at Guest-Tek's urging

Throughout this case, Mr. Reed has followed the lead of Guest-Tek's attorneys. Nomadix first learned that Guest-Tek had enlisted Mr. Reed's assistance in this case when Guest-Tek moved for dismissal or summary judgment in March

2017. (Dkt. No. 28.) In support of that motion, Guest-Tek submitted a declaration from Mr. Reed setting forth Mr. Reed's recollection of the history between Nomadix and Guest-Tek and his purported understanding of agreements between the two parties at issue in this case. (Dkt. No. 28-4.) Mr. Reed fully embraced Guest-Tek's position, signing a declaration whose statements matched precisely the contract interpretations Guest-Tek's attorneys urged in the briefing. Almost every statement Mr. Reed made in his declaration appeared nearly verbatim in a simultaneously filed declaration of Arnon Levy, Guest-Tek's CEO. (*Compare* Dkt. No. 28-4 *with* Dkt. No. 28-3.) When Mr. Reed submitted a second declaration, it again closely tracked the wording of key portions of Mr. Levy's second declaration. (*Compare* Dkt. No. 100 *with* Dkt. No. 99.)

After the Court issued its protective order, Guest-Tek was forced to include Nomadix on its communications with Mr. Reed. When Guest-Tek reached out to Mr. Reed to schedule the May 3 meeting in Thailand, Guest-Tek's attorney, Michael Swope, wrote a long e-mail reciting seven points that he ostensibly wanted Mr. Reed to be aware of. (Swope Decl. Ex. 1 (Apr. 12, 2018 email from Michael Swope to Charles Reed).) These included self-serving statements, such as: "Seventh, Guest-Tek is not paying you, or compensating you, in any manner, for you to meet with me, and has not promised to do so. As I understand it, you have no financial or other interest in the outcome of this matter." (*Id.*) Without being expressly requested to do so, Mr. Reed confirmed all seven points, repeating back nearly verbatim Mr. Swope's words. (*Id.* at Ex. 1 (Apr. 11, 2018 email from Charles Reed to Michael Swope).)

Knowing that Nomadix would seek to depose Mr. Reed, Mr. Swope also went out of his way to suggest that Mr. Reed not cooperate with Nomadix. Despite confirming that the meeting Guest-Tek sought was merely informal and not a deposition, and despite emphasizing that he was not Mr. Reed's lawyer, Mr.

- 10 -

Swope provided Mr. Reed with legal advice on how to avoid a deposition taken by Nomadix:

> Moreover, even if we wanted to take your deposition, because you are not a US citizen or resident in the US, we would need to follow very strict international and Thailand legal procedures in order to obtain your testimony involuntarily. Otherwise, unless you voluntarily agree, the parties in this lawsuit are not entitled to depose you.  If we asked to voluntarily arrange your deposition, you could simply say that you decline.

> Of course, Nomadix may try to arrange to take your deposition after you meet with us. They are similarly bound to abide by international law and the laws of Thailand.

(Swope Decl. Ex. 1 (Apr. 12, 2018 email from Michael Swope to Charles Reed).) Since Guest-Tek did not seek to depose Mr. Reed, it was unnecessary for Mr. Swope to convey this message. And since Mr. Reed was not his client, Mr. Swope should not have offered him unsolicited legal advice. After Mr. Swope's e-mail, Mr. Reed declined Nomadix's request for a voluntary deposition in Thailand. (Laquer Decl. Ex. 3 (Apr. 17, 2018 email from Charles Reed to Alan Laquer).)

