Douglas G. Muehlhauser (SBN 179495)
doug.muehlhauser@knobbe.com
Mark Lezama (SBN 253479)
mark.lezama@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: 949-760-0404
Facsimile: 949-760-9502

Attorneys for Plaintiff
NOMADIX, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC., <br><br> Plaintiff, <br><br> v. <br><br> GUEST-TEK INTERACTIVE ENTERTAINMENT LTD., <br><br> Defendant. | Case No. <br> CV16-08033 AB (FFMx) <br><br> **DECLARATION OF ALAN LAQUER IN SUPPORT OF NOMADIX'S OPPOSITION TO GUEST-TEK'S MOTION TO DISSOLVE PROTECTIVE ORDER** <br><br> Honorable Frederick F. Mumm |

I, Alan Laquer, hereby declare as follows:

1. I am a partner in the law firm of Knobbe, Martens, Olson & Bear, LLP, and am counsel of record for Plaintiff Nomadix. Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called upon to do so, I could and would testify competently to them.

2. On April 20, 2018, I called Michael Swope, counsel for Guest-Tek. During that call, I explained Nomadix's view that, based on the Court's April 18, 2018 order granting-in-part Guest-Tek's motion to stay the case, the May 3, 2018 meeting in Bangkok planned between Guest-Tek and Charles Reed should be postponed. Mr. Swope responded that Guest-Tek was still planning to proceed with that meeting.

3. On April 24, 2018, I sent Mr. Swope an email, a true and correct copy of which is attached hereto as Exhibit 1. I have not received a reply from Mr. Swope or any other counsel for Guest-Tek in response to that email.

4. I travelled to Bangkok, Thailand in order to attend the May 3, 2018 meeting that Guest-Tek's counsel scheduled there with Mr. Reed. That required me to spend more than 20 hours traveling from the United States and more than 20 hours traveling back to the United States.

5. I arrived with Nomadix's General Counsel, Kelly Hughes, at the location that Guest-Tek had set for the meeting, the Intercontinental Hotel in Bangkok, shortly before the meeting's scheduled 10:00 a.m. start time. I followed the signs in the hotel lobby indicating that one of the hotel's conference rooms was reserved for Mr. Swope's law firm, Baker Hostetler.

6. Soon after Mr. Hughes and I arrived at the conference room designated for the meeting, Mr. Swope arrived. Shortly after 10:00 a.m., Mr. Swope stated that he was going to look for Mr. Reed and direct him to the conference room. I stated that I would accompany Mr. Swope, and I did accompany him to the hotel lobby.

7. Mr. Swope and I found Mr. Reed in the hotel lobby. Mr. Reed introduced three men whom he said would be accompanying him in the meeting. Mr. Reed introduced one as his personal attorney, another as a Thai Police Major, and the third as a Thai judge.

8. Mr. Reed asked whether Kelly Hughes would be attending the meeting. I responded that he would. Mr. Reed asked whether Mr. Hughes had an "advisory order" from a Thai court and stated that, under Thai law, Mr. Hughes would need such an order to say anything during the meeting. I asked Mr. Reed what supposed Thai law he was referring to. He stated that he could not identify the law. I then asked Mr. Reed whether he believed that Mr. Swope would also need an "advisory order" under Thai Law in order to say anything during the meeting. Mr. Reed stated that he believed Mr. Swope would not need such an order and that only Mr. Hughes would. I have subsequently been informed by Thai counsel that there does not appear to be any such Thai law that Mr. Reed suggested.

9. While he, Mr. Swope, and I were still in the lobby, Mr. Reed asked me whether Mr. Hughes would agree not to use against him anything that he would say during the meeting. Mr. Reed stated that he did not want Mr. Hughes to have first-hand knowledge of what he says to Guest-Tek's counsel, because Mr. Hughes could then testify regarding that. I told him that I did not believe Nomadix or Mr. Hughes would agree to such a restriction. Mr. Swope told Mr. Reed that Guest-Tek was seeking the meeting, not Nomadix, and thus Nomadix had no incentive to agree to conditions for the meeting. I further noted to Mr. Reed that it should be unsurprising to him that, even if I had attended the meeting without Mr. Hughes, I would necessarily inform Mr. Hughes very soon thereafter of what Mr. Reed said during the meeting, so Mr. Hughes' attendance would not affect his knowledge of Mr. Reed's statements. Mr. Reed responded that he was aware of that, but that he would be unconcerned in that hypothetical situation because

1  Mr. Hughes would only have secondhand knowledge of his statements during the
2  meeting and would therefore be unable to testify against him on that topic.

3     10. Also while we were still in the lobby, Mr. Reed told me that he was
4  glad that I was attending the meeting because he did not want to inadvertently
5  divulge Nomadix's privileged information to Mr. Swope and he hoped that I would
6  prevent him from inadvertently doing so.  I explained to Mr. Reed that
7  Mr. Hughes's attendance was important to protect against Mr. Reed disclosing
8  Nomadix's attorney-client privileged information because Mr. Hughes has far
9  more first-hand knowledge of the attorney-client discussions that occurred within
10 Nomadix involving Mr. Reed.  Mr. Reed asked whether Nomadix would agree that
11 Mr. Hughes would only attend part of the meeting and that Mr. Hughes would
12 need to leave the conference room for other portions of the meeting.  I again told
13 Mr. Reed that I did not believe Nomadix or Mr. Hughes would agree to such a
14 restriction.

