Douglas G. Muehlhauser (SBN 179495)
doug.muehlhauser@knobbe.com
Mark Lezama (SBN 253479)
mark.lezama@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: 949-760-0404
Facsimile: 949-760-9502

Attorneys for Plaintiff
NOMADIX, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC., <br><br> Plaintiff, <br><br> v. <br><br> GUEST-TEK INTERACTIVE ENTERTAINMENT LTD., <br><br> Defendant. | Case No. CV16-08033 AB (FFMx) <br><br> **DECLARATION OF KELLY HUGHES IN SUPPORT OF NOMADIX'S OPPOSITION TO GUEST-TEK'S MOTION TO DISSOLVE PROTECTIVE ORDER** <br><br> Honorable Frederick F. Mumm |

I, Kelly Hughes, hereby declare as follows:

1. I am General Counsel for Plaintiff Nomadix, Inc. Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called upon to do so, I could and would testify competently to them.

2. Nomadix is based in Agoura Hills, California.

3. Guest-Tek is based in Canada but does business in the United States, including in California.

4. I have been employed as General Counsel for Nomadix since 2009. My responsibilities during that time have included developing legal strategies for Nomadix, including negotiating licenses of Nomadix's patents and other intellectual property and overseeing the enforcement of Nomadix's patents through litigation. I have overseen all litigation and licensing between Nomadix and Guest-Tek.

5. Charles Reed was a director of Nomadix from March 2008 through September 2015. For the majority of the time that Mr. Reed was at Nomadix, I was Nomadix's General Counsel. As Nomadix's General Counsel, I advised Mr. Reed regarding several attorney-client issues pertaining to Guest-Tek, such as when Nomadix sued Guest-Tek for patent infringement in 2009; and when the parties entered into a license agreement in 2010; and when the parties mediated breach of that license agreement in 2014; and again when Nomadix and related parties were involved in due diligence in connection with a sale of Nomadix in 2015, during which I advised Nomadix of the value of its claims against Guest-Tek.

6. As Nomadix's General Counsel, a significant portion of my responsibilities consists of advising Nomadix's directors regarding Nomadix's legal matters. That was also true when Mr. Reed was one of Nomadix's directors and I was also Nomadix's General Counsel then. Over the span of at least six years, I advised Mr. Reed and other Nomadix directors regarding legal matters on a near-daily basis. During that time, I estimate that I had hundreds, if not thousands, of privileged discussions with Mr. Reed regarding Guest-Tek and the agreements and

claims at issue in the above-captioned action.  The vast majority of those discussions did not involve outside counsel.  I was the only attorney involved in the vast majority of those discussions, and I am therefore the only Nomadix attorney with personal knowledge of the existence and content of the discussions and surrounding circumstances, such as who was present at the many attorney-client discussions involving Mr. Reed.

7. Nomadix was sold to a new shareholder on September 29, 2015. DOCOMO interTouch Pte. Ltd. (formerly named inter-touch Pte. Ltd. and hereinafter "interTouch") had been Nomadix's parent company for most of Mr. Reed's tenure as a Nomadix director until Nomadix was sold on September 29, 2015.  After the sale, Mr. Reed remained involved in Nomadix during a brief transition period.  Both leading up to the sale and during the transition period, I had several attorney-client discussions with Mr. Reed regarding Nomadix's litigation strategy as it relates to this case and the sale.  Mr. Reed left Nomadix shortly after the time of the sale in 2015.

8. I travelled to Bangkok, Thailand in order to attend the meeting between Guest-Tek's counsel and Charles Reed that they had scheduled for May 3, 2018. That required me to spend more than 20 hours traveling from the United States and more than 20 hours traveling back to the United States, imposing a significant inconvenience on my work obligations.  My goal in traveling to Bangkok was to seek to avoid disclosure by Mr. Reed, to Guest-Tek's counsel, of Nomadix's attorney-client privileged information.  I am uniquely qualified to identify conversation topics that Mr. Reed might engage in that are particularly likely to lead to the disclosure of attorney-client privileged information.  To the best of my knowledge, my discussions with Mr. Reed during our several years working together at Nomadix are the primary source of Mr. Reed's knowledge on several attorney-client privileged topics, including those related to litigation strategy.

9. I understand that Mr. Reed has claimed that our last conversation when he left Nomadix's then-parent company was "that our friendship was no longer" and that he will never speak to me again. We did not have such a conversation. Prior to the scheduling of Mr. Reed's meeting with Guest-Tek's counsel in Bangkok, I believed that he and I remained on cordial terms. In fact, before that meeting scheduling but after Mr. Reed departed Nomadix and after this litigation began, I and my family happened to encounter Mr. Reed while on vacation and had a friendly interaction with him then.

10. Based upon Mr. Reed's statements at the May 3, 2018 meeting with Guest-Tek's counsel in the lobby of the Intercontinental Hotel in Bangkok, I believe that there is a significant risk that Mr. Reed might divulge Nomadix's attorney-client privileged information to Guest-Tek's counsel should there be a future meeting between them. I therefore believe that, in order to protect Nomadix's attorney-client privileged information, it would be very important for me to attend any such future meeting between Mr. Reed and Guest-Tek's counsel.

11. In the course of performing my duties for Nomadix, I have worked closely with Nomadix's Board of Directors. Mr. Reed was a director of Nomadix from March 2008 through September 2015. In November 2009, I was appointed to Nomadix's Board of Directors, and I served as a director through the remainder of Mr. Reed's tenure on the Board. Throughout Mr. Reed's tenure as a director, the Board had no more than four members at any point in time; in several years, the Board had only three members. Of the three to four members of the Board, Mr. Reed was an important director because he was also the Chief Executive Officer of DOCOMO interTouch Pte. Ltd., the sole shareholder of Nomadix during Mr. Reed's tenure on the Board.

