Steven J. Rocci (Admitted *Pro Hac Vice*)
Email: srocci@bakerlaw.com
Kevin M. Bovard, SBN 247521
Email: kbovard@bakerlaw.com
**BAKER & HOSTETLER LLP**
2929 Arch Street, 12th Floor
Philadelphia, PA 19104-2891
Telephone: 215.568.3100
Facsimile: 215.568.3439

*Attorneys for Defendant/Counter-Claimant*
GUEST-TEK INTERACTIVE ENTERTAINMENT LTD.

(*additional counsel listed on following page*)

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC., <br><br> Plaintiff, <br><br> v. <br><br> GUEST-TEK INTERACTIVE ENTERTAINMENT LTD., <br><br> Defendant/Counter-Claimant, <br><br> v. <br><br> NOMADIX, INC., <br><br> Counter-Defendant. | Case No.: 2:16-cv-08033-AB-FFM <br><br> [*Honorable Frederick F. Mumm*] <br><br> **GUEST-TEK INTERACTIVE ENTERTAINMENT LTD.'S REPLY IN SUPPORT OF MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, TO MODIFY PROTECTIVE ORDER (D.I. 194)** <br><br> Hearing Date: July 3, 2018 <br> Time: 10:00 a.m. <br> Courtroom: 580 <br><br> Action Filed: 10/28/16 <br> Amended Complaint Filed: 03/23/17 |

Michael J. Swope (Admitted *Pro Hac Vice*)
Email: mswope@bakerlaw.com
**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3500
Seattle, WA 98104-4040
Telephone: 206.332.1379
Facsimile: 206.624.7317

Michael R. Matthias, SBN 57728
Email: mmatthias@bakerlaw.com
Joelle A. Berle, SBN 252532
Email: jberle@bakerlaw.com
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859

*Attorneys for Defendant/Counter-Claimant*
GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. ARGUMENT .................................................................................................. 3

    A. The Court should dissolve the protective order. ................................... 3

        1. Nomadix violated the protective order by insisting that Mr. Hughes attend Guest-Tek's meeting with Mr. Reed. ................. 3

        2. The protective order does not mandate a Nomadix-approved "smooth meeting." ............................................................... 5

    B. Alternatively, the Court should modify the protective order. ............... 6

        1. The Court should allow Guest-Tek to meet with Mr. Reed upon reasonable notice to Nomadix. .......................................... 6

            a. Nomadix's duty to cooperate does not end once a meeting is scheduled. ........................................................ 6

            b. Nomadix did not cooperate—it bullied Mr. Reed out of meeting with Guest-Tek. ................................................ 6

        2. The Court should also exclude Mr. Hughes from any future meetings between Guest-Tek and Mr. Reed. ............................. 8

            a. Mr. Reed has consistently and validly objected to Mr. Hughes' attendance. ........................................................ 9

            b. Mr. Reed has independently objected to Mr. Hughes' attendance. ........................................................................ 9

    C. Nomadix's deflections do not excuse its conduct. ............................. 10

        1. Nomadix alone is responsible for Guest-Tek's fees and costs. .................................................................................. 10

        2. Guest-Tek made no misrepresentations or omissions. ............. 12

III. CONCLUSION ............................................................................................ 13

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Redus v. CSPH, Inc.*,
   No. 3:15-cv-2364, 2017 WL 2079807 (N.D. Tex. May 15, 2017) ......... 11, 12, 13

*In re Shell Oil Refinery*,
   136 F.R.D. 615 (E.D. La. 1991) ............................................................... 4, 5, 7, 9

## I. INTRODUCTION

The Court's February 1, 2018 order concerning Guest-Tek's interactions with Charles Reed (D.I. 194) struck a balance between Guest-Tek's right to privately interview a third-party fact witness, Mr. Reed, and Nomadix's alleged fears that Mr. Reed might disclose its privileged information. Indeed, when seeking the order, Nomadix argued that the scope of the protection it sought was "narrowly tailored." (D.I. 171 at 18.) And Nomadix "neither requested nor did the Court grant any restriction on contact between [Guest-Tek] and Mr. Reed other than the restriction that [Nomadix] was entitled to have *an* attorney witness any such contact." (D.I. 260 at 1) (emphasis added). Until this dispute arose in early May, Nomadix never mentioned or suggested that it might want its internal corporate representative, Kelly Hughes—or any corporate representative—present at the interview. The suggestion was always that Nomadix wanted its *outside* counsel present at those interviews. Nomadix sprang Mr. Hughes on the scheduled May 3 interview at the very last minute.

