# EXHIBIT "A"

1

1

2    SUPREME COURT OF THE STATE OF NEW YORK

3    COUNTY OF NEW YORK:   TRIAL TERM PART 61

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - X

5    GATE WORLDWIDE HOLDINGS LLC,

6                            Plaintiff,

7            - against -

8    INTERTOUCH HOLDINGS LLC,

9                            Defendant.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - X
      Index No. 650026/2018
11
                              August 9, 2018
12                            60 Centre Street
                              New York, New York 10007
13
      B E F O R E:   THE HONORABLE BARRY R. OSTRAGER, Justice
14
      A P P E A R A N C E S:
15
      ROBINSON & COLE LLP
16    Attorneys at Law
      280 Trumbull Street
17    Hartford, Connecticut 06103
      BY:  JOSEPH L. CLASEN, ESQ.
18         IAN T. CLARKE-FISHER, ESQ.

19    TONKON TORP LLP
      Attorneys at Law
20    888 SW Fifth Avenue, Suite 1600
      Portland, Oregon 97204
21    BY:  CAROLINE HARRIS CROWNE, ESQ.
           TIMOTHY J. CONWAY, ESQ.

22

23

24

25

26    (Continued on next page for appearances.)

        Terry-Ann Volberg, CSR, CRR, Official Court Reporter

2

1

2   A P P E A R A N C E S:    (Continuing)

3   GANFER SHORE LEEDS & ZAUDERER LLP
    Attorneys at Law
4   360 Lexington Avenue #14
    New York, New York 10017
5   BY:   CRAIG S. KESCH, ESQ.
          SEALE MOORER, ESQ.
6
    ALSO PRESENT:   JACK BRANNELLY, ESQ.
7                   Gate Worldwide

8
                          Terry-Ann Volberg, CSR, CRR
9                         Official Court Reporter.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3

```
1              Proceedings
2              THE COURT:   We are assembled with all of the
3    parties in connection with the Gate Worldwide v.
4    interTouch matter.   Prior to opening the record which
5    we have now done, I indicated that I didn't see any bar
6    to the parties consensually working out the details of
7    sale so that there wouldn't be any need for judicial
8    determinations other than to so order what the parties
9    might consensually agree to do.
10             So I outlined off the record a number of
11   items that I distilled from the papers that seemed to
12   me to make common sense with a view toward maximizing
13   the efficacy and proceeds of the public sale, and
14   everybody in the room heard those suggestions, and now
15   counsel for Gate is addressing some of the issues that
16   I mentioned, but, again, having read the papers, this
17   seemed to be something that the parties could come to a
18   consensual resolution on.
19             MR. CLASEN:   First of all, I agree with you
20   on that, I think we should be able to do that.
21             If I could just -- why don't I tick off the
22   ones in the order that you dealt with them or at least
23   in the order that Ian has them listed.
24             THE COURT:  Okay.
25             MR. CLASEN:   The first one you had was, you
26   said that the schedule that we had proposed, which,
```

4

1                              Proceedings

2         again, was the sale happening on September 7 and the

3         confirmation being on September 12, should be moved to

4         four weeks.  Okay.  We obviously want to do it as soon

5         as possible, and I understand, the motion has been

6         pending a little bit.  I think speaking on behalf of my

7         client, if we split the difference, make it three

8         weeks, we would agree to that.

9                   THE COURT:   Is that agreeable?

10                  MS. HARRIS CROWNE:   The key period is from

11        when the notice goes out until the date when the

12        bidders need to submit their qualifications.  Obviously

13        if we are engaging a professional, they would have some

14        control over when the notice goes out so I think this

15        is one of the items we would love to work through

16        consensually.  We have some detailed comments that we

17        can provide counsel to work out these issues.  I think

18        we are fully aligned in terms of the result here.  Gate

19        may feel a greater sense of urgency, we recognize that,

20        and we are prepared to compromise in that regard.

