Steven J. Rocci (admitted *pro hac vice*)
*srocci@bakerlaw.com*
Kevin M. Bovard, SBN 247521
*kbovard@bakerlaw.com*
**BAKER & HOSTETLER LLP**
2929 Arch Street, 12th Floor
Philadelphia, PA 19104-2891
Telephone:  215.568.3100
Facsimile:  215.568.3439

*Attorneys for Defendant/Counter-Claimant*
GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.

(*additional counsel listed on following page*)

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC., | Case No.: 2:16-cv-08033-AB-FFM |
| Plaintiff, | Honorable André Birotte Jr. |
| v. | **GUEST-TEK INTERACTIVE ENTERTAINMENT LTD.'S CASE STATEMENT IN ADVANCE OF NOVEMBER 9, 2018 CONFERENCE & REQUEST FOR CONTINUANCE** |
| GUEST-TEK INTERACTIVE ENTERTAINMENT LTD., | |
| Defendant/Counter-Claimant, | Status Conference:  November 9, 2018 |
| v. | Time:                      10:00 a.m. |
| | Courtroom:            7B |
| NOMADIX, INC., | Action Filed: 10/28/16 |
| Counter-Defendant. | Amended Complaint Filed: 03/23/17 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4

Michael J. Swope (admitted *pro hac vice*)
*mswope@bakerlaw.com*
**BAKER & HOSTETLER LLP**
999 Third Avenue, Suite 3500
Seattle, WA 98104-4040
Telephone:      206.332.1379
Facsimile:      206.624.7317

5
6
7
8
9

Michael R. Matthias, SBN 57728
*mmatthias@bakerlaw.com*
Thomas D. Warren, SBN 160921
*twarren@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:  310.820.8800
Facsimile:   310.820.8859

10
11

*Attorneys for Defendant/Counter-Claimant*
GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   The Court has stayed this action while a New York court resolves an

2   ownership dispute bearing on the Nomadix patents and license agreement at issue

3   in this case.  A status conference is presently set for November 9, 2018 to discuss

4   the status of the co-pending New York action.  Guest-Tek requests that the Court

5   continue the November 9, 2018 status conference—and the current stay of the

6   case—to December 14, 2018, the pre-trial hearing date.  The proposed substitute

7   plaintiff, Gate Worldwide Holdings LLC ("GWH"), joins in this request.

8   Since the Court's hearing in this matter on August 31, a public foreclosure

9   auction was completed for the Nomadix assets, as ordered by the New York court.

10  (Ex. A, Aug. 31, 2018 Hearing Tr.; Ex. B, Memorandum of Law of GWH at 3-5.)

11  The court-authorized broker received no bids other than GWH's credit bid of $10

12  million.  (Id. at 5; Ex. C, Pacchia Affidavit at ¶ 21.)  As a result, GWH has moved

13  the New York court to confirm the sale of the collateral, so that it may be

14  transferred to GWH.  (Ex. B.)  The hearing is set for November 28, 2018.

15  Guest-Tek and GWH respectfully request the Court's indulgence in a short

16  stay until after the New York court's hearing to confirm the sale of the collateral.

17  As the Court is aware, Guest-Tek must proceed against the patent owner, and the

18  confirmed asset transfer will remove the ownership cloud hanging over the patents

19  and license at issue in this case.  The further requested extension of the stay is

20  appropriate to "eliminate the uncertainty and confusion regarding the proper

21  plaintiff here [and] ensure the case proceeds in a manner fair to all parties

22  involved." (D.I. 284 at 5.)  Guest-Tek suggests December 14 presently set for the

23  pre-trial hearing, is a good date, as the New York court will have likely confirmed

24  the asset transfer to GWH by that time.  (Despite Nomadix's representations that it

25  would pay off the $50 million judgment held by GWH, it has not done so.)

26

27

28



Nomadix has not yet responded to undersigned counsel's request to join in this application. (Ex. D.)

Dated:  November 5, 2018

Respectfully submitted,

BAKER & HOSTETLER LLP

By:   */s/Michael R. Matthias*
Steven J. Rocci
Michael J. Swope
Michael R. Matthias
Thomas D. Warren
Kevin M. Bovard

*Attorneys for Defendant/Counter-Claimant*
GUEST-TEK INTERACTIVE
ENTERTAINMENT LTD.

# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5  NOMADIX, INC.,                    )
                                     )
6                  PLAINTIFF,        )
                                     )
7           vs.                      ) No. CV 16-8033-AB
                                     )
8  GUEST-TEK INTERACTIVE            )
   ENTERTAINMENT LTD.,               )
9                                    )
                   DEFENDANT.        )
10 _____)

11

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              FRIDAY, AUGUST 31, 2018

15                   10:07 A.M.

16              LOS ANGELES, CALIFORNIA

17

18

19

20

21

22  _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA 90012
25               cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3           KNOBBE MARTENS
             BY:  MARK LEZAMA, ATTORNEY AT LAW
 4           AND  JAMES F. SMITH, ATTORNEY AT LAW
             2040 MAIN STREET
 5           14TH FLOOR
             IRVINE, CALIFORNIA 92614
 6           949-760-0404

 7

 8   FOR THE DEFENDANT:

 9           BAKERHOSTETLER
             BY:  THOMAS D. WARREN, ATTORNEY AT LAW
             1900 EAST 9TH STREET
10           SUITE 3200
             CLEVELAND, OHIO 44114
11           216-861-7528

12

13   FOR THE DEFENDANT:

             BAKERHOSTETLER
14           BY:  MICHAEL J. SWOPE, ATTORNEY AT LAW
             999 THIRD AVENUE
15           SUITE 3600
             SEATTLE, WASHINGTON 98104
16           206-332-1386

17

18   FOR THE INTERVENOR APPLICANT GATE WORLDWIDE HOLDINGS:

             MORRISON & FOERSTER LLP
19           BY:  GREGORY B. KOLTUN, ATTORNEY AT LAW
             707 WILSHIRE BOULEVARD
20           LOS ANGELES, CALIFORNIA 90017
             213-892-5551

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 31, 2018

 2                            10:07 A.M.

 3                            -  -  -

 4         THE CLERK:  Calling CV 16-8033-AB, Nomadix, Inc.,

 5    versus Guest-Tek Interactive Entertainment Ltd.

 6         Counsel, please step forward and state your

 7    appearances.

 8         MR. LEZAMA:  Mark Lezama of Knobbe Martens on

 9    behalf of plaintiff Nomadix.

10         THE COURT:  Good morning.

11         MR. LEZAMA:  With me is my colleague, James Smith.

12         THE COURT:  Say that again.

13         MR. LEZAMA:  My colleague, James Smith.

14         THE COURT:  Good morning.

15         MR. WARREN:  Tom Warren on behalf of Guest-Tek.

16    With me is Michael Swope.

17         THE COURT:  Good morning to you both.

18         MR. KOLTUN:  Greg Koltun, Morrison and Foerster,

19    for intervenor applicant, Gate Worldwide Holdings.

20         THE COURT:  Good morning to you as well.

21         There has been a lot that's happening in this case

22    over the last -- since the last time we were all together,

23    including what I just saw, I guess, was filed yesterday

24    by -- by Nomadix, their statement or their position with

25    respect to what's happened in New York.
```

```
 1            I guess let's hear from Mr. Lezama, if you would

 2    just outline your views as to where we are.  It sounds like,

 3    if I understand you correctly, that even if there is the

 4    sale, the sale will only do -- the sale will not relinquish

 5    the patent rights of Nomadix.  Is that in sum and substance

 6    your position?

 7            MR. LEZAMA:  That is correct, Your Honor.  It's

 8    clear now that Nomadix owns the patents.  It has since the

 9    outset of this case, as we argued.  And the foreclosure path

10    that Gates sought and has been approved to take and is now

11    ordered to take will transfer only the LLC membership

12    interest units of Nomadix's parent company.

13            So, basically, the New York Court has made clear

14    that Nomadix owns the patents and Nomadix will remain the

15    owner even if Gate completes its foreclosure.

16            THE COURT:  If you wouldn't mind, play out --

17    let's play out what would happen.  The foreclosure sale

18    occurs, okay?  And then what?  Foreclosure sale occurs and

19    just pick a figure -- it sold for X amount.  That money goes

20    to who?

21            MR. LEZAMA:  That money goes to Gate.

22            THE COURT:  And they're done?  They just take

23    their money and run?