Most importantly for this motion, Mr. Reed also voiced his purported objection to Mr. Reed *only after Guest-Tek invited him to do so*. Initially, Mr. Reed had no objections to any Nomadix attorneys. On April 11, he agreed to meet Guest-Tek in Bangkok on May 3, noting "I understand Nomadix lawyers may appear at this meeting." (Swope Decl. Ex. 1 (Apr. 11, 2018 email from Charles Reed to Michael Swope).)  Having been advised by Mr. Hughes for more than six years while serving as Nomadix's director, Mr. Reed well understood that Mr. Hughes was Nomadix's General Counsel and that he (Mr. Reed) was agreeing to meet with Guest-Tek even though Mr. Hughes and other Nomadix lawyers might attend. On April 24, more than a week before May 3, Nomadix informed Guest-

Tek that Mr. Hughes and one external attorney would attend the Bangkok meeting. Guest-Tek waited two days and then went out of its way to inform Mr. Reed that Mr. Hughes would be attending, pointedly inviting Mr. Reed to object to the presence of Nomadix's General Counsel:

> I know that you and Mr. Hughes are former colleagues. Therefore, please let me know if you believe that Mr. Hughes' presence would in any way impede or inhibit our meeting.

(*Id.* at Ex. 1 (Apr. 27, 2018 email (Apr. 26 Pacific) from Michael Swope to Charles Reed).) There was no reason for Mr. Swope to suggest that Mr. Hughes's presence would somehow "impede or inhibit" the meeting, much less on the basis that he had once worked with Mr. Reed.

Taking the hint, Mr. Reed purported to object to Mr. Hughes attending the May 3 meeting. (*Id.* at Ex. 1 (Apr. 30, 2018 email from Charles Reed to Michael Swope).) But the only reason he offered was that their friendship had supposedly ended a few years ago:

> My last conversation with Kelly Hughes when I left interTouch [Nomadix's then-parent company] was that our friendship was no longer and that I will never speak to him again.

(*Id.*)

Mr. Reed never had such a conversation with Mr. Hughes. (Hughes Decl. ¶ 9.) As far as Mr. Hughes is concerned, he remained on cordial terms with Mr. Reed when the latter left Nomadix. (*Id.*) Indeed, when Mr. Hughes and his family subsequently bumped into Mr. Reed on vacation—after this litigation began—the meeting was a friendly one. (*Id.*)

Understanding that Guest-Tek wanted him to object to Mr. Hughes but unable to sustain the pretense of an objection based on their friendship ending, Mr. Reed changed his position at the May 3 meeting. In Bangkok, Mr. Reed explained that he supposedly did not want Mr. Hughes to be a percipient witness to the

statements he would make to Guest-Tek so that Mr. Hughes could not later testify from personal knowledge about the statements Mr. Reed made to Guest-Tek. (Laquer Decl. ¶ 9.) Mr. Reed claimed he had no issue with the presence of Nomadix's outside counsel. (*Id.* at ¶ 10.)  Mr. Reed understood that Nomadix's outside attorney, Alan Laquer, would repeat what he learned during the meeting to his client, including Mr. Hughes as Nomadix's General Counsel. (*Id.* at ¶ 9.) Mr. Reed claimed this arrangement would be fine because Mr. Hughes would then be unable to testify about the meeting with Guest-Tek, as his knowledge of the meeting would be secondhand. (*Id.*)

Mr. Reed's purported objections to Mr. Hughes are the crux of Guest-Tek's motion. But Mr. Reed initially had no such objections and agreed to meet with Guest-Tek with the express understanding that the meeting would take place in the presence of Nomadix's attorneys, whom he knew included Mr. Hughes. Mr. Reed voiced his objections to Mr. Hughes only after Mr. Swope pointedly suggested that Mr. Hughes's presence might somehow him "impede or inhibit" the meeting.

**3.    Neither Mr. Reed's personal feelings nor his preferences as to which Nomadix attorneys may be percipient witnesses constitute valid reasons to modify the protective order**

Not only did Mr. Reed object to Mr. Hughes only after Guest-Tek's attorney invited him to do so, his objections do not give rise to good cause. Mr. Reed first objected to Mr. Hughes on the grounds that they were no longer friends. (Swope Decl. Ex. 1 (Apr. 30, 2018 email from Charles Reed to Michael Swope).) Once all parties were assembled in Bangkok, Mr. Reed identified a much more strategic objective: for reasons he did not offer to explain, he sought to avoid Mr. Hughes becoming a percipient witness who would be in a position to later testify with personal knowledge about Mr. Reed's statements during the meeting. (Laquer Decl. ¶ 9.) The Court issued the protective order so that Nomadix could protect its

1  privilege. Neither Mr. Reed's views on friendship nor his legal strategies should be
2  allowed to control how Nomadix protects its privilege.