15    11. Mr. Reed then began to discuss the April 16, 2014 mediation between
16 Nomadix and Guest-Tek, which I have been informed Mr. Reed and Mr. Hughes
17 attended on behalf of Nomadix, along with Nomadix's outside counsel, William
18 Shreve and Mark Lezama.  I have also been informed that Arnon Levy (Guest-
19 Tek's CEO) and a Guest-Tek employee, together with Guest-Tek's outside
20 counsel, Steven Rocci and Michael Swope, attended the mediation on behalf of
21 Guest-Tek.

22    12. While Mr. Reed, Mr. Swope, and I were still in the hotel lobby in
23 Bangkok, Mr. Reed began to discuss that mediation and questioned whether certain
24 conversations that occurred during it were protected by the attorney-client
25 privilege.  Mr. Swope told Mr. Reed that the conversations were not attorney-client
26 privileged and Mr. Reed should be free to discuss them further.  I told Mr. Reed
27 that Nomadix did not necessarily agree with Mr. Swope and that I would need to
28 discuss with Mr. Hughes.  I also noted that the meeting in the lobby had become

substantive rather than merely procedural, and should therefore be moved to the conference room. Mr. Swope responded that they were free to conduct the meeting in the lobby because Nomadix had me, as its attorney, present. I again explained that Mr. Hughes is more knowledgeable than I am about the many attorney-client correspondence between him and Mr. Reed over their several years working together, and that it was inappropriate for the meeting to continue substantively in the lobby without Mr. Hughes present. I informed Mr. Reed that I would discuss with Mr. Hughes his requested conditions for Mr. Hughes' full or partial attendance of the meeting. Mr. Swope and I then returned to the conference room where Mr. Hughes was waiting.

13. After Mr. Hughes and I spoke, Mr. Swope, Mr. Hughes, and I walked to the hotel lobby, where Mr. Reed and his entourage were waiting. I told Mr. Reed that Nomadix would not agree to the conditions he requested regarding Mr. Hughes' attendance. I offered Mr. Reed a letter that I stated more fully explained Nomadix's position. Mr. Reed calmly refused to accept the letter. Mr. Swope acted increasingly agitated by my offer of the letter. Mr. Swope asked what the letter's contents were. I responded to him that I had a copy for him and would provide it to him as soon as Mr. Reed accepted his copy. Mr. Swope became visibly more upset and demanded that I inform him what the letter regarded, irrespective of whether Mr. Reed accepted his copy. I declined and again explained that I had an exact copy for him and would provide it to him if and when Mr. Reed accepted his copy.

14. Mr. Swope, Mr. Hughes, and I then stepped away from Mr. Reed and his group in the lobby. Mr. Swope then told me that he was cancelling the meeting. Mr. Swope specifically identified my attempt to deliver the letter to Mr. Reed as the basis for Guest-Tek's cancellation of the meeting.

15. Throughout those discussions on May 3, 2018 involving at least Mr. Swope and me, Mr. Reed never definitively stated that he refused to meet with

Guest-Tek if Mr. Hughes would be present. Mr. Reed offered a series of compromises seeking to limit Mr. Hughes' attendance or Mr. Hughes' use of knowledge gained through attendance, but Mr. Reed did not make any ultimatum about Mr. Hughes' attendance. Also throughout those discussions, Mr. Reed never refused to answer a single question that Mr. Swope asked. After Mr. Reed offered to meet with Guest-Tek in Mr. Hughes' presence so long as Mr. Hughes agree to leave for unspecified portions of the meeting, Mr. Swope never asked for what topics Mr. Reed anticipated he would request that Mr. Hughes leave. Mr. Swope never made any attempt to get Mr. Reed to explain what topics he was willing to discuss in front of Mr. Hughes. Mr. Swope never suggested that the parties try to get through as much of Guest-Tek's questions as they could.

16. After Mr. Swope told me that he was cancelling the meeting, he and I walked back to the area in the lobby where Mr. Reed and his entourage were. Mr. Swope informed Mr. Reed that Guest-Tek was cancelling the meeting. Mr. Reed apologized to me that I had traveled all the way to Bangkok for that to occur. He repeated that he would be glad for me to attend the meeting because he did not want to inadvertently divulge Nomadix's privileged information to Mr. Swope and he hoped that I would prevent him from inadvertently doing so.

17. Mr. Reed then began to comment to Mr. Swope and me about his understanding of Nomadix's motivations, goals, and litigation strategy in this case, including his understanding of the role of Seale Moorer, CEO of Nomadix's parent company in shaping that litigation strategy. I told Mr. Reed that he should stop discussing that because it is likely attorney-client privileged information that he learned while he was still at Nomadix. Mr. Swope and Mr. Reed began to discuss what information they claimed was publicly available regarding Nomadix's ownership. I explained that Mr. Reed's statements went far beyond the issue of ownership, and I would again need to discuss with Mr. Hughes (who was a few

yards away in the lobby at the time) regarding the likely privileged source of Mr. Reed's statements about Nomadix's litigation strategy.

18. Mr. Reed and his entourage then exited the hotel. Mr. Swope, Mr. Hughes, and I returned to the conference room to gather our possessions and then also exited.

19. On May 14, 2018, I sent Kevin Bovard, counsel for Guest-Tek, an email, a true and correct copy of which is attached hereto as Exhibit 2.

20. Between April 16 and 23, 2018, I exchanged emails with Mr. Reed seeking to schedule his deposition in response to Guest-Tek scheduling the meeting with him. A true and correct copy of the last email from that exchange, incorporating the earlier emails, is attached hereto as Exhibit 3. To date, Mr. Reed has not provided Nomadix with specific availability for his deposition; the most detail he has offered is that he "may be in the US in August if that helps."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 12, 2018.

_____
Alan Laquer