12. I am familiar with the responsibilities Mr. Reed had at Nomadix. While serving on Nomadix's Board of Directors, Mr. Reed was the primary liaison between Nomadix's management and the Board and its shareholder. Mr. Reed advised

1  Nomadix's management, on behalf of the Board, regarding strategic decisions for
2  the company, and reported back to the Board and its shareholder regarding
3  Nomadix's operations. Mr. Reed also presided over Nomadix's Board meetings. Mr.
4  Reed also worked with me and Nomadix's outside counsel on litigation and licensing
5  between Nomadix and Guest-Tek. Because Mr. Reed was a member of Nomadix's
6  Board and was CEO of Nomadix's sole shareholder, I kept him regularly informed
7  about Nomadix's legal strategies. Indeed, in the course of performing his duties as a
8  Nomadix director, Mr. Reed was privy to Nomadix's privileged and most
9  confidential information and strategies. Mr. Reed is not a lawyer.

10  13.  In 2009, Nomadix sued Guest-Tek for patent infringement. In December 2010, the parties settled. As part of the settlement, Nomadix and Guest-Tek entered into a Confidential License Agreement. I oversaw this lawsuit and negotiation of the License Agreement. During the settlement negotiations between Nomadix and Guest-Tek that led to the License Agreement, Nomadix's outside counsel and I conducted numerous privileged briefings with Mr. Reed regarding Nomadix's internal strategy. Topics of these discussions included various drafts of the agreement, negotiation strategy, enforcement strategy, and the relative strength and value of the licensed Nomadix patents. Mr. Reed signed the License Agreement on behalf of Nomadix, and Guest-Tek's CEO, Arnon Levy, signed the License Agreement on behalf of Guest-Tek.

21  14.  Under the License Agreement, Guest-Tek must pay royalties on a quarterly basis for incorporating Nomadix's patented technology into its products. Nomadix contends that Guest-Tek has breached the License Agreement and owes Nomadix millions of dollars in royalties under the agreement.

25  15.  In January 2013, Nomadix requested that the parties mediate Guest-Tek's breach of the License Agreement. On April 16, 2014, Nomadix and Guest-Tek appeared before Antonio Piazza of Mediated Negotiations in San Francisco. Mr. Reed and I attended the mediation on behalf of Nomadix, along with Nomadix's

outside counsel, William Shreve and Mark Lezama of Knobbe Martens Olson & Bear. Mr. Levy and Andrew MacMillan, an employee of Guest-Tek, together with Guest-Tek's outside counsel, Steven Rocci and Michael Swope, attended the mediation on behalf of Guest-Tek. The mediation lasted a full day. For most of the proceedings, the parties were in separate rooms, with Mr. Piazza going back and forth between the parties. When Mr. Piazza brought a proposal or other issue to Nomadix's attention, Nomadix's standard procedure was to discuss the issue in its private room outside of Mr. Piazza's presence prior to discussing the issue with Mr. Piazza. Mr. Shreve, Mr. Lezama, and I did not provide advice on the fly in front of Mr. Piazza. Nor did Mr. Reed or I solicit advice from Nomadix's outside counsel in front of Mr. Piazza. Nor did Nomadix take positions, make proposals, or give instructions to Mr. Piazza without first discussing those issues privately. When Mr. Piazza was not present, Mr. Reed, Mr. Lezama, Mr. Shreve, and I conducted confidential discussions in Nomadix's separate room regarding resolution of the License Agreement dispute, including interpretations of the relevant provisions of the License Agreement, the relative strengths and weaknesses of the parties' actual and potential positions, the likelihood of potential outcomes and recoveries, and Nomadix's threshold for settlement. Although the parties conducted some discussions face to face in the morning, the parties did not conduct any face-to-face discussions after lunch.

16. In the afternoon, Mr. Piazza brought Nomadix a handwritten proposed MOU that Guest-Tek had prepared. Under Guest-Tek's proposed MOU, the parties would engage in a twelve-month standstill of their dispute. Under the proposed MOU, the parties would also retain a mutually agreeable expert to evaluate Guest-Tek's alleged design-arounds; although the parties would agree not to dispute the expert's conclusions for purposes of settlement discussions, the expert's conclusions would not be discoverable, admissible, or binding. Under its proposal, Guest-Tek

would also cooperate with Nomadix's requests for audits under the License Agreement.

17. After delivering the proposed MOU, Mr. Piazza left Nomadix's room, and Mr. Reed, the two Knobbe attorneys, and I discussed the proposed MOU. During that discussion, we formulated our position regarding the sufficiency of the provisions therein and determined how we would respond. After we finished discussing the proposed MOU, Mr. Piazza re-entered. We then discussed with Mr. Piazza the position that Mr. Reed, the two Knobbe attorneys, and I had determined in Mr. Piazza's absence. During our conversation with Mr. Piazza, Nomadix's attorneys did not provide advice and Nomadix did not take positions, make proposals, or give instructions that we had not discussed privately. Mr. Piazza then left with the proposed MOU and returned sometime later with an edited version. The proposed MOU now also contained the following sentence: "The parties stipulate that this satisfies the arbitration provision of the settlement and license agreements." After discussing the new proposed MOU, Nomadix accepted Guest-Tek's offer and signed the MOU.

18. My recollection of events the day of the mediation differs from the recollection Mr. Reed sets forth in his October 5, 2017 declaration, and I do not agree with all of the statements in his declaration. But the accuracy of Mr. Reed's declaration does not affect the points I make in the preceding paragraph.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 12, 2018.

*Kelly H. Hughes*
Kelly Hughes