Nomadix's conduct is yet another blatant abuse of the order, which limits Nomadix's presence at interviews to "Nomadix's attorneys." (D.I. 194 at 1.) While Mr. Hughes may be an attorney, he is nonetheless a corporate representative of Nomadix, whose presence is meant to make an impression on Mr. Reed. Mr. Hughes knows that there is animosity between Mr. Reed and himself, and that there is distrust between them from previous business dealings. Nomadix desires Mr. Hughes' presence for only one purpose—to silence Mr. Reed through intimidation and fear of retribution for speaking with Guest-Tek.

Nomadix should not be allowed to use the Court's order as a gag order. The Court's order did not say that Nomadix is entitled to have its allegedly *most knowledgeable* attorney, much less a Nomadix corporate representative, witness Guest-Tek's contact with Mr. Reed. (Indeed, the protective order was supposed to protect privilege, not facts.) It did not say that Nomadix is entitled to have *Kelly*

1

*Hughes*—Nomadix's general counsel, Nomadix's corporate representative and Mr. Reed's antagonist—witness that contact. Yet Nomadix now argues that the protective order entitles it to all of those things. (*See, e.g.*, D.I. 291 at 2, 6, 7, 8.) If Nomadix had wanted its corporate representative present at the interview, then it should have made that request when it sought the order.

When not trying to rewrite the protective order, Nomadix tries to rewrite the facts. But the undisputed facts are these:

- When Nomadix moved for the protective order, it never specifically requested that Mr. Hughes attend any meetings between Guest-Tek and Mr. Reed. (D.I. 260 at 1; D.I. 288 at 4.)
- Nomadix never specifically told Mr. Reed that Mr. Hughes would attend the meeting in Bangkok. Guest-Tek was forced to "relay[] that information to Mr. Reed." (D.I. 291 at 17.) And by the time Mr. Reed could object to Mr. Hughes' attendance, Mr. Hughes was on a plane to Bangkok. (D.I. 288 at 5.)
- Nomadix's outside counsel, Alan Laquer, accompanied Mr. Hughes to Bangkok. (D.I. 292 ¶ 4.) Guest-Tek and Mr. Reed did not object to Mr. Laquer's attendance at the meeting. (D.I. 288 at 6–7.) Yet Nomadix insisted that Mr. Hughes attend over Mr. Reed's objections. (D.I. 291 at 6.)
- In Bangkok, during negotiations over Mr. Hughes' attendance at the meeting, Nomadix tried to hand-deliver Mr. Reed a letter alleging "that Nomadix had incurred substantial expenses litigating issues concerning Mr. Reed." (*Id.* at 19.)
- After Nomadix's attempted delivery of the letter, the meeting was called off. The meeting never became substantive. (D.I. 288 at 7; D.I. 291 at 15.)

Nomadix refused to cooperate with Guest-Tek—and shows no signs of changing its mind. In its opposition brief, Nomadix announces that Mr. Hughes' attendance at "any future meeting between Guest-Tek and Mr. Reed" will be not only preferred, but "necessary." (D.I. 291 at 7.) If that is so, then Nomadix should move for a new protective order. Under the current protective order, Nomadix must cooperate with Guest-Tek (D.I. 260 at 1), and the plain fact is that it could have protected its privileged information with outside counsel's attendance alone; Mr. Hughes' attendance was not required. Nomadix should not be allowed to interfere with Guest-Tek's informal fact-gathering. Because Nomadix refuses to cooperate, the current protective order must be dissolved or modified.

## I. ARGUMENT

### A. The Court should dissolve the protective order.

#### 1. Nomadix violated the protective order by insisting that Mr. Hughes attend Guest-Tek's meeting with Mr. Reed.

The protective order imposes only one "restriction on contact between [Guest-Tek] and Mr. Reed": that Nomadix is "entitled to have an attorney witness any such contact."[1] (*Id.*) By trying to rewrite "an attorney" to mean Nomadix's corporate representative, who coincidentally happens to be its general counsel, Nomadix is trying to impose a new restriction on Guest-Tek's meetings with Mr. Reed. That violates the protective order. (D.I. 288 at 10; *contra* D.I. 291 at 6.)