21                  MR. CONWAY:   It's important to keep in mind,

22        your Honor, that the sale process has to be formulated

23        in a way that would allow this asset to be sold.  We

24        are not selling a mom and pop grocery store at the

25        corner.  We are selling the ownership interest of two

26        very large subsidiaries with complex business

Proceedings

1
2  transactions throughout the world including
3  intellectual property assets that's involved in complex
4  licensing agreements so you have to give time for
5  buyers to come in, review all of that information,
6  digest it, and then have a hearing.  Normally this
7  would take three to six months from the time that they
8  get noticed that it's up for sale.  We understand that
9  we want to compress that, we are happy to compress it,
10  and we would suggest that the short end of that would
11  be three months.  Their timing was even two months
12  based on their motion so I think the difference between
13  two months and three months is not all that long, we
14  can reach an accommodation there, but it has got to be
15  from the notice because the time we have spent just in
16  this court --
17          THE COURT:   No, I understand that.  I don't
18  think Gate disagrees with that.  This motion was made
19  some time ago.
20          MR. CLASEN:   Not too long ago, July 17, yes,
21  July 17, your Honor.
22          By the way, the agreement --
23          THE COURT:   Today is August 9 so that's
24  three weeks.
25          MR. CLASEN:   -- contemplates a sale ten days
26  after the notice.  The agreement, the security

6

1                            Proceedings

2       agreement that they signed said they agreed ten days

3       would be reasonable notice.

4                  With that said and done, what I think is

5       important to remember here is, your Honor, this is not

6       an ongoing business that's being sold in the ordinary

7       course of business, it's a judicial foreclosure of

8       security interest.  He's right, if you decided you know

9       what, I want to sell my company, you can go to an

10      investment banker, they market it, they may take three

11      to six months going through various things so they can

12      do various things.  That's what happens.  When you are

13      selling collateral at a foreclosure sale because you

14      have a judgment it's a whole different animal.

15                  THE COURT:  That's absolutely right.  On the

16      other hand, there's no exigent circumstance that

17      requires that the sale be scheduled in such a

18      compressed time period that the value that can be

19      achieved is materially reduced.

20                  MR. CLASEN:  That's why I was taking you up

21      on your offer.  You said two to four weeks.  I said

22      split the difference -- our original proposal was about

23      a month and a half -- which is three weeks.  I am

24      willing to go, to extend.  If you propose two to four,

25      I say split the difference and we do three weeks.

26                  MS. HARRIS CROWNE:  Your Honor, with regard

7

1
2      to the exigency of the circumstances, Nomadix is a
3      profitable business month to month.  Month to month it
4      brings it more revenue from product sales and licensing
5      than it spends on inventory and operations including
6      personnel.  Allowing the business to operate in the
7      ordinary course is to everybody's benefit here, and the
8      value -- this is not a situation where the value is
9      declining.
10             MR. CLASEN:   Your Honor, we served
11     restraining orders with information subpoenas on the
12     three defendants that we have a judgment against.  We
13     have gotten -- we served them back in June, right?  At
14     the time we did get the response, the response
15     indicated there was only -- of the three entities,
16     right, of which we have got a judgment for almost, for
17     over 50 million at this point in time with interest, it
18     has one bank account with about, which had about
19     $700,000 in it.  Okay.  Since then, right, supposedly
20     they have been restrained from paying anybody, and all
21     this money is supposedly coming in, we just got -- we
22     served an information subpoena on the bank, and in the
23     course of apparently about a month 200,000 more has
24     gone in there.  So this isn't a company that's
25     generating a ton of cash because presumably if they
26     only had one bank account, all monies being generated

1          Proceedings

2      by Nomadix are going into that bank account.

3              MS. HARRIS CROWNE:    The restraining notices

4      are and have been interfering with normal business

5      operations.

6              THE COURT:    Look, he's right, this is a

7      foreclosure sale.   I think that reasonable people ought

8      to be able to come up with reasonable arrangements to

9      conduct this that doesn't prejudice anybody.   So if I

10     have to make an order on the time frame within which

11     the sale takes place, it will be a month from the time

12     that notice goes out, and the notice isn't going to go

13     out until an appropriate third-party, whether it's a

14     broker or investment banker, is engaged with the

15     understanding that that has to be done forthwith, ten

16     days.

17             MS. HARRIS CROWNE:    Your Honor, if I may

18     make a suggestion, perhaps we can have an order on the

19     record today to the effect that the motion is granted

20     to the extent that there will be a sale of interTouch

21     Holdings, that the parties are to confer and report

22     back by a deadline on the sale process, and given that

23     there will be a sale of interTouch Holdings, that

24     enforcement actions against subsidiary assets are

25     terminated and shall cease so as to preserve the

26     ongoing value of what is being sold.

9

1                              Proceedings

2                    MR. CLASEN:    If I could address that, first

3         of all, the assets that we are aware of that they hold

4         that we could collect our $50 million consists of one

5         bank account with $700,000 approximately.