24            MR. LEZAMA:  Yes.  Whoever is the prevailing

25    bidder at the foreclosure sale will acquire
```

1    interTouch Holdings, which is the parent company of Nomadix.

2              So interTouch Holdings and its assets will remain

3    intact.  Nomadix and its assets will remain intact through

4    the closing of the foreclosure sale.

5              THE COURT:  Help me understand that.  How does

6    Nomadix and its holdings -- they remain intact but they will

7    be owned by whom?

8              MR. LEZAMA:  They will still be owned by

9    interTouch Holdings, the present parent company.

10             THE COURT:  Who will own interTouch Holdings?

11             MR. LEZAMA:  Whoever is the prevailing bidder at

12   the foreclosure sale.  This is assuming that the defendants

13   do not first pay the money that's owed and, basically, avoid

14   a sale.

15             THE COURT:  Right.  What's the likelihood of that?

16             MR. LEZAMA:  We think it's likely but --

17             THE COURT:  Percentage-wise, can you give me a

18   little more?  I will likely win the Lotto tomorrow.  What

19   are we talking about?

20             MR. LEZAMA:  So Nomadix and its related group of

21   companies have secured a contractual obligation to provide

22   over $70 million in funding, and that money is earmarked for

23   paying off the debt.  That's as much as I can say.

24             THE COURT:  Okay.  All right.  I guess -- well, is

25   there anything else you wish to add as it relates to this

1  issue?

2        MR. LEZAMA:  Sure.  I would just say that, by

3  stipulated order of the parties in the New York case, the --

4  if the foreclosure sale goes through to completion, even

5  though what's being sold is interTouch Holdings, that sale

6  will extinguish the security interests of Gate in all the

7  subsidiary collateral.  So that, basically, includes

8  Nomadix's patents.

9        So Gate will no longer -- the foreclosure sale

10  will extinguish any security interest in Nomadix's patents.

11        THE COURT:  I don't know if Mr. Warren or

12  Mr. Swope, which of you have drawn the short straw.  What's

13  your response to it?  I guess I am concerned -- well, not

14  concerned.  The language at least that's highlighted in the

15  filing by Nomadix yesterday that talks about -- seems to

16  suggest that, at the closing of the sale, for all intents

17  and purposes, once that sale is done, Gate is out.  Do you

18  have a different view?

19        MR. WARREN:  Well -- and, yes, Your Honor, I drew

20  the short straw.

21        The -- I mean, unlikely that they -- I mean it's

22  likely that they will be the high bidder.

23        THE COURT:  You think it is likely that Gate --

24  that Nomadix will be the high bidder?

25        MR. WARREN:  No.  I think Your Honor has a better

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    chance of winning the lottery than Nomadix coming up with

2    the money.

3              THE COURT:  Okay.

4              MR. WARREN:  But, you know, Gate has a $50 million

5    note.  Since they are likely to be the company that has the

6    biggest interest in purchasing these assets since they have

7    such a large note on it -- and I don't want to speak for

8    Gate, but in all likelihood what will happen will be that

9    Gate will be the high bidder just like the bank is a high

10   bidder on any other foreclosure where they have got the big

11   note.  So they'll end up owning it.

12             And I think that we're getting a little bit into

13   the metaphysical when Nomadix argues that the company will

14   still own the patents.  It won't be the company as it is

15   currently constituted.  InterTouch will be owned either by

16   Gate or by some other company --

17             THE COURT:  So what's your view?  You are right.

18   We are getting into the weeds.  I am just trying to play

19   this out because I have a feeling we'll end up at this point

20   at some point, and I would rather just, at least, start a

21   discussion about it.

22             MR. WARREN:  I mean, when we originally briefed

23   this issue, Gate was taking the position that it owned the

24   patents and Nomadix was taking the position that it owned

25   the patents.

```
 1              Now we're, sort of, in this intermediary position
 2    where -- and Judge Ostragar in New York wasn't entirely
 3    clear on this.  He started off by saying that Nomadix owned
 4    the patents, and by the end of that hearing he said, "Look.
 5    The only thing I am holding is that you guys have a valid
 6    note, and you are allowed to foreclose on it."
 7              But we have a situation where the patents are
 8    redeemable -- the collateral is redeemable by Nomadix if it
 9    comes up with the dough, which it's likely not to, and it's
10    part of the collateral that Gate is foreclosing on.
11              THE COURT:  So, then, let's play out two
12    scenarios.  One, Nomadix comes up with the money, it's their
13    patent.  That's the easier one; right?
14              MR. WARREN:  Right.
15              THE COURT:  The other scenario, Gate comes up --
16    they likely prevail at the foreclosure sale.  Okay?  Does
17    Gate own the patent at that point?  Or Gate owns interTouch
18    Holdings, which is the parent company of Nomadix; and if so,
19    does that, in essence, mean that Gate owns the patent?
20              MR. WARREN:  Yes.  So if Gate buys interTouch, it
21    owns Nomadix, and that means it owns the patents.
22              THE COURT:  And then what difference does it
23    make -- well, I will ask the question.  I think I know the
24    answer.  Would it be Gate's position -- and, obviously, I
25    will give Gate an opportunity to be heard on this -- but
```

1    would Gate say, "Okay.  We now own you, Nomadix.  We're

2    going to shut you down or get out of the way so we can

3    proceed with this lawsuit"?

4            MR. WARREN:  I think that Gate, as the owner of

5    the patents, at that point would have the right to either

6    operate the company and litigate these cases or sell the

7    company and try to collect the rest of their collateral that

8    way.

9            I don't want to speak to Gate's interests, but,

10   when we started this, we were concerned about whether 25(c)

11   really applied or not.  I think we -- to my mind, we've

12   moved past the legal into the practical at this point.

13           THE COURT:  Right.  Although there are some legal

14   implications just by -- at least paragraph 14 suggests that

15   Gate's rights get extinguished upon the foreclosure sale.

16   So I guess that may -- forgive me because I am going to add

17   another scenario.

18           Let's say somebody else comes in and they're the

19   prevailing party.  What happens then?  Is Gate out?  I mean,

20   at least, if you read this language, it suggests that Gate

21   is out of the game in that third scenario.

22           MR. WARREN:  I'm not entirely sure what Gate's

23   position would be on whether they're in or out because I'm

24   not entirely sure what the record is in New York on that

25   point.  But we believe that it is likely that Gate will end

```
 1   up owning the patents.
 2            And if either Nomadix or Gate ends up owning the
 3   patents, then we know who we're litigating against, and then
 4   we are not put in the middle of this foreclosure.
 5            THE COURT:  So getting back to the real issue from
 6   your perspective, your of the view, for lack of a better
 7   term, let's kick this can down the road another 70 days and
 8   figure out who is going to -- where we stand after the
 9   foreclosure sale.
10            MR. WARREN:  That's right, Your Honor.
11            THE COURT:  All right.  Thank you, Mr. Warren.
12            Let me hear from Mr. Koltun because I have a
13   feeling we are all going to be back here again, but I just
14   want to at least, for the sake of my slow mind, I want to
15   get my thoughts rolling on this.
16            MR. KOLTUN:  Good morning.
17            THE COURT:  I gave three scenarios.  Okay?  I
18   think we all agree, if Nomadix comes up with the money and
19   they're the prevailing party at the foreclosure sale, then
20   Nomadix, I guess, owns the patent.
21            MR. KOLTUN:  Right.  There are three scenarios at
22   the foreclosure sale.  The most likely scenario is that Gate
23   Worldwide bids its credit or some portion of its credit and
24   then owns interTouch Holdings.  Another possibility is a
25   third party comes in and outbids Gate Worldwide.
```

1            The third possibility, which to me, based on my

2    experience in these types of things seems the least likely,

3    is Nomadix comes in and redeems because, if they had that

4    ability to do that, they would have done it a long time ago.

5            THE COURT:  Right.

6            MR. KOLTUN:  It's, sort of, like a situation --

7    well, it is a situation where there is likely to be a change

8    of ownership in the company, a potential change in counsel

9    down the line.

10           You granted a stay last time of 120 days so these

11   issues over ownership and control could be resolved.  What's

12   happened in the meantime is, sort of, two things.  It

13   switched from transfer of ownership of the patents to a

14   transfer of ownership of the entire company.

15           And then the other thing that's happened is that

16   the judge in New York, Judge Ostragar, has put it on a

17   really tight schedule, like, much quicker than you would

18   normally see in cases like this.  And I don't know if it was

19   done for the purposes of this litigation or what, but he set

20   a schedule where the sale of the company is likely to take

21   place within two months.

22           So to us, to Gate Worldwide Holdings, it cries out

23   for an extension to accommodate that process that

24   Judge Ostrager set up so we can get certainty over who is

25   going to control the company and how we move forward in the

```
 1   litigation.
 2             THE COURT:  I appreciate your comments.  I want to
 3   get your thoughts as to the scenario where, let's say, a
 4   third party comes in and outbids.  What would you contend
 5   happens after that?
 6             MR. KOLTUN:  If a third party comes in -- and I
 7   don't want to bind the company to this -- but I believe, if
 8   a third party comes in and satisfies Gate Worldwide's debt
 9   or is the winning bidder, they take the company, the third
10   party.
11             THE COURT:  Including the patent?
12             MR. KOLTUN:  Yeah, because they own the company
13   which owns the patents.
14             By the way, there is another scenario.  I can't
15   put a percentage of likelihood on this, but in these kind of
16   circumstances where there is a change of control, it's
17   frequently the case that a new entity would be set up to own
18   some or all of the interest.
19             So there is a decent chance that the patents would
20   be set into a different entity and that entity could become
21   the plaintiff in the case.
22             That was suggested to me as a possibility.  I
23   don't -- like I said, I can't put a percentage of likelihood
24   on it.
25             But back to your point, if a third party comes in
```

```
 1    and buys the company and they outbid Gate Worldwide, then

 2    presumably Gate Worldwide is satisfied with that result and

 3    would not have --

 4            THE COURT:  Dealing with a whole other potential

 5    plaintiff in this case.

 6            MR. KOLTUN:  Right.  Entirely different.

 7            THE COURT:  Okay.  Thank you for your thoughts.

 8            Mr. Lezama, is there anything else you wish to say

 9    in response?  I am going to tell you -- look.  It just seems

10    to me we need to put this over to sometime in November.

11    Given that you take a different view than everyone else,

12    let's figure out who prevails, and then we can have a real

13    discussion about who is the plaintiff in this case.  But I

14    will allow you a moment to be heard.

15            MR. LEZAMA:  Sure, just a few points.

16            One, everything that we just heard is really just

17    speculation.  There is no basis for saying that Gate will be

18    the likely bidder or the New York defendants won't come up

19    with the money.  I don't think we can stay the case based on

20    speculation.