3      Neither Guest-Tek nor Mr. Reed explains why it is critical that Mr. Hughes
4  not be a percipient witness to Mr. Reed's statements to Guest-Tek, when Mr. Reed
5  was prepared to permit at least five other persons witness those statements,
6  including another Nomadix attorney. (*See* Laquer Decl. ¶ 7 (identifying meeting
7  attendees).) Whatever the reason, one thing is clear: allowing Mr. Reed's
8  friendships or legal strategies to dictate which Nomadix attorneys may attend the
9  meeting will allow Guest-Tek to question Mr. Reed about Nomadix outside the
10  presence of the Nomadix attorney most knowledgeable about Mr. Reed's exposure
11  to Nomadix's privileged information.

12      **4.   It was not Mr. Reed but Guest-Tek who decided to cut the**
13          **meeting short**

14      Throughout its brief, Guest-Tek accuses Nomadix of either "stymieing,"
15  "preventing," "interfering" with, or "obstructing" a meeting between Guest-Tek
16  and Mr. Reed. Two facts are fatal to Guest-Tek's accusations. First, Mr. Reed,
17  Guest-Tek's attorney Michael Swope, and Nomadix's attendees in fact all met at
18  the InterContinental Bangkok around 10:00 a.m. on May 3, 2018. (*Id.* ¶¶ 5-7.)
19  Second, Mr. Reed did not refuse to answer a single question that Mr. Swope asked
20  him. (*Id.* ¶ 15.)

21      In its brief, Guest-Tek appears to suggest that no meeting with Mr. Reed
22  took place because the parties wound up conducting their discussions in the hotel
23  lobby instead of moving to the conference room Guest-Tek had reserved. But
24  Guest-Tek fails to mention that, when Nomadix's attorney suggested the parties
25  move to the conference room, Mr. Swope indicated that his meeting with Mr. Reed
26  was already in progress and there was no reason the parties could not continue in
27  the lobby. (*Id.* at ¶ 12.)

28

More importantly, to the extent Guest-Tek contends that the meeting the parties conducted was not what it had in mind, Guest-Tek made no effort to ask the questions it had supposedly traveled thousands of miles to ask. Mr. Reed made it crystal clear that he was willing to speak with Guest-Tek in front of Mr. Hughes, except that he might ask Mr. Hughes to leave if the questions turned to certain topics—it was clear Mr. Reed had in mind certain topics he did not want to speak on in front of Mr. Hughes, but he did not identify what those topics were. (*Id.* at ¶ 15.) If Mr. Swope had been interested in what Mr. Reed had to say, he would have begun asking Mr. Reed substantive questions and waited for Mr. Reed to raise an objection to Mr. Hughes's presence based on a specific question asked. At no point did Mr. Swope attempt to turn the meeting to any substantive questions that he supposedly wanted to ask. (*Id.*) Nor did he ever suggest that the parties try to get through as much of Guest-Tek's questions as they could. (*Id.*) Nor did Mr. Swope make any attempt to get Mr. Reed to explain what topics he was willing to discuss in front of Mr. Hughes. (*Id.*)

Instead, Mr. Swope unilaterally cut the meeting short (Laquer Decl. ¶¶ 14–15), and Guest-Tek is now trying to use its own cancellation of the meeting to argue obstruction by Nomadix. Guest-Tek chose to cut short the meeting despite numerous indications from Mr. Reed that he expected the meeting to continue. First, Mr. Reed had explained he was open to discussing some (unspecified) topics in front of Mr. Hughes. Second, Mr. Reed also indicated he was willing to speak in front of Mr. Hughes on *any* topic provided that Nomadix waived its legal rights and agreed not to use whatever Mr. Reed said against him. (*Id.* at ¶ 9.) Without knowing what Mr. Reed might say, Nomadix naturally was unwilling to waive its legal rights. When Mr. Reed made this query, Nomadix informed Mr. Reed it had brought a letter that would address the very question he had raised. In a nutshell, the letter explained that, by attending the May 3 meeting, Nomadix in no way waived any of its legal rights or consented to Mr. Reed's disclosure of Nomadix's