Not even Nomadix's version of the protective order's history requires Mr. Hughes' attendance. "[R]ecalling why the Court issued a protective order in the first place," Nomadix urges that "communications between Guest-Tek and Mr. Reed outside the presence of Nomadix's attorneys threaten Nomadix's privileged attorney-client information." (D.I. 291 at 4–5.) But that alleged threat does not

---

[1] Guest-Tek does not "contend," and does not ask the Court to decide, whether "the protective order entitles Nomadix to have only a single attorney present at any meeting between Guest-Tek and Mr. Reed." (D.I. 291 at 6) (citing D.I. 288 at 9).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  explain why the protective order mandates that Mr. Hughes observe all of those
2  communications.
3        Nor can it.  Nomadix's outside counsel, including Mr. Laquer, could have
4  protected its privileged information.  (*Id.* at 8.)  Yet Nomadix refused to let Mr.
5  Laquer do so, stating unbelievably that "[n]o amount of litigation experience and
6  competence on the part of Nomadix's outside counsel" could possibly allow him to
7  preserve privilege without Mr. Hughes' help.  (*Id.* at 9.)  Guest-Tek thinks more
8  highly of Mr. Laquer than that; after all, he has represented Nomadix against Guest-
9  Tek for most of this decade.  (D.I. 288 at 9.)  But even if Nomadix's dim
10  assessment of Mr. Laquer were true, then Nomadix should have sent one of its
11  more seasoned outside attorneys to the meeting, or it should have moved for a
12  protective order specifically granting Mr. Hughes permission to attend any meeting
13  between Guest-Tek and Mr. Reed.  Nomadix never did that.
14        Whether Mr. Hughes is the "most knowledgeable" person about Nomadix's
15  privileged information is irrelevant.  (*Cf.* D.I. 291 at 2, 3 ("greatest knowledge"), 6,
16  7, 8, 9, 14, 20.)  Knowledge of facts is not at issue here; the question of attorney-
17  client privilege is.  Neither the protective order nor any other authority entitles
18  Nomadix to bring its allegedly most knowledgeable person to meetings between
19  Guest-Tek and Mr. Reed.  *See In re Shell Oil Refinery*, 136 F.R.D. 615 (E.D. La.
20  1991).  In *Shell*, for example, the court excluded the defendant's corporate
21  representative from the plaintiff's deposition.  *Id.* at 618.  It found no authority "that
22  a party is entitled to have a *knowledgeable* corporate representative"—let alone the
23  "most knowledge[able]" representative—attend the opposing party's deposition.
24  *Id.* at 615, 617 (emphasis in original).  The court observed that the plaintiff "fe[lt]
25  intimidated" by the defendant's representative, and warned that the representative, a
26  potential fact witness, should not "have the benefit of attending the plaintiff['s]
27  deposition[]." *Id.* at 617.  So too here.  Mr. Hughes harassed and intimidated Mr.
28  Reed with his surprise appearance in Bangkok.  (D.I. 288 at 2.)  And Mr. Hughes is

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

not merely a potential fact witness—he is an actual fact witness. He has already submitted four declarations for Nomadix, and three of them repeatedly mention Mr. Reed. (D.I. 87 ¶¶ 9, 13, 18; D.I. 162 ¶¶ 5–7, 9, 11–12; D.I. 207; D.I. 293 ¶¶ 5–13, 15.) Mr. Hughes' alleged knowledge is no excuse for him to impose himself on Mr. Reed.

Whether "Mr. Reed stated more than once that he wanted a Nomadix attorney present" for the Bangkok meeting is also irrelevant. (D.I. 291 at 5) (citing D.I. 292 ¶¶ 10, 16). Mr. Reed was talking about one specific "Nomadix attorney"—Mr. Laquer. According to Mr. Laquer, "Mr. Reed told me that he was glad that *I was attending* the meeting" and later "repeated that he would be glad *for me to attend* the meeting." (D.I. 292 ¶¶ 10, 16) (emphasis added). Mr. Reed did not say anything similar about Mr. Hughes, with whom he is not on speaking terms.

Guest-Tek and Mr. Reed were willing to hold the Bangkok meeting with Mr. Laquer in the room. (D.I. 288 at 6–7.) Nomadix could have protected its privileged information that way. Yet Nomadix rejected this compromise, proving that it is more interested in bullying Mr. Reed than preserving privilege.