6                    Secondly, if I could, they also provided us

7         with detailed information about intercompany transfers,

8         and apparently assets of Nomadix and interTouch have

9         been transferred to other companies which we don't have

10        a judgment against and are not subsidiaries of these.

11        So the idea that they can now willy-nilly go around and

12        do stuff, we would be very concerned, we would be

13        prejudiced with that, number one.

14                   Number two, the restraining order has been in

15        effect for over a month, right.   How is it that they

16        are still operating?    If this is doing so much damage,

17        how are they paying their employees and operating?    To

18        remove it without any proof or protection to us would

19        prejudice us.

20                   THE COURT:    I agree with that.

21                   You have your restraining orders.   They would

22        like them to be lifted.   You don't consent to that.

23        I'm not going to order that.   Okay.   So you will settle

24        an order on notice because you're apparently incapable

25        of doing what I asked you to do which was to

26        consensually agree on a reasonable proposal.

                Terry-Ann Volberg, CSR, CRR, Official Court Reporter

1        Proceedings

2            So an appropriate third-party broker or

3    investment banker will be selected.  That third-party

4    will send out a notice, and the foreclosure sale will

5    take place 30 days after that occurs.  And with respect

6    to bidders, the proposal that Gate made is reasonable

7    which is that they will approve bidders, and if they

8    choose to reject any bidder, they will give the

9    judgment debtor notice of that, and if we have to have

10   a ruling on whether the rejection of the bidder is

11   reasonable, you will come back to the court to deal

12   with that.

13            The proposed sale is going to extinguish

14   Gate's security interest in the collateral --

15            MR. CLASEN:   If I could, the collateral

16   being sold.

17            THE COURT:   Yes, the collateral being sold.

18            MR. CLASEN:   We have security interest in

19   other collateral.

20            THE COURT:   Yes, the collateral being sold.

21            MS. HARRIS CROWNE:   May we address that?

22            There is a major issue here about what is

23   being sold, what the bidders are obtaining, because

24   this is not, this was not a proposal to liquidate

25   Nomadix and sell bank accounts, patents.  This was a

26   proposal to sell a holding company with Nomadix as an

11

1                          Proceedings
2         operating business and interTouch as an operating
3         business.
4                  If Gate maintains the right, pending the sale
5         process, to enforce against subsidiary collateral, to
6         take the patents, to take money out of the bank
7         account, no bidders will have any certainty about what
8         it is they are buying.  There is tremendous value in
9         the sale of these operating businesses continuing to
10        operate, continuing to generate revenue through product
11        sales and licensing.
12                 THE COURT:   Okay.  Nobody is suggesting that
13        the businesses not operate.  All I'm suggesting is that
14        whatever it is that's being sold, Gate will no longer
15        have a security interest in.  Why is that so
16        complicated?
17                 MS. HARRIS CROWNE:   So what the papers
18        provide is that Gate's security interest in interTouch
19        Holdings will be released.  Gate also has security
20        interest, for example, in the patents of Nomadix.
21        Those patents are not being sold in this process.
22                 THE COURT:   Okay.  We are talking of
23        cross-purposes.  I indicated twice already that
24        whatever is being sold to a bidder which will be
25        described in the notice will be acquired by the bidder
26        free and clear of any security interest that Gate has.

                Terry-Ann Volberg, CSR, CRR, Official Court Reporter

1                    Proceedings

2              MR. CONWAY:   Including any interest they

3      have in any subsidiaries; just all their security

4      interest in those assets.

5              THE COURT:   Whatever they have a security

6      interest in that's being sold is going to the buyer

7      free and clear of any security interest that Gate has.

8      If something is not being sold, and Gate has a security

9      interest in it, then Gate continues to maintain the

10     security interest in it.

11             Why is that complicated?

12             MS. HARRIS CROWNE:   It should be simple, but

13     it was not set forth that way in the papers, and I was

14     not hearing agreement --

15             THE COURT:   Now you have heard agreement

16     from counsel from Gate.

17             So we have dealt with the bidders.  We have

18     dealt with engaging a third-party to prepare a notice.

19     We have dealt with the date within which potential

20     bidders have to conduct due diligence and prepare a

21     bid.  We have dealt with the extinguishment of Gate's

22     security interest in what's being sold.