21            THE COURT:  Hold on, Mr. Lezama.  You are saying

22    it's speculation.  But -- yes, technically, it is

23    speculation.  But the reality of it is there is a

24    foreclosure sale that's been set up for your company.

25    Somebody is going to prevail at that foreclosure sale.
```

1            It may be you, it may be Gate, it could be a third

2     party.  But the point is we now know that there is a

3     likelihood -- or at least there is at least two thirds of a

4     chance that someone else other than Nomadix is going to own

5     this company after the foreclosure sale.

6            And why wouldn't I just wait to figure that out as

7     opposed to -- let's say I move forward and we start with

8     discovery and other matters and then a third party comes in.

9     And then I am going to get a bunch of paper saying "Whoa.

10    Time out.  We just got in this case.  We don't know what we

11    want to do."  I mean, why would I do that?

12           As much as I like seeing you all, wouldn't it just

13    make sense -- what's the prejudice in putting this over till

14    November until we know what's happened?  Particularly given

15    the fact that, thanks to the judge in New York, he put it on

16    a tight timeline, he's willing to take time out of his

17    vacation with his -- I think it was his daughter is getting

18    married, to deal with this so we could get some finality?

19    What's the harm in that?

20           MR. LEZAMA:  So as to the harm, we are preparing

21    for foreclosure sale, and the foreclosure sale needs to be

22    conducted on commercially reasonable terms, which means

23    terms that are designed to get fair value for the assets

24    being sold.

25           And when bidders are making a valuation of the

```
 1    assets being sold, they're going to look to this litigation,

 2    and they're going to look at our claim against Guest-Tek,

 3    which is for many millions of dollars; and this will be an

 4    important asset that the prevailing bidder will be looking

 5    at in trying to attach a value to.

 6            And the farther out trial is, the longer it will

 7    take to monetize this claim and the lower a prep and value

 8    the bidders will assign to this asset.  Likewise, the more

 9    uncertainty we have about when trial will occur, the lower

10    the present value the bidders are going to assign to this

11    claim and thus to their overall bid for interTouch Holdings.

12            THE COURT:  Flip side of that, there is

13    litigation -- no one is hiding the fact that this litigation

14    exists.  That's a known fact.  That's going to be a factor

15    in a foreclosure sale regardless of whether this gets

16    continued or not, isn't it?  I mean --

17            MR. LEZAMA:  I'm sorry.  What?

18            THE COURT:  There is a foreclosure sale that's

19    set.  Anyone that does their due diligence is going to know

20    that there is existing litigation.  I'm not sure I

21    understand what you mean when you say that delaying the case

22    might have an impact on the value of the company.  It seems

23    to me the existing litigation may have a value on the

24    company, not necessarily the dates contained within that

25    litigation.
```

```
 1              MR. LEZAMA:  Well, I think the time to trial and
 2     the time to monetization of, you know, of this claim,
 3     certainly the farther out trial is, the less -- smaller
 4     present value would be assigned to this claim.  So it will
 5     tend to depress the foreclosure sales proceeds, in our view.
 6              I guess one way to address that potential
 7     uncertainty would be to say -- would be to set a trial date
 8     for a fixed amount of time when the stay lifts, if the
 9     Court's inclined to issue a sale -- to issue a stay order.
10              The other thing I want to just point out is --
11     this is speculation.  Let's imagine a hypothetical where
12     there is no foreclosure sale, there is no litigation in
13     New York.  What we're basically saying is we should stay the
14     case because Nomadix's grandparent company might sell
15     Nomadix's parent company to some third party and that some
16     third party might decide to change the direction of
17     litigation.
18              THE COURT:  That's a vastly different hypothetical
19     than what's currently going on.  Look.  There has been
20     litigation.  There has been a decision by the Court.  There
21     is a foreclosure sale.  There are certain things that have
22     occurred and will occur going forward.
23              It's not like I am just saying -- look.  I would
24     not be inclined to kick this can down the road if I didn't
25     know there was going to be a foreclosure sale.
```

```
 1            But to the judge's credit in New York, the judge
 2   recognizes the competing interests of all the parties, says,
 3   "We need some finality.  Let's get some dates in place and
 4   move forward."  And I guess that's to your concern as to you
 5   want this trial to move forward.
 6            I think currently we have a pretrial conference
 7   scheduled for November 9th and a jury trial set for December
 8   the 4th.  Maybe you will be ready for both of those dates --
 9   I don't know.  But my proposal would be to have another
10   status conference on November 9th.  We would continue the
11   pretrial conference -- we'll continue everything another 30
12   days.  So the pretrial conference will be December the 14th,
13   and then a jury trial -- we could do February the 12th of
14   2019.  We could have those dates.  This way it gives you
15   some comfort the case is moving forward.
16            Now, I am going to give you a little hard time.  I
17   will put those dates down at your request, but then, when
18   you come -- assuming if you are the prevailing party, then
19   asks to continue the case, I am going to remind you of this
20   conversation.
21            But, again, you made that request.  So I want to
22   try to at least give you some comfort that, hey, we've got
23   dates set.  We're not going anywhere.  I am here all day.
24   So I'm ready to try the case whenever you all are.
25            MR. LEZAMA:  I appreciate that, Your Honor.
```

```
 1            THE COURT:  With that in mind, I appreciate the

 2   comments of all counsel.  Why -- I think it makes sense to

 3   continue this matter.  Let's have a status conference for

 4   November the 9th so we can figure out where we are at

 5   relative to that.

 6            We'll move the pretrial conference to -- the

 7   pretrial conference will be December -- I think I said the

 8   14th and then a jury trial date of February the 12th of

 9   2019.  So let's do that, then.  And your objection and your

10   opposition is noted for the record.

11            Is there anything else we need to discuss today?

12            Mr. Lezama?

13            MR. LEZAMA:  I don't think so, Your Honor.

14            THE COURT:  Mr. Warren?

15            MR. WARREN:  Just one thing, Your Honor.  I just

16   want to note, as the Court knows, that we are still in the

17   preliminary stages of discovery.  If in fact the sale goes

18   through, I would presume that the parties will be back

19   before the Court seeking a little more time.

20            THE COURT:  I would presume that to be the case,

21   but I know your track record, Mr. Warren, you could try a

22   case in a moment's notice -- I am giving you a hard time.

23            We'll keep these dates.  Maybe there is a

24   Hail Mary and Nomadix prevails with the sale and we move

25   forward.  But I want to give Mr. Lezama some comfort that we
```

```
 1   have got dates set.  But I will be amenable.  I think my
 2   reputation is that I am amenable to the parties moving dates
 3   if it's a reasonable request.  But we'll keep these dates
 4   for now.
 5           MR. WARREN:  Very good.  Your Honor, thank you.
 6           THE COURT:  All right.  Mr. Koltun, anything
 7   further?
 8           MR. KOLTUN:  No, thank you, Your Honor.
 9           THE COURT:  All right.  So thank you all.  I will
10   see you all on November 9th, and, hopefully, we'll get
11   closer to some finality in this matter.  Thank you all.
12           MR. LEZAMA:  Thank you, Your Honor.
13        (Proceedings concluded at 10:32 a.m.)
14                          --oOo--
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE


     I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  September 24, 2018.




                    ___/S/ CHIA MEI JUI _____

                    Chia Mei Jui, CSR No. 3287

1

2   !!FINISH FINISH!!

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. KOLTUN: [8]
3/17 10/15 10/20 11/5
12/5 12/11 13/5 19/7
MR. LEZAMA: [18]
3/7 3/10 3/12 4/6 4/20
4/23 5/7 5/10 5/15
5/19 6/1 13/14 14/19
15/16 15/25 17/24
18/12 19/11
MR. WARREN: [12]
3/14 6/18 6/24 7/3
7/21 8/13 8/19 9/3
9/21 10/9 18/14 19/4
THE CLERK: [1]  3/3
THE COURT: [37]

$
$50 [1]  7/4
$50 million [1]  7/4
$70 [1]  5/22
$70 million [1]  5/22

-
--oOo [1]  19/14

0
0404 [1]  2/6

1
10:07 [2]  1/15 3/2
10:32 [1]  19/13
120 [1]  11/10
12th of [2]  17/13 18/8
1386 [1]  2/16
14 [1]  9/14
14TH [3]  2/5 17/12
18/8
16-8033-AB [2]  1/7
3/4
1900 [1]  2/9

2
2018 [3]  1/14 3/1
20/10
2019 [2]  17/14 18/9
2040 [1]  2/4
206-332-1386 [1]  2/16
213-892-5551 [1]  2/20
216-861-7528 [1]  2/11
24 [1]  20/10
25 [1]  9/10
28 [1]  20/4

3
30 [1]  17/11
31 [2]  1/14 3/1
3200 [1]  2/10
3287 [2]  1/23 20/15
350 [1]  1/24
3600 [1]  2/15

4
4311 [1]  1/24
44114 [1]  2/10
4th [1]  17/8

5
5551 [1]  2/20

7
70 [1]  10/7
707 [1]  2/19
7528 [1]  2/11
753 [1]  20/3

9
90012 [1]  1/24
90017 [1]  2/20
92614 [1]  2/5
949-760-0404 [1]  2/6
98104 [1]  2/15
999 [1]  2/14
9TH [4]  2/9 17/7 17/10
19/10
9th so [1]  18/4