- 15 -

confidential information to Guest-Tek. (Swope Decl. Ex. 4.) Mr. Reed calmly declined to accept delivery of the letter. (Laquer Decl. ¶ 13.) He never suggested the letter had affected his willingness to confer with Guest-Tek in Mr. Hughes's presence. (*Id.* ¶¶ 13, 15.) But rather than ask Mr. Reed any further questions, Mr. Swope used the attempted delivery of the letter as an excuse to cut the meeting short. (*Id.* ¶ 14.) Guest-Tek's actions show it was more interested in engineering a dispute it could argue before the Court than learning the answers to any questions it supposedly had for Mr. Reed.

In summary, all relevant parties met in Bangkok at the appointed time and venue; Mr. Reed did not refuse to answer any questions Mr. Swope asked him; and to the extent Guest-Tek now claims the May 3 meeting did not cover all its questions for Mr. Reed, Mr. Swope made no effort to ask any of those questions. Guest-Tek cannot come close to showing that Nomadix prevented it from meeting with Mr. Reed.

### 5. Nomadix has done nothing to harass or intimidate Mr. Reed

Guest-Tek also repeatedly accuses Nomadix of harassing and intimidating Mr. Reed. These accusations are equally baseless.

### a. Guest-Tek fails to present any evidence of harassment or intimidation

Guest-Tek alleges Nomadix harassed and intimidated Mr. Reed by (1) supposedly surprising Mr. Reed with Mr. Hughes as an attendee of the May 3 meeting and (2) sending correspondence to Mr. Reed to preserve its legal rights. Neither Mr. Hughes's attendance nor the correspondence constitutes harassment or intimidation.

First, Guest-Tek cannot demonstrate intimidation when Mr. Reed answered every question Mr. Swope asked. Guest-Tek made no effort to ask any of the questions that apparently remain unanswered. It has no grounds to blame Nomadix for its failure to obtain any information from Mr. Reed.

Second, Guest-Tek makes vague assertions of intimidation but never explains why Mr. Reed would find Mr. Hughes intimidating. The two men no longer work together, and Mr. Hughes holds no power over Mr. Reed. Guest-Tek neglects to explain in its brief that Mr. Reed brought with him to the InterContinental an entourage of individuals he identified as his personal attorney, a Thai judge, and a Thai police major. (Laquer Decl. ¶ 7.) Mr. Reed had substantial representation at the May 3 meeting, and Guest-Tek fails to identify any question that Mr. Reed refused to answer, let alone any question Mr. Reed refused to answer because Mr. Hughes was present.

Third, Guest-Tek repeatedly misrepresents facts when it accuses Nomadix again and again of a "surprise visit from Mr. Hughes." (*E.g.*, Guest-Tek's Mot. 11; *also id.* at 10.) As an initial matter, nothing obligated Nomadix to identify its attorneys who would be attending, and Mr. Reed agreed to meet with Guest-Tek with the express understanding that "Nomadix attorneys" might attend. Even though it had no obligation to do so, Nomadix notified Guest-Tek that Mr. Hughes would attend on April 24, over a week before the May 3 meeting, and Guest-Tek relayed that information to Mr. Reed. There was no surprise.

Finally, the letters sent to Mr. Reed cannot be improper because every company must be able to preserve its legal rights. Although Nomadix and Mr. Reed terminated their relationship in 2015, Mr. Reed remains contractually prohibited from disclosing Nomadix's confidential information or assisting Guest-Tek in connection with Nomadix's patent enforcement and licensing. A 2005 Employment Agreement prohibits Mr. Reed from disclosing Nomadix's confidential information to third parties. (Dkt. No. 172 Ex. 3 § 6.4.) Before departing, Mr. Reed also entered into a 2015 Transition Agreement that amended and expanded Mr. Reed's obligations under the 2005 Employment Agreement. (Dkt. No. 172 Ex. 4 ¶ 5.a. & Ex. C thereto.) Under these amendments, Mr. Reed "shall not consult with, assist, or otherwise provide advice or other services to"

1   Guest-Tek in connection with Nomadix's patent enforcement and licensing. (*Id.*
2   (amending § 6.4 of 2005 Employment Agreement).)