**2.  The protective order does not mandate a Nomadix-approved "smooth meeting."**

Unable to outright deny that Mr. Laquer can preserve privilege, Nomadix disparages his ability to preserve it "on the fly." (D.I. 291 at 8.) Nomadix imagines that Mr. Laquer "would need to pause the meeting and confer privately with Mr. Reed to thoroughly explore the facts surrounding Guest-Tek's question." (*Id.*) And it frets that even if Mr. Laquer paused the meeting, he still may not be able to assess privilege because Mr. Reed "may misremember . . . whether . . . [his] responses to a pending question would reflect legal advice." (*Id.*) Nomadix does not identify any particular questions or facts that might require a pause, or any particular reasons to doubt Mr. Reed's memory, yet it deems Mr. Hughes "critical to ensuring a smooth meeting with minimal interruptions." (*Id.*) But whether or not he is critical, the

protective order does not mandate a Nomadix-approved "smooth meeting" free of pauses. The meeting is Guest-Tek's, not Nomadix's.

### B. Alternatively, the Court should modify the protective order.

#### 1. The Court should allow Guest-Tek to meet with Mr. Reed upon reasonable notice to Nomadix.

Nomadix's failure to "to cooperate with [Guest-Tek] in arranging any . . . contacts" with Mr. Reed has necessitated this "motion to amend the order to provide that [Guest-Tek] must only give reasonable notice to [Nomadix] for any such meeting." (D.I. 260 at 1.) Mr. Hughes' surprise appearance in Bangkok is not cooperation. Nomadix's threatening letters to Mr. Reed are not cooperation. And Nomadix's excuses do not justify its antics.

##### a. Nomadix's duty to cooperate does not end once a meeting is scheduled.

Instead of showing that it cooperated with Guest-Tek, Nomadix tries to disclaim its duty to cooperate. Nomadix suggests that the duty applies only to "scheduling the meeting" and not to anything that happens afterward. (D.I. 291 at 23.) But Nomadix's duty is not so narrow—it exists to prevent Nomadix from imposing "restriction[s] on contact between [Guest-Tek] and Mr. Reed" that are not authorized by the protective order. (D.I. 260 at 1.) The protective order does not mandate Mr. Hughes' attendance at Guest-Tek's meetings with Mr. Reed. So Nomadix should have cooperated with Guest-Tek to determine not only the date, time, and location of a meeting—but also a reasonable resolution to Mr. Reed's objection to Mr. Hughes' presence.

##### b. Nomadix did not cooperate—it bullied Mr. Reed out of meeting with Guest-Tek.

Unable to disclaim its duty to cooperate, Nomadix denies that it "harassed and intimidated Mr. Reed" by surprising him with Mr. Hughes' attendance or by

sending letters threatening legal action. (D.I. 291 at 16.) But none of Nomadix's excuses justifies its conduct.

For its first two excuses, Nomadix argues that Guest-Tek "cannot demonstrate intimidation" or "explain[] why Mr. Reed would find Mr. Hughes intimidating." (*Id.* at 16–17.) In support, Nomadix concludes that "Mr. Reed answered every question Mr. Swope asked." (*Id.* at 16; *accord id.* at 17.) But that is not saying much. Nomadix and Mr. Hughes prevented Mr. Swope from asking a single substantive question; all of the questions pertained to meeting logistics. (D.I. 292 ¶¶ 8–15.) And in any event, the real issue is whether Mr. Hughes' attendance would influence Mr. Reed's answers by, among other possibilities, causing Mr. Reed not to answer "as fully as he would otherwise." *Shell Oil*, 136 F.R.D. at 617. That possibility looms large here, given Mr. Reed's concern that Mr. Hughes will use his answers against him. (D.I. 288 at 6; D.I. 291 at 3–4.)