23             We will have a hearing date after the public

24     sale to approve the sale to the successful bidder

25     within ten days after the sale occurs, and counsel will

26     be in touch with the court to advise the court of the

13

1                           Proceedings

2        date of the sale, and then we will fix a hearing date.

3                    Is there anything else that needs to be

4        addressed?

5                    MR. CLASEN:   Just two things.  I want to

6        make sure I understand.

7                    You are talking about picking a broker or

8        investment banker within ten days, 30 days for the

9        sale, and then ten days after the sale we have a

10       hearing to confirm it?

11                   THE COURT:   No, no.  After you pick the

12       person to conduct the sale, that person has at least

13       ten days within which to send out a notice.

14                   MR. CLASEN:   I stand corrected.

15                   THE COURT:   Again, the sale takes place 30

16       days after the notice goes out.

17                   MR. CLASEN:   Ten days to pick a broker, ten

18       days to send the notice out, 30 days after the notice

19       goes out the sales occurs, ten days after that subject

20       to the court's availability we have a hearing to

21       confirm the sale.

22                   THE COURT:   Correct.

23                   MR. CLASEN:   The other issue -- we have two

24       other issues.  One is, we didn't deal with hiring a

25       broker or investment broker.  The reason why it's not

26       teed up that way, your Honor, is that it costs a lot of

                Terry-Ann Volberg, CSR, CRR, Official Court Reporter

Proceedings

1
2    money, and it comes out of my hide because they are not

3    paying for it because we have a security interest in

4    all of their assets.  So if -- what I would ask is, we

5    have to have at least some understanding that we are

6    not going to spend a ton of money on somebody if we can

7    help it, and, more importantly, if it ends up that this

8    person is very successful and sells it for more than my

9    lien, that the cost of this investment banker comes out

10   of their --

11           THE COURT:   I will deal with that in the

12   fullness of time.

13           MR. CLASEN:   The second thing you had was

14   the opening bid --

15           THE COURT:   Obviously if you have a

16   qualified third-party preparing a notice with the

17   assistance of the judgment debtor you're more likely to

18   get a higher price from the bidders than if you rush

19   through this thing in a less than deliberate manner.

20           MR. CLASEN:   I appreciate that, your Honor.

21   We are trying to -- we are trying to come to a

22   resolution.

23           The opening bid was the other issue.  The

24   opening bid, that was the last issue.

25           We had proposed $10 million for two reasons.

26   One is, I don't think these assets are worth that much,

Proceedings

1

2    but, more importantly, you want to encourage people to

3    bid, okay.  If somebody comes in and has us bidding

4    $50 million out of the box, what that does is

5    discourages bidders, number one.

6         Number two, the only reason really for having

7    a high bid like $50 million is, we have a judgment

8    right now for $50 million.  We also have a claim

9    against ST Holdings, and we have collateral in the

10   Dutch pledge.  What they are trying to have us do is

11   use up our entire judgment on this collateral which we

12   don't think is worth anywhere near $50 million so that

13   we can't use some of that money to go after the Dutch

14   pledge.

15        I don't see how they are hurt if we do an

16   opening bid of $10 million.  If it's worth that much

17   people will outbid us right out of the box.

18        MS. HARRIS CROWNE:   The only evidence in the

19   record before the court as to what that opening bid

20   should be is in the detailed affidavit of Kelly Hughes

21   which amply supports an opening bid of 50 million as we

22   suggested.

23        As to the value of the opening bid in this

24   kind of process, I defer to Mr. Conway and his

25   experience in this area.

26        MR. CLASEN:   They have $700,000 in assets,

16

1                        Proceedings

2        cash.

3                THE COURT:   Look, people, you are correct

4        that if you're conducting an auction, fixing an

5        extremely high opening bid discourages people from

6        bidding, and what you want to have is a number of

7        people bidding because at a public auction people who

8        become interested in a property, any property, seeing

9        that other people are interested in the same property

10       redefines their expectations as to how high they are

11       willing to go based on the dynamic of the auction

12       process.  So I think an opening bid of 10 million is a

13       perfectly reasonable place to start, and if it's worth

14       $50 million, the notice that goes out from the

15       independent third-party who's going to be conducting

16       the sale and is going to prepare a notice in

17       consultation with the judgment debtor will describe

18       things in a way that produces a higher than

19       10 million-dollar bid hopefully.