A
AB [2]  1/7 3/4
ability [1]  11/4
accommodate [1]
11/23
acquire [1]  4/25
add [2]  5/25 9/16
address [1]  16/6
after [3]  10/8 12/5
14/5
again [3]  3/12 10/13
17/21
against [2]  10/3 15/2
ago [1]  11/4
agree [1]  10/18
allow [1]  13/14
allowed [1]  8/6
Although [1]  9/13
amenable [2]  19/1
19/2
amount [2]  4/19 16/8
ANDRÉ [1]  1/3
ANGELES [4]  1/16
1/24 2/20 3/1
another [6]  9/17 10/7
10/24 12/14 17/9
17/11
answer [1]  8/24
appearances [2]  2/1
3/7
applicant [2]  2/17
3/19
applied [1]  9/11
appreciate [3]  12/2
17/25 18/1
approved [1]  4/10
argued [1]  4/9
argues [1]  7/13
asks [1]  17/19
asset [2]  15/4 15/8
assets [5]  5/2 5/3 7/6
14/23 15/1
assign [2]  15/8 15/10
assigned [1]  16/4
assuming [2]  5/12
17/18
attach [1]  15/5
AUGUST [2]  1/14 3/1

AVENUE [1]  2/14
avoid [1]  5/13

B
back [4]  10/5 10/13
12/25 18/18
BAKERHOSTETLER
[2]  2/8 2/13
bank [1]  7/9
based [2]  11/1 13/19
basically [4]  4/13 5/13
6/7 16/13
basis [1]  13/17
become [1]  12/20
before [1]  18/8
behalf [2]  3/9 3/15
believe [2]  9/25 12/7
better [2]  6/25 10/6
bid [1]  15/11
bidder [9]  4/25 5/11
6/22 6/24 7/9 7/10
12/9 13/18 15/14
bidders [3]  14/25 15/8
15/10
bids [1]  10/23
big [1]  7/10
biggest [1]  7/6
bind [1]  12/7
BIROTTE [1]  1/3
bit [1]  7/12
both [2]  3/17 17/8
BOULEVARD [1]  2/19
briefed [1]  7/22
bunch [1]  14/9
buys [1]  8/20 13/1

C
CALIFORNIA [6]  1/2
1/16 1/24 2/5 2/20 3/1
Calling [1]  3/4
cases [2]  9/6 11/18
CCRR [1]  1/23
CENTRAL [1]  1/2
certain [1]  16/21
certainly [1]  16/3
certainty [1]  11/24
CERTIFICATE [1]
20/1
certify [1]  20/3
chance [3]  7/1 12/19
14/4
change [4]  11/7 11/8
12/16 16/16
CHIA [3]  1/23 20/14
20/15
circumstances [1]
12/16
claim [5]  15/2 15/7
15/11 16/2 16/4
clear [3]  4/8 4/13 8/3
CLEVELAND [1]  2/10
closer [1]  19/11
closing [2]  5/4 6/16
cmjui.csr [1]  1/25
Code [1]  20/4
collateral [4]  6/7 8/8
8/10 9/7
colleague [2]  3/11

3/13
collect [1]  9/7
comes [12]  8/9 8/12
8/15 9/18 10/18 10/25
11/3 12/4 12/6 12/8
12/25 14/8
comfort [2]  17/15
17/22 18/25
coming [2]  7/1
comments [2]  12/2
18/2
commercially [1]
14/22
companies [1]  5/21
company [24]
competing [1]  17/2
completes [1]  4/15
completion [1]  6/4
concern [1]  17/4
concerned [2]  6/13
6/14 9/10
concluded [1]  19/13
conducted [1]  14/22
conference [8]  17/6
17/10 17/11 17/12
18/3 18/6 18/7 20/8
conformance [1]  20/7
constituted [1]  7/15
contained [1]  15/24
contend [1]  12/4
continue [4]  17/10
17/11 17/19 18/3
continued [1]  15/16
contractual [1]  5/21
control [3]  11/11
11/25 12/16
conversation [1]
17/20
correctly [1]  4/3
counsel [4]  2/1 3/6
11/8 18/2
Court's [1]  16/9
credit [3]  10/23 10/23
17/1
cries [1]  11/22
CSR [2]  1/23 20/15
currently [2]  7/15
16/19 17/6
CV [2]  1/7 3/4

D
date [3]  16/7 18/8
20/10
dates [10]  15/24 17/3
17/8 17/14 17/17
17/23 18/23 19/1 19/2
19/3
daughter [1]  14/17
day [1]  17/23
days [3]  10/7 11/10
17/12
deal [1]  14/18
Dealing [1]  13/4
debt [2]  5/23 12/8
December [1]  17/7
17/12 18/7
decent [1]  12/19
decide [1]  16/16

decision [1]  16/20
DEFENDANT [3]  1/9
2/7 2/12
defendants [2]  5/12
13/18
delaying [1]  15/21
depress [1]  16/5
designed [1]  14/23
difference [1]  8/22
different [5]  6/18
12/20 13/6 13/11
16/18
diligence [1]  15/19
direction [1]  16/16
discovery [2]  14/8
18/17
discuss [1]  18/11
discussion [2]  7/21
13/13
DISTRICT [3]  1/1 1/2
1/3
DIVISION [1]  1/2
dollars [1]  15/3
dough [1]  8/9
down [5]  9/2 10/7
11/9 16/24 17/17
drawn [1]  6/12
drew [1]  6/19
due [1]  15/19

E
earmarked [1]  5/22
easier [1]  8/13
EAST [1]  2/9
either [2]  7/15 9/5
10/2
end [4]  7/11 7/19 8/4
9/25
ends [1]  10/2
ENTERTAINMENT [2]
1/8 3/5
entire [1]  11/14
entirely [4]  8/2 9/22
9/24 13/6
entitled [1]  20/6
entity [3]  12/17 12/20
12/20
essence [1]  8/19
even [3]  4/3 4/15 6/4
existing [2]  15/20
15/23
exists [1]  15/14
experience [1]  11/2
extension [1]  11/23
extinguish [2]  6/6
6/10
extinguished [1]  9/15

F
fact [4]  14/15 15/13
15/14 18/17
factor [1]  15/14
fair [1]  14/23
farther [2]  15/6 16/3
FCRR [1]  1/23
February [2]  17/13
18/8
FEDERAL [1]  1/23

**F**

feeling [2]  7/19 10/13
few [1]  13/15
figure [5]  4/19 10/8
13/12 14/6 18/4
filed [1]  3/23
filing [1]  6/15
finality [3]  14/18 17/3
19/11
FINISH [2]  21/2 21/2
first [2]  1/24 5/13
fixed [1]  16/8
Flip [1]  15/12
FLOOR [1]  2/5
FOERSTER [2]  2/18
3/18
foreclose [1]  8/6
foreclosing [1]  8/10
foreclosure [27]
foregoing [1]  20/4
forgive [1]  9/16
format [1]  20/7
forward [8]  3/6 11/25
14/7 16/22 17/4 17/5
17/15 18/25
frequently [1]  12/17
FRIDAY [2]  1/14 3/1
funding [1]  5/22
further [1]  19/7

**G**

game [1]  9/21
GATE [34]
Gate's [4]  8/24 9/9
9/15 9/22
Gates [1]  4/10
gave [1]  10/17
gets [1]  15/15
getting [4]  7/12 7/18
10/5 14/17
give [5]  5/17 8/25
17/16 17/22 18/25
given [2]  13/11 14/14
gives [1]  17/14
giving [1]  18/22
gmail.com [1]  1/25
goes [4]  4/19 4/21 6/4
18/17
good [6]  3/10 3/14
3/17 3/20 10/16 19/5
grandparent [1]  16/14
granted [1]  11/10
Greg [1]  3/18
GREGORY [1]  2/19
group [1]  5/20
guess [8]  3/23 4/1
5/24 6/13 9/16 10/20
16/6 17/4
GUEST [4]  1/8 3/5
3/15 15/2
GUEST-TEK [4]  1/8
3/5 3/15 15/2
guys [1]  8/5

**H**

Hail [1]  18/24
Hail Mary [1]  18/24
happen [2]  4/17 7/8

happened [4]  3/25
11/12 11/15 14/14
happening [1]  3/21
happens [2]  9/19 12/5
hard [2]  17/16 18/22
harm [2]  14/19 14/20
he's [1]  14/16
hear [2]  4/1 10/12
heard [3]  8/25 13/14
13/16
hearing [1]  8/4
held [1]  20/6
Help [1]  5/5
hereby [1]  20/3
hey [1]  17/22
hiding [1]  15/13
high [4]  6/22 6/24 7/9
7/9
highlighted [1]  6/14
Hold [1]  13/21
holding [1]  8/5
holdings [12]  2/17
3/19 5/1 5/2 5/6 5/9
5/10 6/5 8/18 10/24
11/22 15/11
HONORABLE [1]  1/3
hopefully [1]  19/10
hypothetical [2]  16/11
16/18

**I**

imagine [1]  16/11
impact [1]  15/22
implications [1]  9/14
important [1]  15/4
INC [2]  1/5 3/4
inclined [2]  16/9
16/24
includes [1]  6/9
including [2]  3/23
12/11
intact [3]  5/3 5/3 5/6
intents [1]  6/16
INTERACTIVE [2]  1/8
3/5
interest [4]  4/12 6/10
7/6 12/18
interests [3]  6/6 9/9
17/2
intermediary [1]  8/1
interTouch [10]  5/1
5/2 5/9 5/10 6/5 7/15
8/17 8/20 10/24 15/11
interTouch Holdings
[2]  5/1 5/9
intervenor [2]  2/17
3/19
IRVINE [1]  2/5
issue [5]  6/1 7/23 10/5
16/9 16/9
issues [1]  11/11