3          Mr. Reed entered into these agreements with a company that today is known
4   as interTouch Pte. Ltd. and that at the time was Nomadix's parent company. (*See*
5   Dkt. No. 162 ¶ 13.) In March 2017, Mr. Reed voluntarily assisted Guest-Tek by
6   submitting his first declaration in support of Guest-Tek's position in this licensing
7   dispute; not only did Mr. Reed assist Guest-Tek when he had no legal obligation to
8   do so, he voluntarily provided Guest-Tek with his purported understanding of
9   confidential agreements. In July, interTouch therefore wrote to Mr. Reed to remind
10  him of his contractual obligations. (Dkt. No. 161-16.) Nomadix made this letter of
11  record when moving for a protective order regarding Mr. Reed. (*Id.*) Through this
12  letter, interTouch appropriately notified Mr. Reed of its contentions that he had
13  breached his contractual obligations not to disclose confidential information
14  voluntarily and not to assist Guest-Tek voluntarily in connection with Nomadix's
15  efforts to enforce its patent license. interTouch further appropriately sought to
16  mitigate its damages by asking Mr. Reed not to continue those breaches. Mr. Reed
17  has never acknowledged receiving the letter, and it is unclear whether he received
18  it, as interTouch had the letter delivered to a Singapore address, but Mr. Reed
19  appears to have been living in Thailand at the time.

20         The other letter Guest-Tek refers to is the letter that Nomadix offered to Mr.
21  Reed at the May 3 meeting after he asked whether Nomadix would waive its legal
22  rights in connection with anything he said to Guest-Tek during the meeting. In the
23  letter, Nomadix and interTouch explained that Nomadix would attend Mr. Reed's
24  May 3 meeting in Bangkok with Guest-Tek to protect privileged and confidential
25  information and that Nomadix's attendance did not constitute a waiver of any legal
26  rights. (Dkt. No. 287-1.) Instead, the letter explained, Nomadix's attendance at the
27  May 3 meeting simply reflected that, during his tenure as director of Nomadix, Mr.
28  Reed was privy to much privileged and other confidential information and that,

1  notwithstanding his contractual and other obligations, he had volunteered to meet

2  with Guest-Tek to discuss the patent license agreement at issue in this litigation.

3  (*Id.*) While the letter shared that Nomadix had incurred substantial expenses

4  litigating issues concerning Mr. Reed, neither Nomadix nor interTouch threatened

5  any legal action. Indeed, the letter specifically clarified that it was not a threat of

6  legal action, it was not intended to encourage or discourage Mr. Reed from any

7  course of action, and its purpose was simply to make clear that Nomadix and

8  interTouch reserved their rights. (*Id.* ¶ 7.)

9      Nomadix offered this letter only after Mr. Reed asked whether Nomadix

10  would waive its legal rights and agree in advance not to use anything he said to

11  Guest-Tek against him. (Laquer Decl. ¶¶ 9, 13.) Mr. Reed refused to accept or read

12  the letter, and the contents of the letter therefore did not affect his willingness to

13  answer any of Guest-Tek's questions.

14      In short, Guest-Tek has failed to support its accusations of harassment or

15  intimidation with any evidence.

16      **b.    The present case does not even remotely resemble the cases**

17          **Guest-Tek cites**

18      Guest-Tek urges that Mr. Hughes should be excluded from further meetings

19  with Mr. Reed to protect Mr. Reed from intimidation and harassment. (Guest-

20  Tek's Mot. 11.) Guest-Tek contends its basis for excluding Mr. Hughes "is even

21  stronger than" the basis for exclusion in *Galella v. Onassis*, 487 F.2d 986, 997 (2d