For its third excuse, Nomadix denies that Mr. Hughes' attendance at the meeting was a "surprise." (D.I. 291 at 17.) But it is undisputed that Nomadix never told Mr. Reed that Mr. Hughes would attend, so Guest-Tek was forced to "relay[] that information" to him. (*Id.*) And by the time Mr. Reed could object to Mr. Hughes' attendance, Mr. Hughes was on a plane to Bangkok. (D.I. 288 at 5.) Blaming Mr. Reed for not objecting sooner, Nomadix points to Guest-Tek's earlier statement to Mr. Reed that "'Nomadix attorneys' might attend" the meeting. (D.I. 291 at 17.) But Mr. Reed had no reason to predict that Mr. Hughes would be among them, especially after Nomadix initially disclosed only that Mr. Laquer would attend. (D.I. 288-1, Ex. 2 at 2.) And while Nomadix's outside counsel were copied on the email communications to Mr. Reed, Mr. Hughes was not. What we do know is that Mr. Reed, when notified, indicated that he did not want Mr. Hughes to attend. He also made that more than clear to Mr. Laquer in person in the lobby of the Bangkok hotel. Likely in expectation of Nomadix's further intimidation

7

GUEST-TEK INTERACTIVE ENTERTAINMENT LTD.'S REPLY IN SUPPORT OF
MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, TO MODIFY PROTECTIVE ORDER (D.I. 194)
CASE NO.: 2:16-CV-08033-AB-FFM

attempts, Mr. Reed had a Thai lawyer, a Thai police officer, and a Thai judge accompany him to the meeting. (D.I. 288-1 ¶ 6; D.I. 292 ¶ 7.)

For its fourth and final excuse, Nomadix downplays its threatening letter that cites its allegedly "substantial expenses" incurred "litigating issues concerning Mr. Reed." (D.I. 291 at 19.) According to Nomadix, it was just "preserv[ing] its legal rights." (*Id.* at 17.) That is a charitable description of a letter insinuating that Nomadix might sue Mr. Reed for tens of thousands of dollars. (*See* D.I. 288 at 7.) And the letter was threatening not only for its content, but also for its manner of delivery. Nomadix's Singaporean counsel could have mailed or emailed that letter to Mr. Reed in advance. After all, they apparently did eventually send him a copy. Instead, Nomadix chose Guest-Tek's meeting with Mr. Reed in Bangkok to spring it on Mr. Reed. (*Id.*) This, too, Nomadix blames on Mr. Reed. (D.I. 291 at 18.) If Mr. Reed did not want to be intimidated by a surprise letter, Nomadix rationalizes, then he should have "acknowledged receiving" an earlier threatening letter. (*Id.*) But Mr. Reed is not required to opt in to Nomadix's cooperation. There are no conditions on Nomadix's duty to cooperate. And Nomadix's disruption should not be excused because Mr. Reed "calmly" refused to accept the letter. (*Id.* at 4.) That may be a testament to Mr. Reed's character, but it does not excuse Nomadix's behavior.

### 2. The Court should also exclude Mr. Hughes from any future meetings between Guest-Tek and Mr. Reed.

Even Nomadix recognizes that a "reasonable notice" modification to the protective order might not be enough to protect Guest-Tek and Mr. Reed from Nomadix's bullying. (*Id.* at 23.) So if the Court modifies the protective order, it should also exclude Mr. Hughes from future meetings between Guest-Tek and Mr. Reed.

### a. Mr. Reed has consistently and validly objected to Mr. Hughes' attendance.

Mr. Reed gave two main reasons for objecting to Mr. Hughes' attendance: that they are not on speaking terms and that Mr. Hughes "would use anything he said at the meeting to try to create problems for him," possibly by testifying against him. (D.I. 288 at 5–6; *accord* D.I. 291 at 13.) Grasping for an ulterior "strategic objective" behind the second reason, Nomadix suggests that Mr. Reed's reasons are inconsistent with each other. (D.I. 291 at 13.) But, in fact, they are closely related: Mr. Hughes' bad blood with Mr. Reed is precisely why Mr. Hughes might create problems for him.

These reasons provide good cause to exclude Mr. Hughes from future meetings. If Nomadix continues to impose Mr. Hughes on Mr. Reed, then it will gain "an unfair advantage over" Guest-Tek because Mr. Hughes, a potential fact witness, "will have the benefit of attending" Guest-Tek's meetings with Mr. Reed. *Shell Oil*, 136 F.R.D. at 617. The benefit would be twofold: In the meeting, Mr. Hughes could try to intimidate Mr. Reed out of giving complete testimony. After the meeting, Mr. Hughes could craft his own testimony to counter Mr. Reed's testimony. If Mr. Hughes' revisionist history of his former friendship with Mr. Reed is any indication, then Mr. Hughes has already begun to testify around Mr. Reed's comments. (*See* D.I. 293 ¶ 9.) The Court should put an end to it.