20               MR. CONWAY:   I think that's important, your

21       Honor.  I think your comment about a less than

22       deliberate manner is the key to this whole process

23       because if that professional preparing those materials

24       is required to meet artificial deadlines and not

25       deliberately prepare adequate documentation, we are

26       stuck with a less than deliberate process.  I have no

17

Proceedings

1
2    doubt that we can get them to act promptly and quickly
3    because we all want that to happen, but I don't want to
4    have an artificial time line like counsel has taken
5    here, no less than ten days to be ten days that they
6    will prepare the notice.  They need enough time to get
7    in and understand this business.  If that's ten days or
8    20 days, that's not going to make or break whether this
9    sale happens or not, but that will make or break
10   whether it's a successful sale.
11             THE COURT:   Respectfully, there's ten days
12   within which to engage the third-party who's going to
13   conduct the preparation of the notice.  You're going to
14   be working with that person, you're going to be
15   preparing in advance of that person's retention
16   material for that person, and I don't think ten days
17   thereafter is an insufficient amount of time for
18   reasonable notice to be prepared.
19             MR. CONWAY:   As long as that's not a
20   deadline.  Your ruling was at least ten days.  I want
21   to be able to -- if they need 11 days or 12 days --
22             THE COURT:   If you have to come back because
23   you get a recalcitrant third-party person to send out
24   the notice, we will deal with that in the fullness of
25   time, but right now I think I've addressed all of the
26   issues that you have raised in your papers.

Terry-Ann Volberg, CSR, CRR, Official Court Reporter

18

Proceedings

1

2      You will settle an order that I will sign

3  reflecting what's in the transcript of proceedings.

4  You can order an expedited copy of the transcript and

5  it will be so ordered.

6      MS. HARRIS CROWNE:   I am not sure that you

7  have addressed one issue which is the defendant's right

8  to redeem the collateral prior to closing of the sale,

9  so that would need to be in the process, as well.

10      THE COURT:   Yes, I agree with that.   If you

11  can satisfy the judgment before the sale is approved,

12  that should be in the notice, and Gate surely would

13  have no objection to that.

14      MR. CLASEN:   Nothing would make us happier.

15      MS. HARRIS CROWNE:  With regard to keeping

16  the business operating pending the sale, as I

17  understand, Mr. Moorer has covered some expenses

18  through other sources, you know, but that's not a

19  certain thing to continue.   I hear the concern about

20  intercompany transfers, and what I would suggest is

21  court approval to use Nomadix funds to pay for

22  inventory, payroll, lease, and patent-related costs, so

23  renewing patents, maintaining current enforcement

24  actions on patents.   Those actions are essential for

25  the business to continue operating.

26      This is not about sale of a bank account with

19

Proceedings

1
2    some cash in it.  This is about sale of a profitable
3    operating company that derives revenue through these
4    month-to-month activities.
5            THE COURT:    Look, he has restraining
6    notices.  I am not lifting any restraining notices.  If
7    there's going to be infusions into the business in
8    connection with the approval of the sale hearing and
9    disbursement of the funds, I'll entertain at that time
10   any applications that you have for reimbursement of
11   advances that are made from sources that are not
12   subject to any judgment or any restraining notices, but
13   I am not going to order in advance that whatever you do
14   to prop up these businesses is automatically
15   reimbursable.
16           MS. HARRIS CROWNE:    That definitely is an
17   issue, the reimbursement on the back end.  I am focused
18   on the prospective buyer who sees that these operating
19   businesses are for sale, and that sale date is several
20   weeks out in the future, and that party will want to
21   know that the business is not going to, you know,
22   deteriorate, fall apart, between now and then.   In
23   other words, between now and when the sale is finalized
24   a bidder will, you know, need to know that during that
25   time the business will be using its revenues to
26   continue to fund its operations.

1                              Proceedings

2              THE COURT:   Look, you will put in the notice

3     whatever you think needs to go in the notice.   I'm

4     assuming that it's in your interest for the sale to be

5     successful.

6              MS. HARRIS CROWNE:   The reason we can't put

7     that in the notice yet is currently Gate's restraining

8     notice prohibits Nomadix from using its revenue on a

9     month-to-month basis from licensing from product sales

10    to pay for its expenses on a month-to-month basis.

11             MR. CONWAY:   Including employees and health

12    care.   We have employees now who can't go to the doctor

13    because they don't have health care insurance.   It may

14    be reimbursed later on through COBRA, but they don't

15    have the out-of-pocket funds.   This is a real issue.