**J**

JAMES [3]  2/4 3/11
3/13
JR [1]  1/3
judge [7]  1/3 8/2
11/16 11/16 11/24

14/15 17/1
Judge Ostragar [2]
8/2 11/16
Judge Ostrager [1]
11/24
judge's [1]  17/1
Judicial [1]  20/8
JUI [3]  1/23 20/14
20/15

**K**

keep [2]  18/23 19/3
kick [2]  10/7 16/24
kind [1]  12/15
KNOBBE [2]  2/3 3/8
known [1]  15/14
knows [1]  18/16
KOLTUN [4]  2/19 3/18
10/12 19/6

**L**

lack [1]  10/6
language [2]  6/14
9/20
large [1]  7/7
last [3]  3/22 3/22
11/10
LAW [5]  2/3 2/4 2/9
2/14 2/19
lawsuit [1]  9/3
least [9]  6/14 7/20
9/14 9/20 10/14 11/2
14/3 14/3 17/22
legal [2]  9/12 9/13
less [1]  16/3
Let [1]  10/12
LEZAMA [7]  2/3 3/8
4/1 13/8 13/21 18/12
18/25
lifts [1]  16/8
like [8]  4/2 7/9 11/6
11/17 11/18 12/23
14/12 16/23
likelihood [5]  5/15 7/8
12/15 12/23 14/3
likely [13]  5/16 5/18
6/22 6/23 7/5 8/9 8/16
9/25 10/22 11/2 11/7
11/20 13/18
Likewise [1]  15/8
line [1]  11/9
litigate [1]  9/6
litigating [1]  10/3
litigation [11]  11/19
12/1 15/11 15/13 15/13
15/20 15/23 15/25
16/12 16/17 16/20
little [4]  5/18 7/12
17/16 18/19
LLC [1]  4/11
LLP [1]  2/18
long [1]  11/4
longer [2]  6/9 15/6
look [6]  8/4 13/9 15/1
15/2 16/19 16/23
looking [1]  15/4
LOS [1]  1/16 1/24 2/20
3/1

lot [1]  3/21
lottery [1]  7/1
Lotto [1]  5/18
lower [2]  15/7 15/9
LTD [2]  1/8 3/5

**M**

made [2]  4/13 17/21
MAIN [1]  2/4
make [2]  8/23 14/13
makes [1]  18/2
making [1]  14/25
many [1]  15/3
MARK [2]  2/3 3/8
married [1]  14/18
MARTENS [2]  2/3 3/8
Mary [1]  18/24
matter [3]  18/3 19/11
20/6
matters [1]  14/8
Maybe [2]  17/8 18/23
mean [8]  6/21 6/21
7/22 8/19 9/19 14/11
15/16 15/21
means [2]  8/21 14/22
meantime [1]  11/12
MEI [3]  1/23 20/14
20/15
membership [1]  4/11
metaphysical [1]  7/13
MICHAEL [2]  2/14
3/16
middle [1]  10/4
might [3]  15/22 16/14
16/16
million [2]  5/22 7/4
millions [1]  15/3
mind [4]  4/16 9/11
10/14 18/1
moment [1]  13/14
moment's [1]  18/22
monetization [1]  16/2
monetize [1]  15/7
money [9]  4/19 4/21
4/23 5/13 5/22 7/2
8/12 10/18 13/19
months [1]  11/21
more [3]  5/18 15/8
18/19
morning [5]  3/10 3/14
3/17 3/20 10/16
MORRISON [2]  2/18
3/18
most [1]  10/22
move [6]  11/25 14/7
17/4 17/5 18/6 18/24
moved [1]  9/12
moving [2]  17/15 19/2
Mr. Koltun [2]  10/12
19/6
Mr. Lezama [5]  4/1
13/8 13/21 18/12
18/25
Mr. Swope [1]  6/12
Mr. Warren [4]  6/11
10/11 18/14 18/21
much [3]  5/23 11/17
14/12

**N**

necessarily [1]  15/24
need [3]  13/10 17/3
18/11
needs [1]  14/21
new [11]  3/25 4/13 6/3
8/2 9/24 11/16 12/17
13/18 14/15 16/13
17/1
New York [10]  3/25
4/13 6/3 8/2 9/24
11/16 13/18 14/15
16/13 17/1
NOMADIX [29]
Nomadix's [5]  4/12
6/8 6/10 16/14 16/15
normally [1]  11/18
note [5]  7/5 7/7 7/11
8/6 18/16
noted [1]  18/10
notice [1]  18/22
November [6]  13/10
14/14 17/7 17/10 18/4
19/10
November 9th [3]
17/7 17/10 19/10

**O**

objection [1]  18/9
obligation [1]  5/21
obviously [1]  8/24
occur [2]  15/9 16/22
occurred [1]  16/22
occurs [2]  4/18 4/18
off [2]  5/23 8/3
OFFICIAL [1]  1/23
OHIO [1]  2/10
once [1]  6/17
one [6]  8/12 8/13
13/16 15/13 16/6
18/15
only [3]  4/4 4/11 8/5
oOo [1]  19/14
operate [1]  9/6
opportunity [1]  8/25
opposed [1]  14/7
opposition [1]  18/10
order [2]  6/3 16/9
ordered [1]  4/11
originally [1]  7/22
Ostragar [2]  8/2 11/16
Ostrager [1]  11/24
out [19]  4/16 4/17
6/17 7/19 8/11 9/2
9/19 9/21 9/23 10/8
11/22 13/12 14/6
14/10 14/16 15/6 16/3
16/10 18/4
outbid [1]  13/1
outbids [2]  10/25 12/4
outline [1]  4/2
outset [1]  4/9
over [6]  3/22 5/22
11/11 11/24 13/10
14/13
overall [1]  15/11
owed [1]  5/13
own [7]  5/10 7/14 8/17

**O**

own... **[4]** 9/1 12/12 12/17 14/4
owned **[6]** 5/7 5/8 7/15 7/23 7/24 8/3
owner **[2]** 4/15 9/4
ownership **[4]** 11/8 11/11 11/13 11/14
owning **[3]** 7/11 10/1 10/2
owns **[9]** 4/8 4/14 8/17 8/19 8/21 8/21 10/20 10/24 12/13

**P**

page **[1]** 20/7
paper **[1]** 14/9
paragraph **[1]** 9/14
paragraph 14 **[1]** 9/14
parent **[5]** 4/12 5/1 5/9 8/18 16/15
part **[1]** 8/10
Particularly **[1]** 14/14
parties **[4]** 6/3 17/2 18/18 19/2
party **[13]** 9/19 10/19 10/25 12/4 12/6 12/8 12/10 12/25 14/2 14/8 16/15 16/16 17/18
past **[1]** 9/12
patent **[6]** 4/5 8/13 8/17 8/19 10/20 12/11
patents **[16]** 4/8 4/14 6/8 6/10 7/14 7/24 7/25 8/4 8/7 8/21 9/5 10/1 10/3 11/13 12/13 12/19
path **[1]** 4/9
pay **[1]** 5/13
paying **[1]** 5/23
percentage **[3]** 5/17 12/15 12/23
Percentage-wise **[1]** 5/17
perspective **[1]** 10/6
pick **[1]** 4/19
place **[2]** 11/21 17/3
plaintiff **[6]** 1/6 2/2 3/9 12/21 13/5 13/13
play **[4]** 4/16 4/17 7/18 8/11
please **[1]** 3/6
point **[9]** 7/19 7/20 8/17 9/5 9/12 9/25 12/25 14/2 16/10
points **[1]** 13/15
portion **[1]** 10/23
position **[7]** 3/24 4/6 7/23 7/24 8/1 8/24 9/23
possibility **[3]** 10/24 11/1 12/22
potential **[2]** 11/8 13/4 16/6
practical **[1]** 9/12
prejudice **[1]** 14/13
preliminary **[1]** 18/17
prep **[1]** 15/7

preparing **[1]** 14/20
present **[1]** 5/9 15/10 16/4
presumably **[1]** 13/2
presume **[2]** 18/18 18/20
pretrial **[5]** 17/6 17/11 17/12 18/6 18/7
prevail **[2]** 8/16 13/25
prevailing **[6]** 4/24 5/11 9/19 10/19 15/4 17/18
prevails **[2]** 13/12 18/24
proceed **[1]** 9/3
proceedings **[3]** 1/13 19/13 20/6
proceeds **[1]** 16/5
process **[1]** 11/23
proposal **[1]** 17/9
provide **[1]** 5/21
purchasing **[1]** 7/6
purposes **[2]** 6/17 11/19
pursuant **[1]** 20/3
putting **[1]** 14/13

**Q**

question **[1]** 8/23
quicker **[1]** 11/17

**R**

rather **[1]** 7/20
read **[1]** 9/20
ready **[2]** 17/8 17/24
real **[2]** 10/5 13/12
reality **[1]** 13/23
really **[3]** 9/11 11/17 13/16
reasonable **[2]** 14/22 19/3
recognizes **[1]** 17/2
record **[3]** 9/24 18/10 18/21
redeemable **[2]** 8/8 8/8
redeems **[1]** 11/3
regardless **[1]** 15/15
regulations **[1]** 20/8
related **[1]** 5/20
relates **[1]** 5/25
relative **[1]** 18/5
relinquish **[1]** 4/4
remain **[4]** 4/14 5/2 5/3 5/6
remind **[1]** 17/19
reported **[1]** 20/5
REPORTER **[1]** 1/23
REPORTER'S **[1]** 1/13
reputation **[1]** 19/2
request **[3]** 17/17 17/21 19/3
resolved **[1]** 11/11
respect **[1]** 3/25
response **[2]** 6/13 13/9
rest **[1]** 9/7
result **[1]** 13/2

right **[14]** 5/15 5/24 7/17 8/13 8/14 9/5 9/13 10/10 10/11 10/21 11/5 13/6 19/6 19/9
rights **[2]** 4/5 9/15
road **[2]** 10/7 16/24
rolling **[1]** 10/15
ROOM **[1]** 1/24
run **[1]** 4/23