22  Cir. 1973), and *E.E.O.C. v. Original HoneyBaked Ham Co. of Ga., Inc.*, No. 11-cv-

23  02560, 2012 WL 3472281 (D. Colo. Aug. 13, 2012). (*Id.*) Guest-Tek's sole

24  argument in support of this contention is that those cases involved depositions,

25  whereas Guest-Tek seeks only "an informal meeting" with Mr. Reed. (*Id.*)

26      Guest-Tek fails to address the material facts of both cases, which bear no

27  resemblance to the present situation. In *Galella*, the Second Circuit found no clear

28  error in the district court's decision to exclude plaintiff Donald Galella from a

- 19 -

deposition of defendant Jacqueline Onassis, the widow of President Kennedy. Galella was a paparazzo who had stalked Onassis and her child. *Galella*, 487 F.2d at 991–92. Galella had been charged with violating a temporary restraining order concerning Onassis and her children, and the parties were litigating Onassis's claims that he had "invaded her privacy, assaulted and battered her, intentionally inflicted emotional distress and engaged in a campaign of harassment." *Id.* at 992. Under these circumstances, the district court excluded Galella from attending Onassis's deposition. Since Galella had already been charged with violating a temporary restraining order entered to protect Onassis from harassment, the Second Circuit concluded: "While we might have assessed the need to exclude Galella differently, we cannot find the court's ruling clearly erroneous." *Id.* at 997.

This case and *Galella* are nothing alike. There are no allegations that Mr. Hughes has ever assaulted or battered Mr. Reed or intentionally caused him emotional distress. No restraining order has been entered against Mr. Hughes to protect Mr. Reed from such conduct, which of course means Mr. Hughes has not violated any such order. As the Nomadix attorney most knowledgeable about privileged information to which Mr. Reed was privy, Mr. Hughes's attendance at meetings between Guest-Tek and Mr. Reed is vital to protect Nomadix's privilege. No such privilege concerns arose in *Galella*.

This case likewise bears no resemblance to *HoneyBaked Ham*. In that case, defendant HoneyBaked Ham was accused of sexual harassment based on the conduct of one of its former managers, James Jackman. HoneyBaked Ham moved to allow Jackman to attend the depositions of the women he allegedly sexually harassed. *HoneyBaked Ham*, 2012 WL 3472281 at *1. The court denied the motion for several reasons. As Jackman was no longer employed at HoneyBaked Ham and was not a party to the case, he was simply a member of the public and had no cognizable right to attend the private depositions held in the case. *Id.* at *1–2. In light of the allegations of sexual harassment and the managerial role Jackman had

1    held over the complainants, it was reasonable to expect that his presence at the
2    depositions of the women he allegedly victimized would legitimately intimidate
3    and embarrass them. *Id.* at *2. Lastly, HoneyBaked Ham's argument that
4    Jackman's presence would allow it "to better frame its case and to be more
5    efficient at additional depositions in the future" was unpersuasive, as HoneyBaked
6    Ham could achieve the same objective by sharing information with Jackman after
7    each deposition. *Id.*

8           Once again, there are no allegations here that Mr. Hughes has victimized Mr.
9    Reed. Nor did Mr. Hughes ever hold a supervisory position over Mr. Reed—to the
10   contrary, during his tenure on Nomadix's Board of Directors, Mr. Reed was also
11   the Chief Executive Officer of Nomadix's sole shareholder and thus effectively
12   supervised Mr. Hughes. Unlike Jackman who was a member of the public, Mr.
13   Hughes is an attorney representing Nomadix, a party in this case; and the Court's
14   protective order prohibits Guest-Tek from contact with Mr. Reed concerning
15   Nomadix outside the presence of Nomadix's attorneys. Finally, while HoneyBaked
16   Ham failed to identify any purpose Jackman's attendance at his alleged victims'
17   depositions would serve, Mr. Hughes's attendance at meetings between Guest-Tek
18   and Mr. Reed is vital to protect Nomadix's privilege. Just like in *Galella*, no such
19   privileged concerns arose in *HoneyBaked Ham*.