### b. Mr. Reed has independently objected to Mr. Hughes' attendance.

Mr. Reed's objections are his alone, and Guest-Tek neither suggested nor forced him to object. When Mr. Reed learned that Mr. Hughes planned to accompany Mr. Laquer to the meeting, he consulted with his lawyer and objected to Mr. Hughes' attendance by the next business day. (*See* D.I. 288-1, Ex. 1 at 3–4.) The facts do not support Nomadix's long-winded conspiracy theory of a Guest-Tek-

9

GUEST-TEK INTERACTIVE ENTERTAINMENT LTD.'S REPLY IN SUPPORT OF
MOTION TO DISSOLVE OR, IN THE ALTERNATIVE, TO MODIFY PROTECTIVE ORDER (D.I. 194)
CASE NO.: 2:16-CV-08033-AB-FFM

induced objection, and Nomadix notably fails to cite *any* evidence supporting its theory. (*Cf.* D.I. 291 at 9–13.)

Not surprisingly, Nomadix's conspiracy theory contradicts itself. In one breath, Nomadix cynically observes that "Mr. Reed confirmed all seven points" of Guest-Tek's email about the meeting by "repeating [them] back" to Mr. Swope. (*Id.* at 10.) Yet in the next breath, Nomadix relies on one of those seven points—"Nomadix lawyers may appear at this meeting"—to argue that Mr. Reed previously agreed to Mr. Hughes' attendance. (*Id.* at 11, 13.)

Nomadix's conspiracy theory is also inaccurate. Mr. Reed never agreed to Mr. Hughes' attendance. On April 11, Mr. Reed agreed only that "Nomadix lawyers may appear at th[e] meeting." (*Id.* at 11.) At the time, Nomadix indicated that only Mr. Laquer would appear, so Mr. Reed would not have known that Nomadix intended to bring his antagonist, Kelly Hughes. (D.I. 288-1, Ex. 2 at 2.) Nomadix waited two more weeks—until April 24—to tell Guest-Tek that Mr. Hughes would attend. (D.I. 288 at 5; D.I. 291 at 24.) Until Guest-Tek "relayed that information to Mr. Reed," he had no reason to believe that Mr. Hughes or anyone else would accompany Mr. Laquer to the meeting. Ever since then, Mr. Reed has independently objected to Mr. Hughes' attendance. (D.I. 288 at 5–6.) He did not need or receive an "invit[ation]" from Guest-Tek "to do so," and Nomadix points to no such "invitation." (D.I. 291 at 11) (emphasis omitted).

### C. Nomadix's deflections do not excuse its conduct.
#### 1. Nomadix alone is responsible for Guest-Tek's fees and costs.

Guest-Tek could have conducted its Bangkok meeting with Mr. Reed, had Nomadix not insisted that Mr. Hughes join Mr. Laquer for the meeting. Guest-Tek could even have conducted its Bangkok meeting had Nomadix offered a reasonable compromise. Guest-Tek and Mr. Reed did not object to Mr. Laquer's attendance, and Mr. Laquer could have protected Nomadix's privileged information. (*See* D.I. 288 at 6–7; D.I. 291 at 8.) Yet Nomadix's response to Mr. Reed's offer of

10

1  compromise consisted of a threatening letter to Mr. Reed prepared by Singaporean
2  counsel.  Nomadix is solely responsible for Guest-Tek's fees and costs.

3      Nomadix's deflections do not change this conclusion.  Nomadix labels
4  Guest-Tek's fees and costs "voluntarily incurred" because the attempted meeting
5  took place "during a stay" and because Mr. Reed might travel to the United States
6  in August.  (D.I. 291 at 23.)  But as Guest-Tek explained in an earlier brief,
7  "'[c]ourts generally do not consider . . . [a] stay to affect informal fact investigation
8  or witness interviews,'" or other informal meetings such as the attempted Bangkok
9  meeting.  (D.I. 290 at 1) (quoting *Redus v. CSPH, Inc.*, No. 3:15-cv-2364, 2017 WL
10 2079807, at *6 (N.D. Tex. May 15, 2017) (collecting cases)).  And if Guest-Tek
11 had waited until August to meet with Mr. Reed, then it would have risked wasting
12 3–4 months before running into the same dispute about Mr. Hughes' attendance
13 that the parties find themselves in now.