16    Any money that is put into the company from another

17    source can't be used out --

18             THE COURT:   How much money are we talking

19    about?

20             MS. HARRIS CROWNE:   On a month-to-month

21    basis inventory is $300,000, and operating expenses,

22    largely payroll, but also lease and some admin, is

23    about $750,000 month-to-month.

24             MR. CLASEN:   My problem is that I have had a

25    restraining order against them for a month, and only

26    $200,000, less than $200,000 had come into the account.

1              Proceedings

2      So if they are generating enough money to pay their

3      expenses, where's the money going?

4              MS. HARRIS CROWNE:    Those --

5              MR. CLASEN:    That's the problem I have.

6              If I can finish, the problem I have here is

7      that they want to spend a million dollars, right, and

8      they say this is a company generating money, making

9      enough money, well, if they have been restrained from

10     paying anybody, but they still have been collecting all

11     the money, that account should have over another

12     million dollars in it since I restrained it.

13             MS. HARRIS CROWNE:    It has not been business

14     as usual since the restraining notices.   Those numbers

15     are from January to July 2018.   Service of the

16     restraining notices has had a dramatic impact on the

17     business's ability to operate in the ordinary course.

18             MR. CLASEN:    To collect?   We are not talking

19     about operating, we are talking about collecting.

20             Right now every dollar that goes out is a

21     dollar I don't have to pay my debt.   If what they want

22     to do is, they want to use a million dollars to go out

23     the door, right, and they say the company is making

24     money, don't worry about it, we have an experience of a

25     month, and the account -- there is only one account,

26     and they told us what was in there, and it went up

         Terry-Ann Volberg, CSR, CRR, Official Court Reporter

22

1          Proceedings

2    under $200,000 a month.

3              MS. HARRIS CROWNE:  The bank is charging --

4              THE CURT:  One at a time.

5              MR. CLASEN:  What that tells me, your Honor,

6    is that this company is not generating enough money to

7    pay its employees, its inventory, right now.  So what

8    they propose to do is take the money that's in there

9    now which is $700,000, and that's right now the only

10   cash we have to get paid.  So if this thing does not

11   sell for more than $50 million our 700,000 -- what they

12   have told us is, don't worry, the company is making

13   money, but we need to keep the company going so we can

14   pay everybody.  It has not made -- it's made less than

15   $200,000 in a month, right, according to its bank

16   account.

17             MS. HARRIS CROWNE:   Your Honor, we can

18   commit --

19             MR. CLASEN:   They are proposing now, they

20   are proposing now to have you enter an order saying

21   they can spend a million dollars, 750 for employees and

22   $250,000 for inventory.  Where's that money coming

23   from?  It's coming from my client's security because

24   it's not coming from revenue that they are generating.

25             They have told us they are having problems

26   operating because of it.  If the problem's operating,

Terry-Ann Volberg, CSR, CRR, Official Court Reporter

23

1                          Proceedings

2      who is it that's not paying them?   What customers are

3      not paying them?   The customers don't know about my

4      restraining order.   The customers should still be

5      paying them.

6                  What we do know is that they are not

7      generating new revenue to cover the expenses they are

8      proposing.   So if you release the restraining order,

9      money that I would have available to collect our debt

10     from is being used from them and not being replaced.

11                  MS. HARRIS CROWNE:    Three things:   First, we

12     could commit to maintain the bank balance above a

13     certain amount as long as the bank balance is above

14     that amount with leave of court, you know, use revenues

15     to pay ordinary course business expenses.   That would

16     be one solution.

17                  Second, as a result of the restraining notice

18     that Gate has served on the bank, the bank has been

19     charging $20,000 a day just because of that restraining

20     notice.   So that restraining notice more than anything

21     is depleting the funds available to Gate.

22                  Third, the consistent profits that I cited,

23     that's for every month up until the restraint notice.

24     This company has a solid track record up until the

25     restraint notices were served of generating more in

26     revenues than it has in expenses month-to-month.   We

            Terry-Ann Volberg, CSR, CRR, Official Court Reporter

24

1              Proceedings

2    simply seek to be able to continue that pending the

3    sale.  That's going to be important to bidders who are

4    looking at the company.

5              THE COURT:  So she is saying that any

6    infusions will not alter the $700,000 in the bank

7    account that you have frozen.

8              MR. CLASEN:  She is not talking about

9    infusions.  She's talking about -- and that's not

10   third-party investment.