**S**

sake **[1]** 10/14
sale **[33]**
sales **[1]** 16/5
satisfied **[1]** 13/2
satisfies **[1]** 12/8
saying **[6]** 8/3 13/17 13/21 14/9 16/13 16/23
scenario **[6]** 8/15 9/17 9/21 10/22 12/3 12/14
scenarios **[3]** 8/12 10/17 10/21
schedule **[2]** 11/17 11/20
scheduled **[1]** 17/7
SEATTLE **[1]** 2/15
Section **[1]** 20/3
secured **[1]** 5/21
security **[2]** 6/6 6/10
see **[2]** 11/18 19/10
seeing **[1]** 14/12
seeking **[1]** 18/19
seems **[4]** 6/15 11/2 13/9 15/22
sell **[2]** 9/6 16/14
sense **[2]** 14/13 18/2
September **[1]** 20/10
set **[10]** 11/19 11/24 12/17 12/20 13/24 15/19 16/7 17/7 17/23 19/1
short **[2]** 6/12 6/20
shut **[1]** 9/2
side **[1]** 15/12
since **[4]** 3/22 4/8 7/5 7/6
situation **[3]** 8/7 11/6 11/7
slow **[1]** 10/14
smaller **[1]** 16/3
SMITH **[3]** 2/4 3/11 3/13
sold **[4]** 4/19 6/5 14/24 15/1
somebody **[2]** 9/18 13/25
someone **[1]** 14/4
sometime **[1]** 13/10
sorry **[1]** 15/7
sort **[5]** 8/1 11/6 11/12 sought **[1]** 4/10
sounds **[1]** 4/2
speak **[2]** 7/7 9/9
speculation **[5]** 13/17 13/20 13/22 13/23 16/11

stages **[1]** 18/17
stand **[1]** 10/8
start **[2]** 7/20 14/7
started **[2]** 8/3 9/10
state **[1]** 3/6
statement **[1]** 3/24
STATES **[3]** 1/1 20/4 20/8
status **[2]** 17/10 18/3
stay **[5]** 11/10 13/19 16/8 16/9 16/13
stenographically **[1]** 20/5
step **[1]** 3/6
stipulated **[1]** 6/3
straw **[2]** 6/12 6/20
STREET **[3]** 1/24 2/4 2/9
subsidiary **[1]** 6/7
substance **[1]** 4/5
such **[1]** 7/7
suggest **[1]** 6/16
suggested **[1]** 12/22
suggests **[2]** 9/14 9/20
SUITE **[2]** 2/10 2/15
sum **[1]** 4/5
sure **[5]** 6/2 9/22 9/24 13/15 15/20
switched **[1]** 11/13
SWOPE **[3]** 2/14 3/16 6/12

**T**

take **[8]** 4/10 4/11 4/22 11/20 12/9 13/11 14/16 15/7
taking **[2]** 7/23 7/24
talking **[1]** 5/19
talks **[1]** 6/15
technically **[1]** 13/22
TEK **[4]** 1/8 3/5 3/15 15/2
tend **[1]** 16/5
term **[1]** 10/7
terms **[2]** 14/22 14/23
thank **[7]** 10/11 13/7 19/5 19/8 19/9 19/11 19/12
thanks **[1]** 14/15
they -- I **[1]** 6/21
thing **[4]** 8/5 11/15 16/10 18/15
things **[3]** 11/2 11/12 16/21
think **[16]** 5/16 6/23 6/25 7/12 8/23 9/4 9/11 10/18 13/19 14/17 16/11 17/6 18/2 18/7 18/13 19/1
third **[3]** 2/14 9/21 10/25 11/1 12/4 12/6 12/8 12/9 12/25 14/1 14/8 16/15 16/16 16/4
thirds **[1]** 14/3
THOMAS **[1]** 2/9
though **[1]** 6/5
thoughts **[3]** 10/15

12/3 13/7
three **[2]** 10/17 10/21
thus **[1]** 15/11
tight **[2]** 11/17 14/16
till **[1]** 14/13
timeline **[1]** 14/16
Title **[1]** 20/4
today **[1]** 18/11
together **[1]** 3/22
Tom **[1]** 3/15
tomorrow **[1]** 5/18
track **[1]** 18/21
transcript **[3]** 1/13 20/5 20/7
transfer **[3]** 4/11 11/13 11/14
trial **[9]** 15/6 15/9 16/1 16/3 16/7 17/5 17/7 17/13 18/8
true **[1]** 20/4
try **[4]** 9/7 17/22 17/24 18/21
trying **[2]** 7/18 15/5
two **[4]** 8/11 11/12 11/21 14/3
two thirds **[1]** 14/3
types **[1]** 11/2

**U**

uncertainty **[2]** 15/9 16/7
understand **[3]** 4/3 3/5 15/21
UNITED **[3]** 1/1 20/4 20/8
units **[1]** 4/12
unlikely **[1]** 6/21
until **[1]** 14/14
up **[13]** 7/1 7/11 7/19 8/9 8/12 8/15 10/1 10/2 10/18 11/24 12/17 13/18 13/24
upon **[1]** 9/15
us **[1]** 11/22

**V**

vacation **[1]** 14/17
valid **[1]** 8/5
valuation **[1]** 14/25
value **[7]** 14/23 15/5 15/7 15/10 15/22 15/23 16/4
vastly **[1]** 16/18
versus **[1]** 3/5
view **[5]** 6/18 7/17 10/6 13/11 16/5
views **[1]** 4/2

**W**

wait **[1]** 14/6
WARREN **[6]** 2/9 3/15 6/11 10/11 18/14 18/21
WASHINGTON **[1]** 2/15
weeds **[1]** 7/18
WEST **[1]** 1/24
WESTERN **[1]** 1/2

**W**

**Whoa [1]** 14/9
**whole [1]** 13/4
**why [3]** 14/6 14/11
18/2
**Why -- I [1]** 18/2
**willing [1]** 14/16
**WILSHIRE [1]** 2/19
**win [1]** 5/18
**winning [2]** 7/1 12/9
**wise [1]** 5/17
**wish [2]** 5/25 13/8
**WORLDWIDE [7]** 2/17
3/19 10/23 10/25
11/22 13/1 13/2
**Worldwide's [1]** 12/8

**Y**

**yesterday [2]** 3/23
6/15
**York [10]** 3/25 4/13
6/3 8/2 9/24 11/16
13/18 14/15 16/13
17/1
**Your Honor [8]** 4/7
6/19 6/25 10/10 17/25
18/13 18/15 19/8

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------- ------------------------------------------------------x

GATE WORLDWIDE HOLDINGS LLC,    :

      :    Index No.: 650026/2018

              Plaintiff,    :    (ECF)

      :

        - against -      :    **MEMORANDUM OF LAW IN**

      :    **SUPPORT OF MOTION TO**

INTERTOUCH HOLDINGS LLC;     :    **CONFIRM SALE OF**

ST HOLDINGS LLC;     :    **INTERTOUCH HOLDINGS LLC**

INTERTOUCH TOPCO LLC; and     :

NOMADIX, INC.     :

      :

             Defendants.   :

------------- ------------------------------------------------------x

      Plaintiff Gate Worldwide Holdings LLC ("GWH"), by its attorneys, Robinson & Cole

LLP, hereby submits this motion to confirm and approve the sale of interTouch Holdings LLC

("interTouch") to GWH for the credit bid in the amount of Ten Million Dollars ($10,000,000).

## I.   PRELIMINARY STATEMENT

      In an effort to partially satisfy GWH's over Fifty Million Dollar ($50,000,000) Judgment

against the Defendants interTouch, interTouch Topco LLC, and Nomadix, Inc., the Parties

entered into a Stipulation and Order (the "Public Sale Order"), governing the public sale (the

"Public Sale") of the membership interest units of Defendant and Judgment Debtor interTouch

owned by Defendant and Judgment Debtor interTouch Topco LLC (the "Subject Collateral").

Specifically, the Public Sale Order outlined an agreed to timeline to retain a qualified broker, to

publish notice of the sale, to conduct the Public Sale, and to obtain this Court's approval of the

Public Sale. The Public Sale Order was "so ordered" by this Court on August 27, 2018.

      To date, the Parties have complied with the Public Sale Order. This included the

retention of a qualified broker, posting a notice of sale in the Wall Street Journal, contacting over

one thousand (1,000) potential bidders, and otherwise abiding by the agreed to timeline.

18582998

However, after diligent efforts by the qualified broker, there were no written offers (or any expressed interest) from any potential bidders other than the Opening Credit Bid in the amount of Ten Million Dollars ($10,000,000) by GWH.  Accordingly, and as explained in more detail below, this motion seeks final approval of the sale of the Subject Collateral to GWH for the Opening Credit Bid.