20                  c.     **Nomadix is not afraid of Mr. Reed—indeed, Nomadix has**
21                         **tried to obtain sworn testimony from Mr. Reed, while**
22                         **Guest-Tek has discouraged Mr. Reed from testifying**

23          Without any support, Guest-Tek accuses Nomadix of trying to block Guest-
24   Tek learning what Mr. Reed has to say because Nomadix supposedly "fears Mr.
25   Reed's possible third, non-privileged, declaration that he, on Nomadix's behalf,
26   'represented to [Guest-Tek CEO Arnon] Levy that Nomadix would not sue Guest-
27   Tek for breach of the License Agreement.'" (Guest-Tek's Mot. 3 (quoting Dkt. No.
28   171 at 31).) Nomadix fears no such thing.

First, Guest-Tek's placement of the alleged representation within quotation marks is misleading. It suggests Guest-Tek is quoting a statement by Mr. Reed, when in fact Guest-Tek merely quotes its own unsupported allegation in its portion of the Local Rule 37-2 joint stipulation on Nomadix's original motion for a protective order. Despite multiple discovery requests, Guest-Tek has failed to produce any evidence that Mr. Reed has ever made such a statement.

Second, Guest-Tek's bold accusations that Nomadix has engaged in witness intimidation to avoid the truth coming to light cannot survive a review of the facts. Nomadix is the party who has actively pursued Mr. Reed's deposition, which would provide sworn testimony usable to advance the merits of this case—the opposite of witness intimidation. (Laquer Decl. Ex. 3.) In contrast, despite its rhetoric about the declaration Nomadix supposedly fears, Guest-Tek has expressed no interest in obtaining Mr. Reed's sworn testimony. Instead, Guest-Tek promised Mr. Reed it would "not attempt to use anything you say during the meeting in court." (Swope Decl. Ex. 1 (Apr. 12, 2018 email from Michael Swope to Charles Reed).) Additionally, Guest-Tek's attorney Michael Swope went out of his way to encourage Mr. Reed to decline Nomadix's request for a deposition. (*Supra*, pp. 10–11.) After Mr. Swope's communication, Mr. Reed indeed declined Nomadix's request for a voluntary deposition in Thailand. (Laquer Decl. Ex. 3)

**6.    Guest-Tek has failed to show good cause to modify the protective order to allow it to schedule a meeting without consulting Nomadix**

Finally, Guest-Tek invokes the Court's April 3, 2018 order (Dkt. No. 260) in requesting that it be permitted to meet with Mr. Reed outside the presence of Nomadix's attorneys as long as it gives Nomadix a reasonable notice of the meeting. The Court indicated it would consider amending the protective order to allow this procedure if Nomadix failed to cooperate with Guest-Tek in "arranging . . . contacts" between Guest-Tek and Mr. Reed. Contrary to Guest-Tek's

suggestion, Nomadix cooperated in scheduling the meeting. Guest-Tek proposed a meeting on May 3 or May 4, Nomadix confirmed it was open to those dates, and then Mr. Reed agreed to meet with Guest-Tek on May 3. (Swope Decl. Ex. 1.) There was no problem scheduling the meeting, which is the only type of problem that the proposed "reasonable notice" amendment would address. Guest-Tek's argument that Nomadix failed to cooperate is merely a reprisal of its argument that Mr. Hughes should be excluded from future meetings, which Nomadix has addressed above.

## V.  THE COURT SHOULD ADMONISH GUEST-TEK, NOT NOMADIX

### A.  Guest-Tek is not entitled to its costs

Guest-Tek suggests that the Court compensate Guest-Tek for its fees and expenses related to its meeting with Mr. Reed in Bangkok. (Guest-Tek's Mot. 12.) But Guest-Tek voluntarily incurred those costs during a stay that Guest-Tek itself requested. Guest-Tek might have substantially reduced those costs had it waited to conduct its meeting; Mr. Reed raised the possibility of meeting in the United States in August, the same month the stay was scheduled to lift. (Laquer Decl. Ex. 3.) In view of the stay, Nomadix asked Guest-Tek to confirm it would call off the meeting with Mr. Reed in Bangkok. (Laquer Decl. Ex. 1.) But Guest-Tek insisted on proceeding. (*Id.*)