14     Nomadix's second-guessing of Guest-Tek's decisions in Bangkok does not
15 excuse its obstruction, either.  Nomadix faults Guest-Tek for not "asking Mr. Reed
16 substantive questions" and then, after each question, "wait[ing] for Mr. Reed to
17 raise an objection to Mr. Hughes' presence based on a specific question asked."
18 (D.I. 291 at 15.)  Nomadix also faults Guest-Tek for not asking Mr. Reed, topic by
19 topic, whether he was "willing" or "unwilling" to discuss the topic in front of Mr.
20 Hughes.  (*Id.* at 23.)  But the protective order contains only one "restriction on
21 contact between [Guest-Tek] and Mr. Reed":  that a Nomadix attorney could attend
22 the meeting to preserve privilege.  (D.I. 260 at 1.)  By insisting that Guest-Tek and
23 Mr. Reed play Go Fish, Nomadix is exceeding its rights under the protective order
24 and causing Guest-Tek to incur unnecessary fees and costs.

25     Nomadix never offered up these purported suggestions for compromise in
26 Bangkok.  Nomadix newly offers them in a transparent attempt to put a thin patina
27 of reasonableness on its actions in Bangkok.  In Bangkok, Nomadix offered no
28 compromise.  Mr. Laquer repeatedly made Nomadix's position clear:  There was no

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

room to negotiate. To soften the harshness of its position, Nomadix's attempts to fault Guest-Tek for not properly guessing which compromise was acceptable to Nomadix and suggests by implication that Nomadix would have agreed to such compromise. The facts on the ground belie that notion. Nomadix would not permit *any* substantive discussion between Guest-Tek and Mr. Reed in the absence of Mr. Hughes. Nomadix's actual offer was a sealed threatening letter from a Singaporean law firm.

### 2. Guest-Tek made no misrepresentations or omissions.

In another failed deflection from its own antics, Nomadix accuses Guest-Tek of making "misrepresentations and omissions." (D.I. 291 at 24.) Guest-Tek did no such thing, and indeed these accusations themselves contain misrepresentations and omissions.

Nomadix accuses Guest-Tek of misrepresenting the date, April 24, on which it finally told Guest-Tek that Mr. Hughes would attend the meeting. (*Id.*) But Guest-Tek expressly identified that date in its opening brief. (D.I. 288 at 5.)

Nomadix blames Guest-Tek for "fail[ing] to mention that Mr. Reed did not object to Mr. Hughes until Guest-Tek [allegedly] invited him to do so." (D.I. 291 at 24.) But Mr. Reed independently objected at his first opportunity. (*See* Section II.B.2.b, *supra*.)

Nomadix doubts Guest-Tek's position that "its motion is not subject to the stay" because the motion "concerns only 'non-discovery communications.'" (D.I. 291 at 24) (quoting D.I. 288 at 2 n.1). But Guest-Tek's position is legally sound. *Redus*, 2017 WL 2079807, at *6. Guest-Tek's conversational use of the word "discovery" in an earlier brief does not change that position. (*Contra* D.I. 291 at 24) (quoting D.I. 259 at 7). In that brief, Guest-Tek contrasted its informal "discovery" of Mr. Reed with formal discovery such as depositions. (D.I. 259 at 7.)

And so on. Nomadix calls an accurate, pin-cited quotation "misleading." (D.I. 291 at 24–25.) Nomadix exaggerates that allegedly distinguishable cases are

"materially misrepresented." (*Id.* at 25.) Nomadix, not Guest-Tek, is the party stretching the truth.

## II. CONCLUSION

If Nomadix wants an order that Kelly Hughes attend Guest-Tek's meetings with Mr. Reed, then Nomadix should move for one. Because Nomadix is abusing the current protective order to Guest-Tek's and Mr. Reed's detriment, the Court should dissolve it. Alternatively, the Court should modify it to allow Guest-Tek to meet with Mr. Reed upon reasonable notice to Nomadix and to exclude Mr. Hughes from any future meetings between Guest-Tek and Mr. Reed.

Dated: June 19, 2018

Respectfully submitted,

BAKER & HOSTETLER LLP

By: */s/ Steven J. Rocci*
Steven J. Rocci
Michael J. Swope
Kevin M. Bovard
Michael R. Matthias
Joelle A. Berle

*Attorneys for Defendant/Counter-Claimant*
GUEST-TEK INTERACTIVE ENTERTAINMENT LTD.