11             THE COURT:  I understand.

12             MR. CLASEN:  She's talking about using the

13   money that I have a security interest in.  All the

14   revenue they generate we have a security interest in.

15             MS. HARRIS CROWNE:  If a customer pays for a

16   product, we can use that money to buy more inventory to

17   sell another product.

18             MR. CLASEN:  Subject to having my client's

19   approval, which I believe they will do, the bank

20   account can't go any lower than it is today, --

21             THE COURT:  That's agreed.

22             MR. CLASEN:  -- number one.

23             Number two, they have to report to us on a

24   weekly basis what revenue they have generated that

25   week, and where they generate it from, and what

26   expenses they propose to pay out of that additional

Proceedings

1
2    revenue.  We will look at it.  If we think the expenses

3    are reasonable in the ordinary course, and they don't

4    exceed the revenue that they have generated, okay, we

5    will agree to it.  If not, we can always come back to

6    talk to your Honor.

7            A blanket that they can continue to use the

8    money, again, it was profitable until July -- June, the

9    end of June when we served our restraining order, and

10   suddenly something that apparently used to generate at

11   least a million a month, that's from their inventory

12   and employees, is suddenly only generating 200,000 last

13   month, I think my client is justifiably somewhat

14   skeptical about giving them a blanket.  If they show us

15   what money comes in, what they propose to go out, I

16   guaranty you right now, your Honor, if it's reasonable

17   expenses for employees, reasonable inventory, and it's

18   been funded by their actual operations so they can

19   cover the expense, right, we will agree to it.

20           MS. HARRIS CROWNE:   We are fine with

21   transparency and guidelines.  We are not fine with Gate

22   having discretion and asking permission for each

23   expenditure.

24           MR. CONWAY:   As long as we are maintaining

25   the minimum that they claim they have a right to, we

26   should be able to borrow money if we need to pay

Terry-Ann Volberg, CSR, CRR, Official Court Reporter

1                    Proceedings

2       expenses, it's going to be subordinate to them, but to

3       the extent we are generating revenue, we have to be

4       able to use that revenue to pay these expenses.

5               They want protection on their 700, that's

6       legitimate, but they shouldn't be able to run our

7       day-to-day business, and our employees shouldn't have

8       to say will you pay us, and we say we don't know, we

9       have to talk to Gate.  That does not make sense.

10              MR. CLASEN:    Counsel is dead wrong.  We have

11      a security interest in every dollar they generate right

12      now, and because they are in default, we are entitled

13      to every dollar they generate now.  They are not

14      entitled to it.

15              MR. CONWAY:    Not loans.

16              MR. CLASEN:    Every dollar you generate in

17      revenue from sale of business, from sales.

18              MS. HARRIS CROWNE:    Buyers in this product

19      are entitled --

20              MR. CLASEN:    I have no objection -- if

21      someone wants to loan Nomadix money, we have no

22      objection to that.  Maybe I was misunderstanding.  If

23      this gentleman or any other gentleman wants to loan

24      Nomadix money subject to you figuring out afterwards

25      whether they can get reimbursed for it, that's fine.

26              What I don't want them to do is sell the

Proceedings

1

2    inventory, right, I have a security interest in

3    inventory, they sell the inventory, the proceeds is our

4    money under these circumstances, and that they

5    generate, they take our money and spend it, unless they

6    get our prior approval to show us what money came in

7    and what money is going out.

8              THE COURT:   Look, you have an interest in

9    having a successful sale.

10             MR. CLASEN:   I do.

11             THE COURT:   You have an interest in the

12   business operating as close to normal as possible

13   because nobody is going to buy a compromised business

14   for maximum dollars.  So I think you can settle an

15   order which accommodates your respective needs here.

16             MR. CLASEN:   I think my proposal does that.

17   I want to let them keep the business going.

18             THE COURT:   You can't run their business.

19             MR. CLASEN:   I am not trying to run it.

20             THE COURT:   If they need to sell inventory,

21   and then replace the inventory that they sold, it

22   doesn't seem to me that you should be able to veto

23   that.

24             MR. CLASEN:   Actually right now, your Honor,

25   we have the absolute right to do that.  I have a

26   judgment --

Proceedings

1

2          THE COURT:    That's neither here nor there.

3          MR. CLASEN:    That's what I am trying to

4    avoid.   I am trying to come to a middle ground.