## II.   FACTUAL BACKGROUND

GWH commenced an action on January 3, 2018 against Defendants interTouch, ST Holdings LLC ("ST"), interTouch Topco LLC ("Topco"), and Nomadix, Inc. ("Nomadix" and collectively with interTouch, ST, and Topco, "Defendants") by filing its Summons and Complaint.  The Complaint alleged that interTouch defaulted on a Note Purchase Agreement by failing to repay the debt upon the maturity date of the Promissory Note, and that ST, Topco, and Nomadix each defaulted on their individual guaranties of interTouch's obligations.  On March 12, 2018, GWH moved for summary judgment arguing that it was entitled to judgment as a matter of law on each count of its Complaint.  On June 25, 2018, the Court entered a Decision and Order granting GWH's Motion for Summary Judgment to the extent provided in the decision on the record on June 20, 2018.  *See* Decision and Order (Doc. 85), Affirmation of Ian Clarke-Fisher ("Clarke-Fisher Aff."), Ex. 1.  On June 29, 2018, the Clerk entered a Judgment against interTouch, Topco, and Nomadix, jointly and severally, for a total amount of $49,658,725.62 (the "Judgment").  *See* Judgment (Doc. 91), Clarke-Fisher Aff., Ex. 2.

Topco's guaranty was secured by a Membership Interest Pledge Agreement, dated September 29, 2015 (the "Topco Pledge").  *See* Clarke-Fisher Aff., Ex. 3.  Pursuant to Section 2 of the Topco Pledge, Topco granted "a first priority ... security interest in all of [Topco's] right, title and interest in and to the Collateral, as collateral security for the prompt and complete

2

payment and performance when due … of the [o]bligations [defined in the Topco Guaranty]." *See id*. The Subject Collateral is that portion of collateral that is secured by the Topco Pledge and more particularly defined as "the membership interest units of [interTouch] owned by [Topco], as such amount may be adjusted from time to time by [interTouch], pursuant to splits, together with all certificates, options, or rights of any nature whatsoever that may be issued or granted in such membership interest units by [interTouch] to [Topco] while this Agreement is in effect." *See id*. Pursuant to the Judgment and Section 7(b) of the Topco Pledge, GWH has the right to sell or otherwise dispose of and deliver the Subject Collateral in a public sale.

As Defendants had not paid the Judgment, on July 17, 2018, GWH sought an order to sell the Subject Collateral to partially satisfy the Judgment. *See* Motion for Entry (Doc. 94). On August 27, 2018, according to the Court proceeding on August 9, 2018, the Parties entered into the Public Sale Order, governing the proceedings relating to the Public Sale of Subject Collateral, which was "so ordered" by the Court. *See* Public Sale Order (Doc. 123), Clarke-Fisher Aff., Ex. 4. The Public Sale Order required, among other actions, that (i) the Parties retain a qualified broker within 10 days, (ii) the Broker would publish a notice of public sale within 10 days of retention, (iii) the Opening Credit Bid would be $10,000,000, and (iv) the Public Sale would be held within 30 days of the publication of the notice of public sale. *Id*.

Following the entering of Public Sale Order, counsel for the Parties began the process of retaining a qualified broker. This included interviews with a couple of potential brokers, including Traxi LLC ("Traxi"). During the interviews and subsequent submissions by Traxi, Traxi confirmed that it is well versed in judicial sales, including dozens of 363 sales in bankruptcy court, and has handled a number of sales for companies in the technology sector.

3

After the interviews, the Parties were between the retention of either Traxi or FTI Consulting, Inc. Accordingly, the Parties sought the Court's guidance on which qualified broker to retain. Following submissions to the Court, on September 12, 2018, the Court ordered that Traxi would act as the qualified broker for the sale. *See* Order (Doc. 124), Clarke-Fisher Aff., Ex. 5. On that same day, Traxi was retained to and acted as the qualified broker in furtherance of the Public Sale Order. *See* Affidavit of Anthony J. Pacchia ("Pacchia Affidavit"), ¶ 3.

Immediately following retention, Traxi began working with the Parties to prepare the Notice of Public Sale, Sale Teaser, Participation Requirements/Bid Procedures, and Confidentiality Agreement. *See id.*, ¶¶ 5-6. On September 21, 2018, following interTouch's counsel's input and agreement on the language of the Notice of Public Sale, Traxi published a Notice of Sale in the Wall Street Journal. *See id.*, ¶ 8; and Clarke-Fisher Aff., Ex. 6. In addition, following interTouch's counsel's input and agreement on the language of the Sale Teaser, Participation Requirements/Bid Procedures, and standard Confidentiality Agreement, Traxi sent a solicitation email to over one thousand (1,000) potential bidders between September 26, 2018 and October 8, 2018. *See* Pacchia Affidavit, ¶¶ 9, 12. These potential bidders included contacts known to Traxi, contacts that had expressed interest to GWH's counsel, and targeted contacts purchased from Dun & Bradstreet. *See id.*, ¶ 10. In fact, Traxi asked Defendants' in-house counsel to provide any contacts interTouch would like Traxi to reach out to; however, no contacts were provided. *See id.*, ¶ 11.

As part of the sale process, interTouch created a data room to house relevant information relating to the Subject Collateral. In order for potential bidders to access the data room, potential bidders were required to sign a non-disclosure agreement. *See id.*, ¶¶ 15-16. Working in combination with Defendants, including their General Counsel Kelly Hughes, a number of

interested parties pursued the possibility of bidding for the Subject Collateral, including entering into non-disclosure agreements to gain access to the Data Room. *See id.*, ¶¶ 17-18. Pursuant to the Participation Requirements/Bid Procedures, any potential bidder must have provided a written offer by October 15, 2018. *See id.*, ¶ 7.

By the close of business on October 15, 2018, Traxi had received *no offers* from any potential bidders other than the Initial Opening Bid in the amount of Ten Million Dollars ($10,000,000) by a credit bid by GWH. *See id.*, ¶ 19. Indeed, as of the date of this motion, there have been *no offers* other than the Initial Opening Bid in the amount of Ten Million Dollars ($10,000,000) by a credit bid by GWH. *See id.*, ¶ 21. There being no qualified bidders other than GWH, pursuant to the Public Sale Order, Traxi designated GWH as the Successful Bid for the Subject Collateral for the credit bid in the amount of Ten Million Dollars ($10,000,000). *See id.*, ¶ 22.

On October 16, 2018 at 1:25 a.m. (EST), Defendants' General Counsel sent GWH an email requesting wiring instruction to pay GWH "the outstanding loan balance and expenses." *See* E-mail, Clarke-Fisher Aff., Ex. 7. Following this correspondence, Defendants outside counsel, Mark LeRoux followed up by stating that GWH should not "worry about calculating any balances" and should "[j]ust provide wire transfer instructions." *See* E-mail, Clarke-Fisher Aff., Ex. 8. On the morning of October 16, GWH provided its wire information to Defendants' counsel. To date, however, no payment has been made on the Judgement, nor has any been scheduled.

## III. ARGUMENT

GWH respectfully requests that the Court proceed with confirming the sale of the Subject Collateral to GWH for the credit bid of $10,000,000 without further delay.

5

Pursuant to New York U.C.C. § 9-610, "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." Article 9 of the New York U.C.C. does not dictate how or when the secured party must dispose of its collateral other than to mandate that "every aspect of the disposition, including the method, manner, time, place and other terms, must be commercially reasonable". U.C.C. § 9-610(b). According to New York U.C.C. § 9-627(b), "[a] disposition of collateral is made in a commercially reasonable manner if the disposition is made: (1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." "New York courts have determined commercial reasonableness by whether the secured party acted in good faith and to the parties' mutual best advantage." *Coxall v. Clover Commercial Corp.*, 4 Misc.3d 654, 781 N.Y.S.2d 567 (N.Y. City Civ. Ct., 2004). Additionally, pursuant to CPLR Article 52, the Court has broad discretion to control and regulate enforcement of money judgment procedures. *See* CPLR § 5240.

Here, there can be no dispute that Traxi conducted the sale of interTouch in a commercially reasonable manner and in full compliance with the Public Sale Order, which was agreed to by the Parties and confirmed by this Court. Traxi did not receive a single complaint from any of the Defendants or anyone else about the sale process. In fact, Traxi complied with all requests made by Defendants and their counsel. *See* Pacchia Affidavit, ¶¶ 23-25. Moreover, Court conferences were scheduled for October 2 and October 12 to address any Party concerns that needed to be raised to the Court and, in both instances, the Parties agreed that the conferences should be adjourned as there were no issues that needed to be addressed by the

Court.

Accordingly, because the Parties fully complied with the commercially reasonable stipulated and "so ordered" terms and procedures governing the Public Sale, the Court should confirm the sale of interTouch to GWH for the credit bid in the amount of Ten Million Dollars ($10,000,000) without further delay.[1]

## IV.   CONCLUSION

WHEREFORE, GWH respectfully requests that this Court grant its Motion confirming the sale of the Subject Collateral in accordance with the Proposed Order, a copy of which is attached hereto as **Exhibit A**.


Dated: New York, New York
       October 30, 2018

PLAINTIFF,
GATE WORLDWIDE HOLDINGS LLC


BY:   */s/Joseph L. Clasen*
      Joseph L. Clasen
      Ian T. Clarke-Fisher
      ROBINSON & COLE LLP
      666 Third Avenue
      New York, New York 10017
      Phone:  (212) 451-2900
      E-mail:  jclasen@rc.com
      E-mail:  iclarke-fisher@rc.com
      *Its Attorneys*

---

[1] If granted, GWH's Judgment would then be reduced by Ten Million Dollars ($10,000,000). This reduction, however, would be without prejudice to GWH's claims for any additional interest or other fees and without prejudice to GWH's claims for judgment against defendant ST Holdings LLC, as provided for in the Court's Decision and Order, dated June 22, 2018 (Doc. 85).

7

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------- x
                                              :

GATE WORLDWIDE HOLDINGS LLC

                 :  Index No. 650026/2018

             Plaintiff,

                 :  **AFFIDAVIT OF**
              -against-          **ANTHONY J. PACCHIA**

                 :

INTERTOUCH HOLDINGS LLC;
ST HOLDINGS LLC; INTERTOUCH TOPCO LLC;   :
AND NOMADIX, INC.