There is no merit to Guest-Tek's suggestion that the presence of Mr. Hughes in Bangkok justifies Guest-Tek's request for fees and expenses. Guest-Tek did not attempt during the meeting in Bangkok to ascertain the information Mr. Reed was willing to share. Mr. Reed stated he was unwilling to speak with Guest-Tek in front of Mr. Hughes only regarding certain unidentified topics. (Laquer Decl. ¶ 15.) Guest-Tek never asked Mr. Reed what topics he was and was not willing to discuss. Thus, Guest-Tek cannot say whether Mr. Hughes's presence affected Mr. Reed's willingness to discuss any of the topics Guest-Tek might have raised. Indeed, Guest-Tek's opening brief does not specify any information that Guest-Tek

1   was unable to gather, much less explain how Nomadix prevented Guest-Tek from

2   obtaining any such information.

3   **B.    The Court must not overlook Guest-Tek's repeated misrepresentations**

4   **and material omissions**

5           Guest-Tek's brief contains material misrepresentations and omissions. For

6   example, Guest-Tek alleges several times in its brief that Nomadix waited until

7   "the eve" of the meeting in Bangkok to "surprise" Mr. Reed with an appearance

8   from Mr. Hughes. (Guest-Tek's Mot. 2, 10, 11.) But Nomadix informed Guest-Tek

9   that Mr. Hughes would attend the May 3 meeting nine days before the meeting, on

10  April 24, 2018. (Laquer Decl. Ex. 1.)

11          Guest-Tek also fails to mention that Mr. Reed did not object to Mr. Hughes

12  until Guest-Tek invited him to do so. Initially, Mr. Reed agreed to meet with

13  Guest-Tek knowing that Nomadix's attorneys would likely attend and knowing

14  that Mr. Hughes was Nomadix's General Counsel. (*Supra*, pp. 11–12.)

15          As another example, in a footnote, Guest-Tek argues that its motion is not

16  subject to the stay because it supposedly concerns only "non-discovery

17  communications." (Dkt. No. 288 at 2, n.1.) But this contradicts Guest-Tek's prior

18  position that it "should be permitted to conduct its *discovery* of Mr. Reed in any

19  manner it chooses." (Dkt No. 259 at 7 (emphasis added).)

20          Further, Guest-Tek's placement of its prior attorney argument in quotations

21  is misleading. Its brief reads:

22          Nomadix fears Mr. Reed's possible third, non-privileged, declaration

23          that he, on Nomadix's behalf, "represented to [Guest-Tek CEO

24          Arnon] Levy that Nomadix would not sue Guest-Tek for breach of the

25          License Agreement." (D.I. 171 at 31.)

26  (Guest-Tek's Mot. at 3.) Prior to checking the citation, this passage provides the

27  incorrect impression that the quoted text is attributed to Mr. Reed. Instead, the

28

quote Guest-Tek cites is merely Guest-Tek's argument from its portion of the Joint Stipulation on Nomadix's Motion for a Protective Order (Dkt. No. 171).

As yet a further example, Guest-Tek materially misrepresents the two cases it principally relies on. (*Supra*, pp. 19–21.)

## VI.  CONCLUSION

*Ex parte* contact between Guest-Tek and Mr. Reed is still a threat to Nomadix's privilege. Mr. Hughes is the individual most qualified to protect that privilege during a meeting between Guest-Tek and Mr. Reed. The objection to Mr. Hughes's presence during the meeting between Guest-Tek and Mr. Reed in Bangkok was first suggested by Guest-Tek, not Mr. Reed. At the meeting in Bangkok, Mr. Reed agreed to discuss some issues the presence of Mr. Hughes, but Guest-Tek ended that meeting without attempting to explore any of those issues. Guest-Tek's attempt to manufacture a dispute should not be rewarded; its motion to dissolve or modify the Protective Order should be denied.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 12, 2018

/s/ *Mark Lezama*
Douglas G. Muehlhauser
Mark Lezama
Alan G. Laquer
Alexander J. Martinez
Justin J. Gillett
James F. Smith

Attorneys for Plaintiff
NOMADIX, INC.