5              What I am concerned about is an operation

6    supposedly generating a million a month and less than

7    200,000 showed up last month.   Where did the money go?

8          MR. CONWAY:    I think you're right.   They

9    don't have a reason, they shouldn't have a reason to

10   want to run our business.   They don't know how to run

11   our business.

12             We don't have any problem maintaining the

13   bank balance because that's what they are focused on,

14   and that's fair.   We also don't have a problem

15   providing them reports as to what's coming and going,

16   and if they don't like it, they can go to you, but they

17   don't get preapproval of what we do as long as it's

18   ordinary course.

19         THE COURT:    That seems reasonable.   That

20   seems reasonable to me, and really the most productive

21   thing that everybody can do is move the process of

22   sending out a notice as expeditiously as possible,

23   conducting the sale of a business that's as valuable as

24   it can be, and then we will see where we are.

25             I have a high degree of confidence that the

26   judgment debtor is going to act in a manner that will

1                        Proceedings

2       maximize the value of the business for prospective

3       purchasers, and I think you can stipulate to that, that

4       that's what they are going to do.  They can't possibly

5       have any interest in, you know, having a fire sale

6       here, and neither can you.

7                MR. CLASEN:   They don't want a fire sale,

8       but, as I pointed out before, there's a lot of related

9       entities that have been transferred a lot of money, and

10      I don't have a security interest on those other

11      entities.  So to the extent Nomadix is this crown jewel

12      generating all this money and value, and that value is

13      going out to other entities that I don't have a

14      judgment against or security interest in, what that

15      means is that I have to chase those people down later

16      on for fraudulent conveyances.

17               THE COURT:   I understand your position.

18               I think we have gone as far as we need to go

19      here.  If you promptly settle an order we will so order

20      it and the process will begin.

21               So you will order an expedited copy of the

22      transcript.  I'm going to be away for one of my

23      daughter's weddings, but if you expeditiously settle an

24      order, I'll have somebody from my chambers FedEx it to

25      me, and I will FedEx it back so it gets e-filed because

26      I want to help you get to where you want to go in a

30

1                          Proceedings

2          reasonable manner.

3                    So you have the transcript, I think you've

4          reached a lot of common ground, and hopefully we won't

5          have any further sessions.

6                    MR. CLASEN:   I hope so too.

7                    MR. CONWAY:   One clarification, and this is

8          important for us.

9                    The bank is misconstruing its obligations

10         under the restraint, and that is why it's charging us

11         $20,000 a day.  So it needs to be clear in this order

12         if it could be that all they need to do is hang on to

13         that $700,000 or whatever is in the bank account, and

14         their obligations don't extend beyond that.

15                   MS. HARRIS CROWNE:   That's an obligation of

16         the debtors, not of the bank.

17                   MR. CONWAY:   The bank seems to think that

18         they have to hold $100 million.  They don't even have

19         that.  They are thinking it's their own funds they are

20         holding so they are charging us for reserving money

21         from their own account which is insane.

22                   MR. CLASEN:   What the bank has to do is, the

23         bank has to hold all the money that's there plus any

24         money that comes in.

25                   MS. HARRIS CROWNE:   We agree with you.

26                   MR. CONWAY:   They don't understand it that

31

1                          Proceedings

2        way so we need the order to be clear.

3                   THE COURT:   Make that order clear.

4                   MR. CONWAY:   We will.

5                   MR. CLASEN:   We also don't want to mess

6        up -- if you are going to be away for your daughter's

7        wedding, we don't want to -- we can wait a day or two

8        for you to get back.

9                   THE COURT:   It's okay.

10                  MR. CLASEN:   I don't want to --

11                  THE COURT:   I have a sneaking suspicion that

12       I'll be back by the time you settle this order.

13                  MR. CONWAY:   What are your travel dates?

14                  MS. MAGALDI:   I will deal with you.

15                  THE COURT:   If you settle it while I'm away,

16       I'm more than happy to take the steps necessary to have

17       it e-filed and so ordered.

18                  Thank you.

19                  Have a nice weekend.

20                             ***

21                  C E R T I F I C A T E

22       I, Terry-Ann Volberg, C.S.R., an official court reporter of

23       the State of New York, do hereby certify that the foregoing

24       is a true and accurate transcript of my stenographic notes.

25                             Terry-Ann Volberg, CSR, CRR

26                             Official Court Reporter.

          Terry-Ann Volberg, CSR, CRR, Official Court Reporter