              Defendants.        :

------------------------------------------------------------------- x

State of New Jersey      )
                      )    ss.
County of Union         )

Anthony J. Pacchia, being duly sworn, deposes and says as follows:

1.     I am the Founder and Chief Executive Officer of Traxi, LLC ("Traxi"). I have over 30 years of experience working as a restructuring professional in the banking, legal and investment communities.

2.     Unless otherwise stated, I have personal knowledge of the facts set forth herein, and if called as a witness, could testify competently to those facts based upon that knowledge.

3.     On September 12, 2018, Traxi was retained by Gate Worldwide Holdings LLC ("GWH") to act as the broker to assist with the sale of the membership interest units of interTouch Holdings LLC ("interTouch Holdings") owned by interTouch Topco LLC (the "Subject Collateral").

4.     The sale of the Subject Collateral was governed by the terms provided in the Stipulation and Order for the Public Sale of Subject Collateral (the "Public Sale Order").

5.      On September 12, 2018, Traxi contacted Kelly Hughes, in-house counsel for the operating subsidiaries of interTouch Holdings and provided Mr. Hughes with a comprehensive information request on the Subject Collateral to begin the sale process.

6.      Thereafter, Traxi, with the assistance of Mr. Hughes and interTouch's outside counsel, Marc LeRoux of Tonkon Torp LLP, prepared drafts of the Notice of Public Sale, Sale Teaser, Participation Requirements/Bid Procedures, and Confidentiality Agreement.

7.      The agreed upon Participation Requirements/Bid Procedures required that any potential bidder must have provided a written offer by October 15, 2018.  A true and accurate copy of the Participation Requirements/Bid Procedures is attached as **Exhibit A.**

8.      Following interTouch's counsel's agreement on the language of the Notice of Public Sale, the notice was published in the Wall Street Journal on Friday, September 21, 2018.

9.      In addition, following interTouch's counsel's agreement on the language of the Sale Teaser, Participation Requirements/Bid Procedures, and standard Confidentiality Agreement, Traxi sent a solicitation email to over One Thousand (1,000) potential bidders.

10.      The recipients of this email included contacts previously known to Traxi, contacts who had expressed interest in the Subject Collateral to GWH's counsel, and targeted contacts purchased from Dun & Bradstreet who may be interested in the Subject Collateral.

11.      Traxi requested that Mr. Hughes provide a list of any contacts that interTouch Holdings would like Traxi to contact; however, despite several requests, Mr. Hughes never provided any contacts.

12.      The solicitation emails were sent between September 26, 2018 and October 8, 2018.

13.     The body of the targeted solicitation email read as follows:

Pursuant to a Court Order entered August 27, 2018 by the Supreme Court of the State of New York, County Of New York by J.S.C Barry R. Ostrager, in the matter of *Gate Worldwide Holdings LLC v Intertouch Holdings LLC; ST Holdings LLC; Intertouch Topco LLC; and Nomadix, Inc,* Traxi, LLC has been engaged to conduct a court ordered public sale of 100% of the membership interest units of interTouch Holdings LLC ("Subject Collateral") owned by interTouch Topco LLC. The companies are recognized leaders in providing broadband and networking solutions for the hospitality and healthcare industries.

We have attached a Teaser containing some basic information, as well as a copy of the Bid Procedures outlining the specifics of our sales process for your review.  Bids are due October 15, 2018.

If you are interested in obtaining more information regarding this opportunity, please sign and return the attached Confidentiality Agreement. Please feel free to call us with any questions.

14.     The email also included the Sale Teaser, a true and accurate copy of which is attached as **Exhibit B**, the Participation Requirements/Bid Procedures, and the Confidentiality Agreement.

15.     As part of the sale process, interTouch Holdings prepared and controlled a digital Data Room to house information regarding interTouch Holdings and its subsidiaries.

16.     In order for potential bidders to access the Data Room, potential bidders were required to enter into a strict Confidentiality Agreement, which was established by interTouch Holdings.

17.     During the sale process, a number of interested parties entered into Confidentiality Agreements, allowing them access to the Data Room.

18.     Upon information and belief, Mr. Hughes and others associated with interTouch Holdings worked with the interested parties in providing information and answering questions about the Subject Collateral.

3

19.     As of the close of business on October 15, 2018, Traxi received no written offers, or any expression of interest,  from any potential bidders, other than the Initial Opening Bid in the amount of Ten Million Dollars ($10,000,000.00) by a credit bid by GWH.

20.     On October 15, 2018 at 5:38 pm (EST), I received an email from Mr. Hughes inquiring if Traxi had received any bids and stating that, given the bid deadline, interTouch Holdings was interested in terminating access to the Data Room for those who did not submit a bid.

21.     On October 15, 2018 at 5:51 pm (EST), I advised Mr. Hughes that, other than GWH's credit bid, Traxi had not received any bids.  A true and accurate copy of this email is attached as **Exhibit C**.

22.     As of the date of this affidavit, there were no written offers, or any expression of interest, other than the Initial Opening Bid in the amount of Ten Million Dollars ($10,000,000.00) by a credit bid by GWH.

23.     Accordingly, there being no qualified bidders other than GWH, pursuant to the Public Sale Order, Traxi has designated GWH as the Successful Bid for the Subject Collateral for the credit bid in the amount of Ten Million Dollars ($10,000,000.00).

24.     Traxi never received any complaints from Mr. Hughes, Mr. LaRoux or anyone else associated with interTouch Holdings about the sale process.

25.     I am not aware of any request made by Mr. Hughes, Mr. LaRoux, or anyone else associated with interTouch Holdings that was not fully complied with by Traxi.

26.     Traxi regularly included Mr. Hughes and Mr. LaRoux on the sale process, including incorporating their comments on the Notice of Public Sale, Sale Teaser, Participation Requirements/Bid Procedures, and using their Confidentiality Agreement.

27.     Based on my over 30 years of experience, Traxi took all commercially reasonable

actions to proceed with the sale of the Subject Collateral pursuant to the terms of the Public Sale

Order.

ANTHONY J. PACCHIA

Executed before me this
25 date of October, 2018

Notary Public

**SHARON M FISCHER**
**NOTARY PUBLIC OF NEW JERSEY**
**MY COMMISSION EXPIRES OCT 9, 2023**

5

# EXHIBIT D

**Brazil, Nancy**

| | |
|---|---|
| **From:** | Mark.Lezama <Mark.Lezama@knobbe.com> |
| **Sent:** | Friday, November 2, 2018 5:34 PM |
| **To:** | Swope, Michael |
| **Cc:** | Nomadix.Guest-Tek; Guest-TekCA |
| **Subject:** | RE: Nomadix v. GuestTek |

Mike,

I have passed on Guest-Tek and Gate's request to Nomadix. I expect to have an update for you by the end of Monday.

Before the last status conference, Guest-Tek offered to dismiss its lawsuit against Exceptional Innovation in Ohio in exchange for Nomadix's agreement on various points, including staying the California case. In the same vein of that proposal, would Guest-Tek be willing to dismiss or meaningfully stay the Ohio and Delaware actions in exchange for Nomadix's agreement to the proposal set forth in your e-mail below? Please note that I'm simply exploring possibilities here off the cuff in an effort to expedite discussions while I wait for input from my client. Neither Nomadix nor Exceptional Innovation has approved or even suggested this, so please don't bring this up with the court in any of the cases as something Nomadix or Exceptional Innovation offered or as evidence that Nomadix or Exceptional Innovation is willing to stay, wouldn't be prejudiced by a delay, etc.

Best regards,

Mark

**Mark Lezama**
Partner
mark.lezama@knobbe.com

949-721-5362 **Direct**

Knobbe Martens
2040 Main St., 14th Fl.
Irvine, CA 92614
www.knobbe.com/mark-lezama

---

**From:** Swope, Michael <MSwope@bakerlaw.com>
**Sent:** Friday, November 2, 2018 10:11 AM
**To:** Mark.Lezama <Mark.Lezama@knobbe.com>
**Cc:** Nomadix.Guest-Tek <Nomadix.Guest-Tek@knobbe.com>; Guest-TekCA <Guest-TekCA@bakerlaw.com>
**Subject:** Nomadix v. GuestTek

Mark,

I'm following up on the voice mail that I left for you on Tuesday, October 30, 2018 regarding the November 9 status conference. As I noted in my voice mail, in view of the hearing in NY regarding the transfer of assets from Intertouch Holdings to Gate Worldwide Holdings (GWH) on November 28, GuestTek and GWH will ask the court to extend the stay until after the November 28 hearing.

I requested on the voice mail a response from you via email or telephone regarding Nomdix's position on the stay.  Both GuestTek and GWH think that it makes sense to reschedule the November 9 hearing.  I realize that there was an intervening holiday (Halloween) since I left my v-mail, but I would appreciate it if you could give us an answer today.

Specifically, does Nomadix agree to postpone the November 9 status conference?  We think that it makes sense to use the pre-trial conference date that is already calendared on December 14 as the new date but are open to suggestions.

Also, please let us know whether Nomadix will agree to join with GuestTek and GWH in requesting to extend the stay or whether Nomadix will oppose.

Best regards,
Mike


**Michael J. Swope**
Partner

BakerHostetler

999 Third Avenue | Suite 3600
Seattle, WA 98104-4040
T +1.206.332.1386
M +1.206.313.0143

mswope@bakerlaw.com
bakerlaw.com



This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content
of this email is limited to the matters specifically addressed herein
and may not contain a full description of all relevant facts or a
complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.


NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.